# EXHIBIT 1

Adams   v. Festival Fun Parks

1/20/2012                                                   Andrew  Adams

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT


_____          :
                                 :
ANDREW ADAMS,                    : Case No.: 3:11 cv 00427(JCH)
                                 :
          Plaintiff,             :
                                 :
                                 :
   -vs-                          :
                                 :
FESTIVAL FUN PARKS, LLC, d/b/a   :
LAKE COMPOUNCE THEME PARK,       :
                                 :
          Defendant.             :
                                 :
_____          :


DEPOSITION OF:  ANDREW ADAMS
DATE:  JANUARY 20, 2012
TIME:  10:00 a.m.
HELD AT:  HINCKLEY, ALLEN, SNYDER
          20 CHURCH STREET
          HARTFORD, CT 06103


BRANDON SMITH REPORTING SERVICES, LLC
Reporter:  Liza Manafort, LSR# 464


44 Capitol Avenue            6 Landmark Square
Hartford, CT 06106           4th Floor
(860) 549-1850               Stamford, CT 06901
(800) 852-4589               (203) 316-8591
                             (800)852-4589

Page 2

APPEARANCES


FOR THE PLAINTIFF, ANDREW ADAMS:

SABATINI AND ASSOCIATES, LLC
ONE MARKET SQUARE
NEWINGTON, CT 06111
(860) 667-0839

BY:  JAMES SABATINI, ESQ.



FOR THE DEFENDANT, FESTIVAL FUN PARKS, LLC, D/B/A LAKE
COMPOUNCE THEME PARK:

FISHER & PHILLIPS, LLP
RADNOR FINANCIAL CENTER
201 KING OF PRUSSIA ROAD, SUITE 650
(610) 230-2150
RADNOR, PA 19087

BY:  RISA B. BOERNER, ESQ.

Adams   v. Festival Fun Parks

Andrew  Adams

                                                    Page 12

1    to finish?

2        A    We got hired just for four days in September.

3        Q    So you worked just for four days in 1996 for Lake

4    Compounce?

5        A    Right.

6        Q    I see.  When did you return to Lake Compounce

7    again?

8        A    Back in '97, full-time, like for the summer.

9        Q    How long was that season?  You were employed

10   seasonally in 1997?

11       A    Yes, I was.

12       Q    How long was that season?

13       A    From the month of May, up to the end of September.

14       Q    And what position did you have in 1996 and 1997 at

15   Lake Compounce?

16       A    I was a ride attendant.  And then I turned 18, and

17   then I became a ride operator.

18       Q    And when did you become a ride operator, what year

19   was that?

20       A    '97, on my birthday.

21       Q    Did you continue to hold seasonal employment with

22   Lake Compounce after that?

23       A    Like for the whole year of '97?

24       Q    After your seasonal employment ended in 1997, did

25   you go back to Lake Compounce in 1998?

Adams  v. Festival Fun Parks

Andrew  Adams

Page 13

1      A     Yes, I did.

2      Q     And again in 1999?

3      A     Yes.

4      Q     Was there a break at all between then and 2009,

5   when you weren't working for Lake Compounce seasonally?

6      A     I believe 2003 I took a little break, and then

7   went back in '05.

8      Q     And when was it that you stopped working

9   seasonally, and started working full-time for Lake

10  Compounce?

11     A     With benefits and all of that?

12     Q     Yes.

13     A     That started in May 2008, right on Memorial Day

14  weekend.

15     Q     How long were you a ride operator for Lake

16  Compounce, as a seasonal employee?

17     A     It had to be about five years.

18     Q     So from 1997 to 2002?

19     A     Yeah.

20     Q     And then what was your position with Lake

21  Compounce?

22     A     I became a ride trainer.

23     Q     So in 2002 you became a ride trainer?

24     A     Yes.

25     Q     And then how long were you a ride trainer for Lake

Adams   v. Festival Fun Parks

Page 14

1    Compounce?

2        A    Two years.

3        Q    So 2002 to 2004, on a seasonal basis?

4        A    Yes.

5        Q    And then in 2004 what position did you hold?

6        A    They made me assistant ride supervisor.  They call

7    it coach, but I call it supervisor.

8        Q    And just going back to the last question about

9    being a ride trainer, you were a ride trainer in 2002.  And

10   than I believe you testified that you took a break in 2003?

11       A    Yes.

12       Q    So in 2003 you didn't work for Lake Compounce at

13   all?

14       A    I worked, but I took a break in the middle of the

15   summer.  So by the middle of August I left for a while.

16       Q    Why did you leave?

17       A    I was having some problems with management at the

18   time.

19       Q    What type of problems?

20       A    Being accused of not picking up vomit on a ride,

21   when I called for help and no one came.  And I got written

22   up for that, and I thought it wasn't fair.

23       Q    And so what did you do?

24       A    I just left.  I told them I'm leaving.

25       Q    You quit?

Adams   v. Festival Fun Parks

1/20/2012                                          Andrew  Adams

                                                        Page 15

1        A     Yes.

2        Q     Did you submit a written letter of resignation?

3        A     No, I did not.

4        Q     You just verbally quit?

5        A     Yes.

6        Q     Or orally?

7        A     Well, I said I wasn't going to sign the written

8    document, and they said I had to.  So I did.  And that's

9    when I quit.

10       Q     You signed the write-up?

11       A     Yes, I did.

12       Q     And then you quit?

13       A     Yes.

14       Q     I think you were saying that you were promoted to

15   assistant ride coach in 2004?

16       A     Yes.

17       Q     Is that the same position that you held until you

18   left in 2009, or did your position change again?

19       A     It changed again.

20       Q     When did it change?

21       A     The beginning of 2007.  I was a housekeeping

22   supervisor.

23       Q     And how long did you hold that position with Lake

24   Compounce?

25       A     It was until the end of the season, end of

Adams   v. Festival Fun Parks

Page 16

1  October 31st, 2007.

2      Q     And then what about 2008, what position did you

3  hold then?

4      A     That's when I went in to work for the ride

5  mechanics shop at the park.

6      Q     And what position did you have?

7      A     They call them mechanic helper.

8      Q     Did your position change again, before you left in

9  2009?

10     A     No.

11     Q     What were your responsibilities as a mechanic

12 helper?

13     A     Washing parts for the rides; you know, in the off

14 season they all get taken apart.  Helping the other

15 mechanics with like taking things apart, they had me clean

16 the shop up, and helping out in the paint department when it

17 was needed, and helping out doing ride stuff out in the

18 park, like helping them fix the roller coaster or

19 retracking.

20     Q     While you held that position, did you ever help in

21 other departments?

22     A     No.

23     Q     Who did you primarily work with in that position,

24 as a mechanic helper?

25     A     I worked with everyone.  So do you want a special

Adams   v. Festival Fun Parks

Page 17

1   person?

2        Q    I just want to know who you worked with?

3        A    I worked with Wayne Olsen, Bill Cook, Joe, Kyle,

4   sometimes John Fitch, my boss, Danny Pratt, Chris Reeves,

5   Joey Felco, sometimes Lou, I don't know his last name. I'm

6   sorry.

7        Q    That's okay.

8        A    Jim Stevens, the painter at the park, and Richard,

9   they call him Booch, and I don't know how to spell the last

10  name, and those are it.

11       Q    Who was your supervisor, when you were a mechanic

12  helper?

13       A    John Fitch.

14       Q    Did you have any other supervisors?

15       A    The main supervisor was Mario Abela.

16       Q    Anyone else?

17       A    No, those are the only two supervisors.

18       Q    What were your work hours?

19       A    They varied.  Normally from 6:00 in the morning

20  until 3:30 in the afternoon.  Or if the park was open from

21  6:00 in the morning, until sometimes 10:30, eleven o'clock

22  at night.

23       Q    What was your salary at that time, when you left?

24       A    $10.77, I believe.

25       Q    Per hour?

Adams   v. Festival Fun Parks

1/20/2012                                                    Andrew  Adams

Page 20

1      A    Yes.

2      Q    Even while you weren't working at Lake Compounce?

3      A    Yes.

4      Q    Why did you look to come back to Lake Compounce,

5  after you left in 2003?

6      A    Well, the theme park thing, it's in my blood, it's

7  what I like to do.  And I figured maybe things had changed,

8  if I went back.  And I talked to the boss there to see if I

9  could come back, and he said sure.

10     Q    Did you fill out an application for a position

11 there?

12     A    No.  They took me back, because they had one on

13 file.

14     Q    Who did you contact about obtaining employment

15 again at Lake Compounce?

16     A    Eric Dezik.

17     Q    How do you spell that, do you know?

18     A    I don't.

19     Q    What was his role at the park?

20     A    He was the director of operations.

21     Q    And what did he say when you approached him?

22     A    He says I have to talk to the general manager, and

23 make sure it's okay with him, and they'll give you a call.

24     Q    And who was the GM?

25     A    Tom Wages.

Adams   v. Festival Fun Parks

1/20/2012                                                Andrew   Adams

                                                             Page 21

1        Q      Did you speak to anybody else about coming back to

2   Lake Compounce at that point?

3        A      No.

4        Q      You didn't speak to anyone, other than Eric Dezik,

5   about coming back?

6        A      Correct.

7        Q      Were you rehired?

8        A      Yes, I was.

9        Q      And who was your supervisor when you came back?

10       A      Brian Nass.

11       Q      And you didn't have to interview, to come back to

12  that position?

13       A      No.  They just brought me in real quick and told

14  me the new rules, and the safety class that I had to take,

15  and that was it.

16       Q      When you were rehired by Lake Compounce, do you

17  believe that they knew anything about your mental disability

18  that you claim that you have in this lawsuit?

19       A      Yes.

20       Q      Why do you believe that?

21       A      Because I've told my bosses, and I have it written

22  on my application for them when I first applied to there.

23       Q      And what did you say to your bosses about it?

24       A      I told them that I took special ed classes,

25  because I have a hard time with remembering a lot of things,

Adams   v. Festival Fun Parks

Page 24

1     Q     That was full-time from the start?

2     A     Yes.

3     Q     That was May of 2008, you said?

4     A     Yes.

5     Q     You asked to have full-time employment, and they

6   offered you this full-time position as a mechanic helper,

7   and you accepted it?

8     A     Yes.

9     Q     And that was in May of 2008?

10    A     Yes.

11    Q     Who was your supervisor when you became a mechanic

12  helper?

13    A     John Fitch.

14    Q     And who was the GM at the time?

15    A     Jerry Brick.

16    Q     And do you believe that Jerry knew about your

17  claim of mental disability, at the time that he offered you

18  the full-time position?

19    A     Yes.

20    Q     And what about John Fitch?

21    A     Yes, he did.

22    Q     And what makes you think they knew about it?

23    A     Because I talked to both of them about it.

24    Q     And what had you said to both of them about it?

25    A     I told them I'm willing to learn, but it takes me

Adams v. Festival Fun Parks

1/20/2012

Andrew Adams

Page 25

1  time, I can't be like the rest of the guys that can do the

2  job real quick, I have to think about what to do before I

3  jump in there and do it.  And they said don't worry about

4  it, we'll teach you.

5       Q    I had asked you previously about your work

6  experience.  I just want to show you a document that I had

7  premarked as Exhibit 1.  It's an exhibit, it's your resume.

8  Just let me know when you've had a chance to look at it.

9  Ready?

10      A    Yes.  Sorry.

11      Q    That's okay.  When did you prepare this resume?

12      A    That was back when we had to fill out the seasonal

13  management questionnaire, to become a supervisor at the

14  park.  I don't remember what year it was.

15      Q    Do you have any recollection of a time frame, what

16  position, maybe, that you held at the time?

17      A    No, I don't remember.  I'm sorry.

18      Q    Okay.  So you said you prepared this when you were

19  filling out a seasonal management questionnaire, to become a

20  supervisor at the park.

21           So was that the purpose, was it to become a

22  supervisor at the park?  Is that why you filled it out?

23      A    It was asked to.  In the questionnaire, we had to

24  fill in -- they wanted a resume, so I filled one out.

25      Q    Were you applying for a position at the time?

Adams   v. Festival Fun Parks

Andrew  Adams

Page 38

1    directly that Justin said to you, or did to you?

2        A    He never really saw anything done.  It's after the

3    fact of things.

4        Q    What about Booch, did he ever see or hear anything

5    directly that Justin did to you?

6        A    No, just when I went and complained to him about

7    it.  But Jim Stevens saw -- when Mr. Walters threw the apple

8    at my truck, he saw the apple smashed all over my truck.

9        Q    Did he actually see Mr. Walters throwing the

10   apple, or he just saw it afterwards?

11       A    He saw it afterwards what happened, when he was

12   walking over to the shop.

13       Q    Okay.  So he didn't see Justin Walters throw the

14   apple?

15       A    No.  That was Jordan, Justin at time when they

16   were outside.  Jordan was with him at the time when he threw

17   the apple.

18       Q    Do you know Jordan's last name?

19       A    No, I don't.  I'm sorry.

20       Q    Jordan was with Justin when he threw the apple?

21       A    Yes, he was.

22       Q    Did you see it?

23       A    Yes, I was right outside when he did it.  I was

24   coming out of my truck, to go to the back of my truck to get

25   one of my ride parts, and I heard a bang.  And that's when I

Adams   v. Festival Fun Parks

1/20/2012                                                    Andrew   Adams

Page 39

1    saw the apple on my truck.

2         Q    I'll ask you a little bit more about that.  But

3    first I want to finish asking you a few questions.  You said

4    that you also spoke to Wayne Olsen about testifying for you?

5         A    Yes.

6         Q    And what would you have Wayne Olsen testify about?

7         A    Stuff that he saw, that Justin did to me.

8         Q    Like what?

9         A    How he was calling me names outside, when we were

10   working together taking rides apart, how he would throw

11   things from in the shop from one side of the shop to where I

12   was.

13        Q    Anything else?

14        A    Not that I can think of right now.

15        Q    And did Wayne Olsen actually see Justin calling

16   you names?

17        A    Yeah, because he was with me outside.

18        Q    On how many occasions?

19        A    Every couple -- well, every couple of days,

20   whenever we were working together outside.

21        Q    Okay.  And what kinds of names?

22        A    Stupid, you know, like what are you doing, you

23   know, what the heck is the matter with you.

24        Q    Okay.  And did Wayne see Justin throw things from

25   one side of the shop to where you were?

Adams   v. Festival Fun Parks

1/20/2012                                        Andrew  Adams

Page 40

1        A     Yeah, because he was in the shop with me.  Because

2    Wayne would be like, whoa, what was that.  And that's when I

3    showed him.

4        Q     And what was it is that you showed him?

5        A     Washers, nuts, bolts, they call these things -- I

6    call them hockey pucks; they're circle pieces that go onto a

7    ride.  I guess the right word for them is shock per -- I

8    can't pronounce the names.  They're used on rides and

9    they're rubber, and he used to throw those at me.

10       Q     How often?

11       A     He only did it one time, because he thought he was

12   trying to be funny.

13       Q     So only one time that Justin threw something at

14   you?

15       A     Yeah.

16       Q     Is there anything else that Wayne Olsen would

17   testify to, other than what you already testified about and

18   talked about?

19       A     No.

20       Q     What would you have Joe testify about?

21       A     Joe was with me outside the day we were at Boulder

22   Dash, when Justin made the comment about being on my knees,

23   and so was Tommy J.; I don't know his last name.  I call him

24   Tommy J., because I can't pronounce the last name, and he

25   was there, too, when Justin made that comment.

Adams   v. Festival Fun Parks

1/20/2012                                          Andrew  Adams

Page 42

```
 1      A    No, not that I know of.

 2      Q    And what would you have Bill Cook testify to?

 3      A    Basically the same thing I said, about how I went

 4  to him complaining that, you know, this is what Justin said

 5  to me about being on my knees, and constantly picking on me

 6  at work, and that I couldn't take it no more.

 7      Q    Did Bill Cook ever witness or hear anything that

 8  Justin said or did to you?

 9      A    No, because he wasn't really with us too much.

10      Q    And then the last name that you mentioned is Kyle.

11  How would you have him testify for you?

12      A    Kyle was with us at Boulder Dash also, when Justin

13  made that remark about me.

14      Q    Which remark was that?

15      A    Being on my knees.

16      Q    Is there anything else that you'd have Kyle

17  testify about?

18      A    No, that was the only time that Kyle was there.

19      Q    Okay.  Did you generally enjoy working at Lake

20  Compounce?

21      A    Yes, I did, up to that point.

22      Q    Until what point?

23      A    Being picked on and bullied every day.

24      Q    When did that start?

25      A    It started when I first went in the maintenance
```

Adams   v. Festival Fun Parks

1/20/2012                                          Andrew  Adams

Page 57

1   believe.

2              ATTORNEY BOERNER:  Off the record.

3

4              (Off the record at 11:31 a.m. for 8 seconds.)

5

6   Q    (By Attorney Boerner) So I premarked this document as

7   Defendant's Exhibit 10.  It's titled "Andy's log of things

8   that happened at Lake Compounce Theme Park."

9              Do you recognize this document?

10       A    Yes, I do.

11       Q    And what is it?

12       A    It's a log I started when I was having problems at

13   the park.  I wrote down things that was happening to me.

14       Q    When did you start preparing this log?

15       A    Well, it was back in 2009, when I just couldn't

16   take it no more, and I wanted to keep a record of what was

17   going on when I went to my bosses to complain about Justin

18   Walters and nothing was getting done.  So I decided to keep

19   a log going.

20       Q    I'm sorry, when did you say that you started

21   keeping the log, in terms of the date?

22       A    Back in 2008, when I started to write things down.

23       Q    This document starts with an incident in February

24   of 2009.  Were you keeping a log prior to that?

25       A    No.

Adams   v. Festival Fun Parks

1/20/2012                                                    Andrew  Adams

Page 58

1      Q    So does that refresh your memory?  Did you
2   actually start in February of 2009 keeping this log?
3      A    Yes.  That's when I started writing about the
4   first incident that happened with me.
5      Q    And how did you report what was happening?
6      A    When I went home from work, I sat down on the
7   computer and typed it out to the best of my knowledge and
8   the spelling.
9      Q    Did you ever revise it after you initially would
10  type out what happened?
11     A    No.  I can't do spell check, I don't know the
12  right spelling of certain things.
13     Q    Did you ever go back to something that you had
14  previously written, and change it in any way?
15     A    No.
16     Q    So the words that are on this page are exactly as
17  you wrote them the first time that you typed them out?
18     A    Yes.
19     Q    Did you tell anyone that you were maintaining this
20  log?
21     A    No.
22     Q    What is it that you recorded in your log?
23     A    Well, the first incident that Justin Walters did
24  to me about being on your knees; that was the first thing
25  that I started with.

Adams   v. Festival Fun Parks

1/20/2012                                            Andrew  Adams

Page 59

1       Q    And what was the purpose of the log?

2       A    Because I figured, you know, keep it written down,

3    in case I ever did have to testify against that, so they can

4    have proof.

5       Q    Did you have an attorney at that time?

6       A    When I worked at the park?

7       Q    No, when you started keeping this log in February

8    of 2009?

9       A    I had -- yeah, I had it all typed out before I had

10   met with an attorney, yeah.

11      Q    Had you hired an attorney, or talked to an

12   attorney when you started keeping this log?

13      A    I went to a first attorney, but he didn't do

14   nothing for me.  That's when I went to look for a new

15   attorney.

16      Q    I'm asking you in February of 2009, when you

17   started keeping this log, did you have an attorney advising

18   you?

19      A    No.  Because I didn't have an attorney at that

20   time.

21      Q    Okay.  Had you consulted with an attorney prior to

22   that time?

23      A    No.  It was after I left the park in October of

24   '09.

25      Q    That's when you first sought out an attorney?

Adams   v. Festival Fun Parks

1/20/2012                                                        Andrew  Adams

                                                              Page 60

1        A     Yeah.

2        Q     Okay.  So in terms of keeping this log, getting

3    back to this, did you ever show this log to anyone prior to

4    this litigation?

5        A     Just my mother.

6        Q     Just your mother?

7        A     And my aunt.  That's the only two people.

8        Q     You never showed it to anyone at Lake Compounce?

9        A     No.

10       Q     You never showed it to a manager or director, or

11   supervisor at Lake Compounce?

12       A     No.  No.

13       Q     Did this log just relate to incidents involving

14   Justin Walters?

15       A     Yes.

16       Q     Okay.  Did you ever change or revise anything in

17   this log at any point, after you first wrote it in the log?

18       A     No.

19       Q     And do you still have it on your home computer?

20       A     Yes.

21       Q     Did you ever make a complaint about Justin Walters

22   to any manager, or director at Lake Compounce?

23       A     Yes, I did.

24       Q     When?

25       A     When they were happening.  I went to my first

Page 61

1    boss, John Fitch.

2        Q    And when was that?

3        A    It started in 2008.

4        Q    Okay.  So when in 2008 did you first go to John

5    Fitch?

6        A    I can't remember the months.  But I only remember

7    it was around 2008 is when I made my first complaint.

8        Q    What did you complain about at that point?

9        A    That I told Mr. Fitch that, you know, Justin keeps

10   harassing me and picking on me, and bullying me.

11            And that's when Mr. Fitch said I told you before

12   we hired you that, working in the shop, you're going to deal

13   with being picked on and harassed, and I don't want you

14   coming to me and complaining to me every day.

15       Q    Did you say anything specific that Justin had

16   done?

17       A    I told him about the incident with the apple.

18       Q    And this was in 2008?

19       A    Yes.

20       Q    Do you remember when the incident with the apple

21   occurred?

22       A    About September 2009, it was in the off-season.

23       Q    So you didn't tell John Fitch about the apple in

24   2008, because it didn't happen until 2009?

25       A    Correct.

Adams   v. Festival Fun Parks

1/20/2012                                              Andrew  Adams

Page 62

1      Q    In 2008, when you spoke with John Fitch, were

2   there any specific incidents that you described?

3      A    No.  Basically the same thing.

4      Q    I'm sorry?

5      A    Just the same thing that I said before, being

6   picked on and bullied by him.

7      Q    You said that you were picked on and bullied?

8      A    Yes.

9      Q    All right.  Did you ever use the words "sexual

10   harassment" at that point?

11      A    No, not to Mr. Fitch I didn't.

12      Q    Okay.  When was the next time that you complained

13   about any conduct, to any of your managers or supervisors,

14   or directors?

15      A    Well, the next one was Mario Abela.

16      Q    When was that?

17      A    That was in 2009, when things started getting

18   really bad.

19      Q    So you didn't make any other comments in 2008,

20   other than the one to John Fitch?

21      A    Yes, that's correct.

22      Q    And when was that one in 2008?

23      A    What month?

24      Q    Yes.

25      A    It was like probably, I want to say June.

Adams  v. Festival Fun Parks

1/20/2012                                                     Andrew  Adams

Page 63

1          ATTORNEY SABATINI:  Are you guessing, or are you

2     giving an estimate on that?

3          THE WITNESS:  I'd have to say probably an

4     estimate.

5          ATTORNEY SABATINI:  Okay.

6          ATTORNEY BOERNER:  So what's the difference?

7          ATTORNEY SABATINI:  Between, what, a guess and

8     estimate?

9    Q    (By Attorney Boerner) I mean, how sure are you about

10   June?  Would you say it definitely happened in June, or just

11   in the summer?  Can you say what season with certainty?

12        A    Well, it was in the summertime, I don't know what

13   month.

14        Q    So you're certain it was in the summer, you just

15   don't know what month?

16        A    Yes.

17        Q    So the next time that you went and complained to a

18   manager or director, you said was 2009?

19        A    Yes.

20        Q    With Mario Abela?

21        A    Yes.

22        Q    Do you remember when in 2009?

23        A    Was in the summertime when I went to his office.

24        Q    About a year after you had spoken to John Fitch?

25        A    That's correct.

Adams   v. Festival Fun Parks

1/20/2012                                          Andrew  Adams

Page 64

1      Q    What was it that you discussed with the Mario

2  Abela at that time?

3      A    I told Mario basically that he constantly picks on

4  me and bullies me every day, and was putting his stuff in my

5  work area so I can't get into my toolbox.

6           And Mario basically said to me, you know, just try

7  to get along with him, he likes you and he's trying to have

8  fun with you.  And I felt that was unnecessary.

9      Q    You thought what was unnecessary?

10     A    Being treated that way, and to try to get along

11  with him when he's trying to be this way towards me.

12     Q    Did you respond to Mario when he said that?

13     A    Yeah.  That's when I told Mario I don't think this

14  is fair.

15     Q    What did Mario say?

16     A    Well, he said basically he's trying to be your

17  friend.  It's not like you go home with him every night, so

18  try to work with him.

19     Q    Did you have any further discussion with Mario at

20  that point?

21     A    No.  That was my last statement with Mario.

22     Q    Did you make any other complaints to any manager

23  or director of Lake Compounce?

24     A    I went to a girl, her name is Brynn Goldbeck, I

25  want to say, and she was the safety director of the park.

Adams   v. Festival Fun Parks

1/20/2012                                                    Andrew  Adams

Page 68

1        (A recess was taken from 11:46 a.m. to 11:56 a.m.)

2

3   Q    (By Attorney Boerner) Who wrote this letter?

4        A    I did.

5        Q    Okay.  And I'm talking about the letter that's

6   been marked as Defendant's Exhibit 7.  Why did you write it?

7        A    This letter had to be written for my last

8   paycheck.  I was told by Mario Abela that corporate wanted

9   to know what was wrong and why I was leaving the company.

10            And he said that you have to write a letter to the

11  corporation, or you won't receive your last paycheck.  So I

12  did.

13       Q    So did he say why corporate wanted this?

14       A    No.  There was no explanation why.  He just said

15  they wanted a letter from you explaining what happened.

16       Q    How did corporate know that something happened?

17       A    Well, Jerry Brick, the general manager, called

18  them and told them I was leaving the company, said that I

19  resigned.

20            Which I didn't provide them with resignation.  I

21  verbally told Jerry Brick if I can't be moved into a another

22  department, I'm going to have to look for another job.  So

23  he called up Palace and told them.

24       Q    Do you know about anything else that he told them?

25       A    No, not that I know of.  That was all I know.  But

Brandon Smith Reporting & Video

860-549-1850    production@brandonreporting.com   249 Pearl Street

Adams   v. Festival Fun Parks

1/20/2012                                                    Andrew  Adams

Page 81

1        Q     There were no other times that they egged you into

2    making a statement that you were uncomfortable with?

3        A     No.

4        Q     Tell me how your employment with Lake Compounce

5    ended?

6        A     Well, my last day working there was October 31st.

7        Q     Okay.  Why was that your last day?

8        A     That was the day that Mario Abela gave me for my

9    last day working there.  He wanted me to finish out the

10   season.

11       Q     Did you ever tell anyone at Lake Compounce that

12   you were resigning?

13       A     I told a couple of people that I was looking for

14   another job.

15       Q     Who did you tell?

16       A     I told Rich Booch that I was looking for

17   employment somewhere else, Jim Stevens, the painter.  And

18   then Jerry Brick, the general manager, I told him I was

19   putting applications in.  And that's all I've told.

20       Q     Did you ever tell anyone that you found another

21   job?

22       A     No.  I was just going for job interviews, but did

23   not get hired.

24       Q     Did you tell anybody that you found employment

25   with Coca-Cola?

Adams   v. Festival Fun Parks

Page 83

```
 1      Q    When you said that you spoke to these people about
 2   applying for other positions, when did you talk to them
 3   about that?
 4      A    It was mostly the month of September-ish, about
 5   the middle of September.
 6      Q    And why did you tell them you were looking for
 7   another job?
 8      A    I just said I'm having a hard time working here,
 9   and dealing with being picked on every day, and being
10   bullied by Justin.  I just had enough.
11      Q    Did you say that to Jerry Brick?
12      A    Yes, I did.
13      Q    When did you say that to him?
14      A    It was October-ish that I had spoken to him, and
15   asked him to go into a different department.
16      Q    Was this before or after your final day was
17   scheduled?
18      A    No, this was before my final day.
19      Q    Was it before that final day was scheduled?
20      A    Yes.
21      Q    When, in October, was it?
22      A    That they scheduled my last day?
23      Q    No, I'm sorry.  When, in October, was it that you
24   asked to go to a different department?
25      A    It had to be, I want to say, the first week of
```

Adams   v. Festival Fun Parks

Page 84

1    October.

2         Q     Okay.  And what did Jerry Brick say?

3         A     He told me there's no other positions available,

4    he says, you know, there's nothing else for you, unless you

5    work in the maintenance shop.

6         Q     Did you ask to go to any specific other

7    department, or any department?

8         A     I asked to go in the paint department.

9         Q     When Jerry said there were no other positions, you

10   mean he said there were no open positions in the paint

11   department?

12        A     Correct.

13        Q     Had you seen any positions in the paint department

14   posted anywhere?

15        A     No, but I got a call from Jim Stevens telling me

16   what just happened, that they took people from the main shop

17   and sent them over to help him out prepping stuff and

18   sanding stuff, and stuff like that, to get ready for him to

19   paint.

20        Q     How many full-time employees were there in the

21   paint shop at the time?

22        A     There was only two.

23        Q     Who were they?

24        A     Jim Stevens and -- what was his name?  Richie, but

25   I don't know his last name.

Adams   v. Festival Fun Parks

1/20/2012                                          Andrew  Adams

Page 85

1       Q     Was anybody else employed in the paint department,

2   that you knew of at that time?

3       A     No.

4       Q     Did you have any experience painting?

5       A     Yes.

6       Q     What experience did you have?

7       A     When I worked with Bill Finkelstein, at the

8   carousel museum.

9       Q     And what experience did you get there painting?

10      A     Taught me how to sand, prep, how to prime pieces.

11      Q     What kind of pieces?

12      A     Carousel horses, sorry.  And taught me how to gold

13   leaf and how to paint horseshoes.

14      Q     And how frequently did you do painting in that

15   position, before you asked Jerry Brick for a position in the

16   painting department?

17      A     When I was working at the museum, I was about 11

18   years old.  So it was a while.

19      Q     He taught you when you were 11?

20      A     Yeah.

21      Q     Did you have any other painting experience?

22      A     No.

23      Q     Do you know anything about Jim Stevens' experience

24   painting, before he started at Lake Compounce?

25      A     He was in charge of -- what's that paint store

Adams   v. Festival Fun Parks

1/20/2012                                          Andrew  Adams

Page 86

1   called -- Sherwin-Williams.

2        Q    What else do you know about his experience?

3        A    He was a supervisor there for a while.  That's all

4   I basically know about him.

5        Q    What about Rich, do you know anything about his

6   experience in painting?

7        A    No, I don't.

8        Q    Did you have any other further discussion with

9   Jerry Brick, about potentially moving to the painting

10  department?

11       A    No.

12       Q    Had anybody told you, before you asked, that there

13  was an open position in that department?

14       A    No.  The only person I talked to was Jerry Brick.

15       Q    Did you have any reason to think that Lake

16  Compounce was hiring anyone, for a full-time position in the

17  paint department at that time?

18       A    I would, because there was a lot of things that

19  had to get done that year.

20       Q    Did you have any knowledge that Lake Compounce was

21  hiring anybody in the paint department at that time?

22       A    No.

23       Q    Okay.  Getting back to the position that you

24  applied for.  In 2008 and 2009, other than applying to Coke,

25  before you left Lake Compounce, did you apply for any other

Adams   v. Festival Fun Parks

1/20/2012                                        Andrew  Adams

Page 87

1    positions any place other than Lake Compounce?

2        A    No.

3        Q    Did your co-workers at Lake Compounce throw you a

4    fair well party the day before you left?

5        A    Well, no.  It was just our normal breaktime.  It

6    was coffee and doughnuts that I didn't have to pay for his

7    time.  So it wasn't like a party that we normally do for

8    everyone else.

9        Q    So they bought coffee and doughnuts for you?

10       A    Yeah.

11       Q    Who was there?

12       A    Mario Abela, John Fitch, Jordan, Kyle, Joe, Joey,

13   Chris Reeves.  That's it.  That's all I can remember.

14       Q    Was Justin Walters there?

15       A    No.

16       Q    When did you have your first discussion with Lake

17   Compounce about your employment ending at Lake Compounce?

18       A    It was towards the end of September, when I had

19   spoken to John Fitch.

20       Q    And tell me about that discussion?

21       A    Basically went to John saying that I'm giving him

22   notice soon, I'm having a hard time here.  And he asked why.

23   And I said I feel I can't do the job, everybody picks on me,

24   every time I call for help on the radio, I get nothing but a

25   lot of -- what's that word -- intimidation from people

Adams   v. Festival Fun Parks

1/20/2012                                                    Andrew  Adams

Page 88

1   saying, oh, my God, we got to bail Andy out again.

2          And basically he said, you know, keep looking for

3   a job and still work here, you know, we'll find you

4   something else to do in the shop until you find a job.  But

5   he did mention to me if you have any of your holiday time,

6   or any of your vacation time, to use it up, because if you

7   don't you don't get it, you lose it.

8          So I started taking all of my holiday pay, and my

9   vacation time up.  When I came back Jerry Brick had a

10  meeting with me and Mario Abela.

11     Q    How long were you out on your vacation and holiday

12  time?

13     A    I took I believe two weeks, because that's what

14  was owed to me.

15     Q    Who initiated the meeting that you had after that,

16  with Jerry Brick and Mario Abela?

17     A    Who was there?

18     Q    Who initiated it?

19     A    Oh, I don't know.  I went to work that day and

20  Jerry said can we see you upstairs, please.  So I went

21  upstairs to the office.

22     Q    And what did you discuss with them at that point?

23     A    That's when he said to me, you know, I've called

24  corporate up and told corporate you're leaving, so we need

25  to know from you when your last day is.  And Mario said,

Adams  v. Festival Fun Parks

1/20/2012                                              Andrew  Adams

                                                            Page 89

1    well, we're going to give him to October 31st, to the end of

2    the season.

3            And that's when Jerry said to me, okay, and if you

4    can't get a job or find a job, Andy, I'll let you collect

5    unemployment and I won't appeal the case, I'll let you get

6    it.

7        Q    And what did you say to them?

8        A    I said thank you very much.  And then that's how

9    it ended.

10       Q    Was anything discussed, that you haven't described

11   to me, during that meeting?

12       A    Right after my last day I handed him my keys, and

13   they gave me my termination slip.  And then a couple of

14   days, after I couldn't find a job, I called unemployment to

15   put a case in.

16       Q    During that meeting with Jerry Brick and Mario

17   Abela, that you were just describing, was anything else

18   discussed between you, other than what we've already talked

19   about?

20       A    No.

21       Q    Did you have any other discussions with anyone

22   after that, about leaving Lake Compounce?

23       A    Not that I recall.

24       Q    Okay.  Did anybody at Lake Compounce tell you that

25   you were being terminated or fired?

Adams   v. Festival Fun Parks

1/20/2012                                    Andrew   Adams

Page 90

1      A    No.

2      Q    Do you believe that you were fired?

3      A    No.  I wouldn't say I believe I was, no.

4      Q    So you resigned from Lake Compounce?

5      A    Yes.

6      Q    Okay.  All right.  Are you claiming that Lake

7   Compounce discriminated against you, based opinion your

8   gender, being a man?

9      A    Yes.

10     Q    Okay.  How is that?

11     A    Well, because the way I got treated and picked on,

12  no one else got the same treatment.  So I feel I was being

13  mistreated.

14     Q    Okay.

15          ATTORNEY BOERNER:  Off the record.

16

17   (A lunch recess was taken from 12:32 p.m. to 1:13 p.m.)

18

19  Q   (By Attorney Boerner) I understand that you want to

20  change some of your testimony from earlier, is that right?

21     A    Yes.

22     Q    Why do you want to change your testimony?

23     A    Because I feel the question that you asked about

24  the termination, the do you feel you were terminated or did

25  you quit.  I feel I was terminated because of being -- of

Adams   v. Festival Fun Parks

1/20/2012                                          Andrew  Adams

Page 91

1    them not finding nothing else in the park for me to do, and

2    me being picked on, nobody was doing anything about it.  So

3    I felt like I was being forced out of there.

4         Q    What made you change your testimony from earlier?

5         A    Because I thought about it more.  If the park

6    really wanted me, they would have found another job in the

7    park and they wouldn't have me leave.

8         Q    Did you discuss that with your attorney during the

9    break?

10        A    Yes.

11        Q    And after talking to your attorney, you want to

12   change your testimony?

13        A    Yes.

14        Q    And you understood that earlier you were

15   testifying under oath, correct?

16        A    Yes.

17        Q    And you testified earlier that you resigned,

18   right?

19        A    Yes.  Because I was being forced out of there.

20        Q    Earlier you said you weren't terminated, right?

21        A    Yes.

22        Q    And now you're saying that you were?

23        A    Yes.

24        Q    Okay.  Did anyone ever tell you that you were

25   being terminated?

Adams   v. Festival Fun Parks

1/20/2012                                        Andrew   Adams

Page 92

1      A    No.  But working at a place and being picked on

2   and bullied, and your managers aren't doing nothing to stop

3   it...

4      Q    Nobody ever told you you were being terminated, is

5   that right?

6      A    Yes.

7      Q    And nobody ever told you you were being fired,

8   right?

9      A    Correct.

10      Q    Okay.  Sir, you did resign, right?

11      A    Resigned, because I couldn't deal with it no more,

12   being picked on.

13      Q    You resigned because you feel you were being

14   picked on?

15      A    Right.

16      Q    Okay.  But you did resign, correct?

17      A    Yes.

18      Q    Do you think that if you hadn't been a man, you

19   would have been treated differently at Lake Compounce?

20      A    No.

21      Q    Do you think your sex or gender had anything to do

22   with your treatment?

23      A    Yes.

24      Q    How so?

25      A    Because the way Justin said the remark to me, he

Adams   v. Festival Fun Parks

Page 93

1   doesn't talk that way to anyone else that works there.

2      Q    What remark are you talking about?

3      A    About being on your knees, that's your best

4   position for you.

5      Q    Is there anything, other than that, that you feel

6   is an example of you being treated differently because of

7   your sex or gender?

8      A    Yeah.  Well I don't have a girlfriend, that's one

9   reason why I think he makes that remark, not like the rest

10  of the married guys in there.

11     Q    Anything else that is an example of you being

12  treated differently because of your sex or gender?

13     A    No.

14     Q    You understand that you have a claim for gender

15  discrimination in this lawsuit?

16     A    Yes.

17     Q    Other than the one comment about on your knees

18  that Justin Walters made, are there any other times you felt

19  you were being discriminated against at Lake Compounce?

20     A    No, just that time when he said that to me.

21     Q    Okay.  And how did you feel that that comment was

22  discriminating, based upon on your gender or sex?

23     A    How did it make me feel?

24     Q    Why did you think that that related to your gender

25  or your sex?

Adams  v. Festival Fun Parks

1/20/2012                                                      Andrew  Adams

Page 94

```
 1       A      Because I don't date girls, I don't go on dates.

 2   And just because I have friends, you know, that I hang out

 3   with boys, does he think that that's what I am?

 4       Q      Are you a homosexual?

 5       A      No.

 6       Q      Did you ever hear Justin Walters make similar

 7   comments to other employees?

 8       A      Not that I know of.

 9       Q      Did you ever hear Justin Walters make any other

10   derogatory comments to other employees, other than what

11   you've already described?

12       A      Not if I was around.  I didn't see it, no.

13       Q      Okay.  Did you hear about it?

14       A      No.

15       Q      Did you see any conduct by Justin Walters, where

16   you felt that he was treating any other employee badly,

17   other than what you've already described?

18       A      Well, I seen him one time grab an employee by the

19   shirt, and throw him up against -- well, not throw him up,

20   but pin him up against a fence, because some employee said

21   something to him that he didn't like.

22       Q      What employee was that?

23       A      Jordan.

24       Q      Anything else?

25       A      No.
```

Adams   v. Festival Fun Parks

1/20/2012                                                    Andrew  Adams

Page 95

1      Q     Did you ever hear anybody, other than Justin

2  Walters, make similar comments to you or anyone else?

3      A     No.

4      Q     Did you feel that any female employees were

5  treated differently than you, or received better treatment

6  than you?

7      A     Well, there were no females in the maintenance

8  shop.

9      Q     How about other male employees, do you think they

10  were treated differently or better than you?

11      A     Yeah.

12      Q     In what way?

13      A     Well, they're all married and have girls.  So, of

14  course, he's not going to say anything bad about those

15  people.  I was the only one that got picked on.

16      Q     Is Justin Walters married?

17      A     No.

18      Q     I knew you mentioned earlier that he dated Brynn

19  Goldbeck.  Was that the whole time that you were there, or

20  part of the time?

21      A     For part of the time, and she broke up with him.

22      Q     Was he dating anyone else at the time you were

23  there?

24      A     No.

25      Q     Did you talk to anyone about the comment that

Adams   v. Festival Fun Parks

1/20/2012                                          Andrew   Adams

Page 97

1       A    Not that I know of, no.

2       Q    How did he sexually harass you?

3       A    The day when he told me get on your knees, that's

4   your best position.

5       Q    Any other instances where he sexually harassed

6   you?

7       A    Just calling me stupid, or what the heck is the

8   matter with you.

9       Q    Okay.  Anything else?

10      A    Just constantly staring me down, when I'm down on

11  my knees working on my rides, just staring at me.

12      Q    Okay.  Anything else?

13      A    And then just throwing things at me.

14      Q    Okay.  Is that all?

15      A    Yes.

16      Q    Did you ever talk to Justin Walters about any of

17  these things, the on your knees comment?

18      A    No, I didn't want to get in a confrontation with

19  him.

20      Q    Did you ever talk to him about the other things

21  you described, calling you stupid, saying what's the matter

22  you, staring at you or throwing things at you?

23      A    No, I just walked away.

24      Q    Were there any witnesses to the calling you stupid

25  or saying what's the matter with you?

1       A    No, not that I know of.

2       Q    Okay.  And did anybody talk to you about any of

3  these incidents?

4       A    Jim Stevens, Booch, Wayne says you should report

5  it.  And I said, why, it's not going to do nothing,

6  management already told me don't come to them with

7  complaints, we told you what it would be like when you

8  worked here.  So I left it alone.

9       Q    Who told you not to come to them with complaints?

10      A    John Fitch, before I was hired, he told me the

11 rules.

12      Q    Before you got hired?

13      A    Yes, before I switched over to the maintenance

14 shop.

15      Q    What did he say?

16      A    Just I want to let you know that you're going to

17 get picked on and harassed in the shop, that's the nature of

18 working in the shop, don't come to me with complaints every

19 day, because I don't want to hear it, be a man, be tough.

20           So I thought, okay, being picked on, maybe I can

21 deal with it for a while, but not every day.

22      Q    And this was before you started working with

23 Justin Walters?

24      A    Before I even got hired to work in the shop.

25      Q    Did you report any of the conduct that you

Adams   v. Festival Fun Parks

1/20/2012                                        Andrew  Adams

Page 103

1    into my drawers to perform my work.

2         Q    And what did you do when that happened?

3         A    I told Mario Abela about it.

4         Q    And what did Mario say?

5         A    He told me he's going to talk to him, to tell him

6    to knock it off.  But, of course, it didn't stop.

7         Q    What didn't stop?

8         A    Justin from doing what he was doing all the time.

9         Q    Did he put the pumps in your spot after that?

10        A    Yes.

11        Q    How many times?

12        A    At least five times.

13        Q    Did you talk to Mario or anybody else about it,

14   after that initial conversation with Mario?

15        A    No.  Mario saw the pumps back there, so Mario

16   moved it and told people to knock it off.

17        Q    He told Justin to knock it off?

18        A    Yes.

19        Q    And did Justin knock it off after that?

20        A    Yes.

21        Q    Is there any other way that you feel Lake

22   Compounce retaliated against you, other than what you've

23   just described?

24        A    Well, I was looking for my blowtorch that I use,

25   and had my name on there, and it was missing and I couldn't

Adams   v. Festival Fun Parks

1/20/2012                                          Andrew   Adams

Page 104

1    find it.  And I asked everybody in the shop have you seen my

2    blowtorch, and they said, no, we haven't seen it.

3          And one person said Wayne was using it at Boulder

4    Dash.  So I walked all the way up from the shop to Boulder

5    Dash, and it wasn't there.  So I came back from Boulder Dash

6    to the shop, and I found it in the black lockbox, they

7    called it.  And that's where I noticed where I had my name

8    on there, someone wrote the word "sucks" in a black

9    permanent marker next to my name.

10         And I showed it to my boss John Fitch.  And all he

11   did was shake his head, and walked away from me.

12      Q    He didn't say anything?

13      A    No.  Just walked away.

14      Q    Did you have any other discussions with anybody

15   about that, any manager or director?

16      A    No.  I told the workers about my blowtorch, you

17   know, who could do something like this.  They all looked at

18   me and go who knows.

19      Q    Did anybody ever admit to doing that?

20      A    No.

21      Q    You don't know who did that?

22      A    No, I don't.

23      Q    Did you have any other discussions with anybody

24   about that?

25      A    No.

Adams   v. Festival Fun Parks

1/20/2012                                              Andrew  Adams

Page 105

1      Q    Are there any other ways in which you think Lake

2 Compounce retaliated against you?

3      A    Not that I can think of right now.

4      Q    And what do you think you were being retaliated

5 against for?

6      A    I think just Justin didn't like me, he was trying

7 to find a way to maybe make me mad and leave the company.

8      Q    What conduct did you engage in, that you think

9 caused Lake Compounce to retaliate against you?  Is there

10 anything else, other than what you've described -- that

11 Justin didn't like you?

12     A    I think in my heart, since I'm a slow learner, it

13 takes me time to do things, and I have to constantly go at a

14 slower pace to pick it up.

15     Q    And you think you were retaliated against by Lake

16 Compounce because of that?

17     A    Yeah.

18     Q    And who, specifically, retaliated against you?

19     A    Well, one thing was Justin Walters.  John Fitch --

20 there was one day I was working on a ride, it took me all

21 day, I couldn't figure out how to fix the ride.  And he came

22 back into the shop and goes you're still work on that piece.

23          I'm like I'm having a hard time.  He goes you

24 should remember this by now, you've been with us for a

25 while.  So instead of showing me, all he did was basically

Adams   v.   Festival Fun Parks

1/20/2012                                                    Andrew   Adams

Page 108

1        A     I feel the hostile work environment for me.

2        Q     I'm just talking about policies.

3        A     Oh, I'm sorry.

4              ATTORNEY SABATINI:  Objection to form.

5              THE WITNESS:  Not that I know of.

6   Q   (By Attorney Boerner) Okay.  Are you aware of any

7   documents that relate to any of these instances of

8   discrimination or sexual harassment, or retaliation that

9   you've described?

10       A     Did I see any documentation?

11       Q     Yeah, any documentation relating to any of these

12   instances that you talked about today?

13       A     Just the stuff that I answered with my attorneys,

14   from the packet that we looked at.

15       Q     Nothing that's been produced in this lawsuit, that

16   you're aware of?

17       A     No.

18       Q     Why do you think you weren't given a position in

19   the paint department?

20       A     Well, Mr. Brick says to me you don't have any

21   experience in painting, and why would I put you in there if

22   you don't have any experience.

23             And I said to him, well, I have painted before,

24   when you guys first put me in there to help him out in the

25   wintertime, so I feel I can do some stuff.  But he says

Adams   v. Festival Fun Parks

1/20/2012                                          Andrew  Adams

Page 109

1    there's no positions open.  So that's how it was left from

2    there.

3       Q    Okay.  Why do you think you were told that you

4    couldn't have a position in the paint department?

5       A    Because he said there was no positions open.

6       Q    Do you think that's true?

7       A    No.

8       Q    You think there were positions open?

9       A    Yes.

10      Q    What makes you think there were positions open?

11      A    Because Jim Stevens told me in the wintertime they

12   sent people over from the shop, who were mechanic helpers,

13   over there to help him out with stripping and taping, and

14   sanding and stuff like that.

15      Q    Were those full-time positions?

16      A    Well, they were to the main shop, they just went

17   over there to help out a couple of days a week, to help him

18   out.

19      Q    Were you looking for a full-time position in the

20   paint shop, or just a couple of days a week?

21      A    I wanted to be moved over there, because I didn't

22   want to work in the main shop and deal with that no more,

23   the harassment.

24      Q    You wanted a full-time position in the painting

25   shop?

Page 110

1       A    Yes.

2       Q    Are you aware of anyone that got hired full-time

3   in the paint department, after you asked to be transferred

4   there?

5       A    I have no clue.

6       Q    You don't have any reason to think that somebody

7   was hired full-time after that?

8            ATTORNEY SABATINI:  Objection to form.

9            THE WITNESS:  No.

10  Q    (By Attorney Boerner) I'm sorry?

11      A    No.

12      Q    Is there any other reason that you can think of,

13  that it's not true that you weren't hired for the painting

14  department because there were no positions?

15      A    I feel it was a lie, because then why did you send

16  people over from the shop to go and help him out, if there's

17  no work to be done over there.

18      Q    Other than people working one to two days a week

19  there, is there any other reason that you think there was a

20  position open in the paint department?

21      A    No.  I believe that there could have been a

22  position open, because they needed people to help out; they

23  can't do all the work.

24      Q    You thought that there was enough work for them to

25  hire someone?

Adams   v. Festival Fun Parks

1      A     Yes, I did.

2      Q     But you're not aware of anybody being hired

3   full-time in the paint department, after you asked for a

4   position there?

5            ATTORNEY SABATINI:   Objection to form.

6            THE WITNESS:   No.

7   Q    (By Attorney Boerner) Before you started working for

8   Lake Compounce, did you suffer from any kind of disability?

9      A     Just my slow learning disability.

10      Q     Can you describe that disability for me?

11      A     It's a slight mental retardation.   That's what I

12   was tested for.

13      Q     And who tested you for that?

14      A     We went to a hospital in Newington, and they

15   tested me.

16      Q     And when was that?

17      A     Oh, my goodness, it's when I was kid.   I can't

18   remember exactly what year.

19      Q     Okay.   Did you have any other testing for it,

20   other than that?

21      A     Just a regular school test that they do, what the

22   special ed teachers do.

23      Q     What kind of testing was that?

24      A     All of the stuff, like, you know, like math,

25   reading, how to wash clothes; basic stuff that you need to

Adams   v. Festival Fun Parks

Andrew  Adams

Page 112

1    know in life.

2        Q     Has a doctor ever diagnosed you with having a

3    disability?

4        A     My physical doctor, when I was a kid.

5        Q     Are you talking about the Newington --

6        A     No, it was a regular doctor.

7        Q     What doctor was that?

8        A     Dr. Blumer.

9        Q     And what was his diagnosis?

10       A     It came out as a slight mental retardation.

11       Q     Do you have any medical records that relate to

12   that diagnosis?

13       A     My mom probably has them.  I don't.

14       Q     What are your symptoms?

15       A     As a slow learner?

16       Q     Yes.

17       A     Spelling is number one.  Reading, I can only read,

18   I think, normally third grade reading -- third, fourth grade

19   level of reading.  Remembering a lot of things all at once;

20   I can only remember up to five things, and after that I

21   can't remember.  That's all really I can think of.

22       Q     How does that affect your day-to-day life?

23       A     Well, I can't really get out and go get a really

24   good job because of my disability, I can never be in college

25   because I can't take college courses.

Adams   v. Festival Fun Parks

1/20/2012                                              Andrew   Adams

Page 123

1    out there with you, a first year mechanic is not enough for

2    you to know what to do.  And that was about it.

3        Q    Did there ever come a time that you were working

4    as a mechanic helper, that you felt that you had finally

5    learned how to work the rides, and you were well equipped to

6    be able to handle some of your responsibilities?

7        A    Some of the rides I could do.  Some of the harder

8    rides, I couldn't do.

9        Q    Were you asked to do work on the harder rides?

10       A    They were a part of my rides.  And there were days

11   I called for help.  And some days I regretted calling for

12   help, because two-way radios works where everybody hears

13   when you call for help.  I would try to wait until I seen

14   Wayne.

15       Q    When you called for help, did you get help?

16       A    Yeah, eventually.  It took time, but they came.

17       Q    Do you think other employees were given better

18   opportunities by Lake Compounce, or recognition by Lake

19   Compounce because they weren't disabled?

20       A    I believe so.

21       Q    How?

22       A    Because they don't need to ask for help.  They

23   don't have the special learning disability, like I had.

24       Q    What kind of recognition or opportunities were

25   they given, that you weren't?

Adams   v. Festival Fun Parks

1/20/2012                                          Andrew  Adams

Page 124

1       A    Well, they get the bigger rides.  They didn't have

2    the kiddie rides like I was stuck on.  They get to move on

3    to bigger rides and bigger things.  They would send them out

4    to special classes to learn more, and I was supposed to go

5    but they cut it out of the budget for me.  So I felt, yeah,

6    I wasn't getting treated the right way.

7       Q    Okay.  Any other way that you think that other

8    employees were given more opportunities or recognition,

9    because they weren't disabled?

10      A    Well, yeah, because they're getting paid a lot

11   more than I was.  As a helper, I wasn't getting paid doing a

12   mechanic's job.

13      Q    You were a mechanic helper, not a mechanic?

14      A    Exactly.

15      Q    And the mechanics got paid more than a mechanic

16   helper?

17      A    Exactly.

18      Q    Did you apply for the position of a mechanic?

19      A    I applied for the job as a helper, that's what was

20   offered to me, and that's the pay rate that I got -- but

21   doing the helper job, not doing an actual mechanic job.

22           As a helper you're supposed to go with someone and

23   be their right-hand man with them.  That didn't happen with

24   me.

25      Q    Did you ever actually apply for the position of

Adams   v. Festival Fun Parks

1/20/2012                                          Andrew  Adams

Page 126

1      Q     So they were mechanic helpers, just for the water

2   park?

3      A     Yes.

4      Q     What about Joey Felco, was he a mechanic helper

5   for a particular part of the park?

6      A     Joey came in to help me out, and then he started

7   moving on to bigger rides.

8      Q     He came on to help you out?

9      A     In the kiddie ride section.

10     Q     What had he been doing before that?

11     A     He was a ride supervisor for a couple of seasons.

12   And now he's there full-time, as a mechanic.

13     Q     I think you said that you never applied for the

14   position of mechanic.  Did you ever ask to be promoted to

15   that position?

16     A     No, I never asked, because I figured I'm doing

17   mechanics' work already.

18     Q     Did you ever tell anyone that you thought you were

19   not being paid fairly?

20     A     I spoke to Jerry Brick about it, which is the

21   general manager.  And basically I didn't get nothing out of

22   that talk.  He said you should be happy that you got a

23   raise.

24           And then I spoke to Mario, by boss.  And he says

25   the raises went across fair and square across the board,

Adams   v.   Festival Fun Parks

1/20/2012                                              Andrew   Adams

Page 129

1       A     Yes.

2       Q     Are you saying that what Lake Compounce did caused

3    you embarrassment?

4       A     I would say that, yes.

5       Q     How did it cause you embarrassment?

6       A     Just from being harassed.  No one else gets that

7    same treatment, why me?

8       Q     Did you ever talk to anybody in Lake Compounce's

9    human resources department about Justin Walters?

10      A     I spoke to Mary Anne Dudek.

11      Q     When did you talk to her?

12      A     I talked to her at the time when it started

13   happening, back in 2009.

14      Q     What did you say to her?

15      A     I told her basically how I get picked on by him

16   constantly and bullied.  And she goes I understand, I know

17   it's hard in the shop.  I knew you were going to have some

18   issues like that in the shop, but I didn't think it would

19   get that bad for you.

20            And she says have you talked to John and Mario

21   about what he said.  I said no, because this is what John

22   said to me, "you're going to work in the shop, you're going

23   to get picked on and harassed."  She basically shook her

24   head at me and basically said I'm sorry.  But she's not

25   there no more either, so...

Adams   v. Festival Fun Parks

1/20/2012                                          Andrew   Adams

Page 163

1    left Lake Compounce?

2        A    No, I did not.

3        Q    You're claiming emotional distress, we just

4    discussed that, correct?

5        A    Yes.

6        Q    What have been the effects of the emotional

7    distress that you've suffered from?

8        A    Number one, losing my job, the place I loved to go

9    to, to work, every day.  Would have been there until the day

10   I retired.  Being picked on, bullied every day, and just

11   felt like after a while I didn't want to be there no more,

12   and I couldn't find a job that I liked doing.

13       Q    What effect has that had on you?

14       A    Made me feel like I'm not good for what I want to

15   do.

16       Q    Any other effects of the emotional distress that

17   you've suffered?

18       A    There's days I can't sleep, there's nights I have

19   the worst nightmares about Justin doing things to me, just

20   been sick over this whole thing.  Basically that's about it.

21       Q    When you say "sick," do you mean physically sick

22   or emotionally?

23       A    Both.  There's days I don't want to eat, there's

24   days that I feel sick to my stomach, I just don't feel like

25   I used to.

Adams   v. Festival Fun Parks

1/20/2012                                              Andrew  Adams

Page 167

1        A    Yes.

2        Q    -- that you had a discussion in 2008 with him?

3        A    Yes.

4        Q    But it didn't relate to discrimination or

5   harassment with him?

6        A    No.

7        Q    All right.  So the February 2009 discussion you

8   had with John Fitch, this says here "I verbally reported

9   Walters' on your knees comment to John Fitch."  Do you see

10  that?

11       A    Yes.

12       Q    What was John Fitch's response?

13       A    He looked at me and smiled, and then basically

14  just said, well, I told you that if you're going to work in

15  this shop here, you're going to get harassed and picked on,

16  and don't come to me and complain to me about it.  That's

17  when I walked away from John and went home for the day,

18  because I talked to him before it was time to go home.

19       Q    Did you talk to anybody else about that?

20       A    No.

21       Q    What about the June 2009 comment, where you say "I

22  showed my blowtorch with the word "sucks" on it to Fitch."

23  What was his response then?

24       A    He just looked at me and he shook his head, and he

25  says I'll see what I can do about this, and that was it.

Adams  v. Festival Fun Parks

1/20/2012                                          Andrew  Adams

Page 168

1      Q    Did you ever talk to him about it again after

2   that?

3      A    No, I didn't.

4      Q    And then July 2009 you said "I verbally reported

5   to John Fitch and Mario, that Walters was putting things in

6   my work area."  And what was their response to that?

7      A    Well, John's response to it was basically nothing;

8   I got nothing out of that.  Mario finally did something

9   about it, he told him to knock it off.  And then it stopped

10  after Mario said that to him.

11     Q    And when was it that Mario told him to stop?

12     A    When did he?

13     Q    Right.

14     A    It was like in the summertime when I was there.

15     Q    Do you see August 2009, "I told Mario about

16  Walters throwing some things in my work area"?

17     A    Uh-huh.

18     Q    Was it after that, that he told him to stop?

19     A    Yes.

20     Q    And then July 2009 you say "I told Mario that I

21  was having a problem with Walters picking on me."

22     A    Yes.

23     Q    What was that discussion?

24     A    I sat in his office and told him I was having

25  problems with Mr. Walters constantly picking on me, calling

Adams   v. Festival Fun Parks

1/20/2012                                                    Andrew  Adams

Page 169

1    me names, calling me stupid, and I said I'm getting tired of

2    it, Mario.  And I said I've never done nothing wrong to him,

3    why is he always picking on me.

4            And Mario just says, you know, Andy, he comes from

5    a different area, he comes from Kennywood Park, and he has

6    no friends, maybe he's just trying to be your friend, try to

7    get along with him, it's not like you have to go with him.

8    Q    Was that the end of your discussions at that point

9    with Mario about that?

10   A    Basically, because nothing else was getting said.

11   Q    And then in September of 2009 you said "I told

12   Fitch about Walters throwing an apple at my truck."

13   A    Yes.

14   Q    I think you started to describe that incident

15   earlier, but can you give me your recollection of what

16   happened there?

17   A    I was driving my truck from the park to the

18   maintenance shop.  As I pulled into my spot to park my

19   truck, to get out of my truck, and shut the door and walking

20   to get the ride part out of the back of the pick-up, I heard

21   a bang.

22            And I see Justin and Jordan over there, and Justin

23   is laughing, giggling.  And I looked at him, and I said to

24   him what an asshole you are.  And then I walked away from

25   him, and I walked back in the shop.

Adams   v. Festival Fun Parks

1        And I told Jordan that, you know, I'm going to

2   tell John about this.  And Jordan said don't make a big deal

3   about it, it's just an apple.  And I said this is my

4   personal truck, how would you like it happening to your

5   vehicle.

6        And the next day I made a complaint to John Fitch

7   about that.  There's a rule, nobody is supposed to touch

8   anybody's personal items here at the park.  What got me mad

9   was that he didn't even volunteer to clean the mess off my

10  truck.

11       Q    Who didn't?

12       A    Justin Walters.  And according to his statement to

13  John was that I drove into the apple, as I was a driving

14  away from the maintenance shop.

15       The speed limit from the maintenance into the park

16  is ten miles per hour.  So if I was going to drive into the

17  apple, I'd have to go about 50 miles an hour to go into the

18  apple.  And there's a garbage can right outside the shop, so

19  why couldn't he throw the apple in the garbage can?

20       Q    Did you talk to Justin directly about this?

21       A    No.  I called him an asshole and walked away from

22  him.

23       Q    How do you know what Justin said happened?

24       A    Well, that's the response that I got from other

25  people, that Justin must have told the witnesses what him

# EXHIBIT 2

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

ANDREW ADAMS,           :
                                :
               Plaintiff,     :     Case No.:  3:11 cv 00427 (JCH)
                                :
                                :
     vs.                         :
                                :
FESTIVAL FUN PARKS, LLC, d/b/a   :
LAKE COMPOUNCE THEME PARK,   :
                                :
            Defendant.   :     APRIL 27, 2012

<u>**AFFIDAVIT OF ANDREW ADAMS**</u>

     I, Andrew Adams, being first duly cautioned and sworn, and being more than eighteen years of age and competent to testify about the matters contained herein, hereby state as follows upon personal knowledge and information:

1. I am male.

2. I suffer from a slight mental retardation.

3. My disability causes me to be a slow learner, and it takes me longer than average to remember how to perform tasks I am assigned.

4. I began working at Lake Compounce as a seasonal worker in 1997, and continued to be a seasonal worker through 2007.

5. In 2008, I was hired as a full-time employee as a mechanic or maintenance helper.

6. As a mechanic helper, my job was supposed to be assisting mechanics, but I often did jobs on my own, and still received mechanic helper pay.  I should have gotten more individualized training or more shadowing experience.

7.  During this time, John Fitch was my supervisor, and the main supervisor, the supervisor ahead of him was Mario Abela.  Jerry Brick was the general manager.

8.  John Fitch and Jerry Brick at Lake Compounce both knew that I was a slow learner and had a slight mental retardation, as I informed them of this when I was originally hired as a seasonal worker in 1997.  I told them that I took special education classes and was a slow learner.

9.  While a full-time employee, I was harassed and discriminated against by some of my co-workers in the maintenance department.

10. In February & July 2009, Justin Walters, my co-worker, made a comment to me while I was working on my knees stating that I should get down on my knees and being on my knees was my best position because I like men.  Co-workers names Tommy J., Kyle and Joey Fecko were with me.  I told my supervisor, John Fitch, about this comment and he told me that he informed me when I became full-time that while working in the shop I would get harassed and picked on and that he didn't want me complaining to him.  Fitch told me to "be a man" and be tough.

11. In June 2009, Justin Walters told me that he "had" my mother last night and that she was good.

12. On June 2, 2009, my blow torch was missing.  My blow torch had my name on it, so I asked people if they had seen it and everybody told me "no."  When I found it in the shop, someone had written next to my name on the

blow torch in black permanent marker "sucks." I informed John Fitch and Mike Hayes, in HR, of this incident.

13. In July 2009, Justin Walters through nuts and bolts at me. When they landed in the parts washer, the fluid splashed onto me. Dan Pratt, a co-worker named Jordan, Wayne Olsen and Jim Stevens witnessed Walters throwing things at me.

14. In September 2009, I was driving my truck from the park to the shop. When I got out of my truck and walked to the back of it to grab some things, I saw Justin Walters throw his apple on the side of my truck. When it hit my truck, some of the apple remained mashed onto my truck. Justin Walters was laughing about it. A co-worker named Jordan also saw this incident. I told John Fitch about this, and Fitch told me he would talk to Walters, but to my knowledge that never happened.

15. In October 2009, while I was working on a ride, told me that I was stupid and said "what the heck is wrong with you?" This comment was unwelcome and offensive.

16. I spoke with Fitch's supervisor, Mario Abela, in July and August of 2009 about the harassment and discrimination by Walters and was told to give the guy a chance, that he wasn't so bad.

17. In September 2009, I spoke with Jerry Brick, the general manager about changing positions because I was having difficulty in the main shop. I wanted to be moved to the paint shop.

3

18. Jerry Brick first told me that he wouldn't give me a position in the paint shop because I did not have any experience.

19. I informed Jerry Brick that I had past experience in paint work and that I have helped Jim Stevens in the paint shop before, and then Jerry Brick told me there were no open positions in the paint shop.

20. I believe that Jerry Brick lied to me because the paint shop had a lot of work to be done and people from the main shop would often go over to the paint shop to help out.  I am also of the information and belief that after I was terminated, some people were taken from the main shop and worked in the paint shop.

21. At this point I had merely told Brick that I was having trouble in my position and was thinking about leaving the company if I could not be transferred to another department.  I did not ever give a verbal or written resignation.

22. John Fitch suggested that I take some vacation time and holiday time; therefore, I took two weeks off.

23. When I returned I was told that Jerry Brick had already told corporate that I had resigned from the company.  I told Jerry Brick that I did not get another job I had applied for and was only thinking of leaving because I could not be transferred to the paint department, but that I had never resigned.  Jerry Brick then told me that he didn't have anything for me at that time and that October 31, 2009 would be my last day.  Jerry Brick also informed me that he would allow me to collect unemployment and he would not appeal it.

4

24. On October 31, 2009, my employment with the defendant was terminated and I was forced out of the company.

25. On November 8, 2009, I wrote a letter to corporate explaining that I was sexually harassed and discriminated against at work, that I had informed my supervisors about the harassment and that had done nothing about it and that I asked to change departments.  I also told them that I felt forced out of the company or "pushed out the door."

26. My supervisors at Lake Compounce never told Justin Walters to stop harassing me and never ended the harassment or discrimination.  This allowed my co-workers to create a hostile work environment for me.

27. The daily harassment caused me embarrassment.

28. The daily harassment has also caused me trouble outside of work.  I have nightmares of Justin Walters harassing me.

29. I believe that I was sexually harassed, discriminated against because of my disability because I was a slow learner and my gender and the fact that I wasn't dating women, and retaliated against for complaining of the harassment and discrimination.

_____
Andrew Adams

Sworn and subscribed to before me
this ___ day of _____ 2012.

_____
Notary Public/Commissioner of the Superior Court
My Notary Commission Expires On: 3/31/17

6

**ELECTRONIC CERTIFICATE OF SERVICE**

I hereby certify that on May 4, 2012, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated in the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

/s/ James V. Sabatini
James V. Sabatini

# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

ANDREW ADAMS,     )
           )
    Plaintiff,    )
           )  Case No. 3:11-cv-00427 (JCH)
vs.          )
           )
FESTIVAL FUN PARKS, LLC,  )
d/b/a LAKE COMPOUNCE   )
           )
           )
    Defendant.   )
           )

## PLAINTIFF'S RESPONSE TO DEFENDANT'S FIRST SET OF INTERROGATORIES

Defendant, Festival Fun Parks, by and through its undersigned counsel, and pursuant to Federal Rule of Civil Procedure 33, hereby requests that Plaintiff Andrew Adams answer the following Interrogatories, separately and under oath, within thirty (30) days of service in accordance with the Federal Rules of Civil Procedure, the Local Rules of the United States District Court for the District of Connecticut, and the instructions and definitions set forth herein.

## INSTRUCTIONS AND DEFINITIONS

Please follow these instructions and use the following definitions in responding to these Interrogatories. Any term or word that is not defined herein has its usual and customary meaning.

    A.  In each response to these Interrogatories, provide all information in your possession, custody, or control. If you are able to provide only part of the information sought,

**Error! Unknown document property name.**

provide that partial information and specify the reason for your inability to provide the remainder.

B.      Whenever appropriate to these Interrogatories, the singular shall be interpreted as the plural and vice versa; the present tense shall include the past tense and vice versa; and the neuter shall include both the masculine and feminine.

C.      If any form of privilege or protection from disclosure is claimed as a ground for withholding any document and/or responsive information, the answering party shall set forth (i) the name of the document and/or responsive information, its date, the sender and/or speaker, recipient, persons to whom copies have been furnished, its subject matter, and all other information required for identification of the document and/or responsive information without revealing the information for which the privilege or other protection from disclosure is claimed, and (ii) the basis for the claim of privilege or protection from disclosure.

D.      The terms "and" as well as "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of these Interrogatories any information that might otherwise be construed to be outside their scope.

E.      Pursuant to Federal Rule of Civil Procedure 26(e) and Federal Rule of Civil Procedure 33, these Interrogatories are continuing in nature so as to require you to file a supplementary response and/or provide supplementary documents if you subsequently obtain additional or different information or documents before the trial.

F.      "Plaintiff" or "you," as used herein, refers to Plaintiff Andrew Adams and all servants, representatives, investigators, related persons and entities, attorneys, and all other persons acting on his behalf.

G.      "Defendant," as used herein, refers to Festival Fun Parks and all predecessors, successors, principals, officers, directors, agents, affiliates, employees, servants, representatives, investigators, related persons and entities, attorneys, and all other persons acting on its behalf.

H.      "Document" shall mean and include every writing, record, or graphic matter of every type and description in any form, however produced or reproduced, tangible or retrievable in any way, whether prepared by you, or received by you and wherever located, now or at any time in your possession, custody or control, including, but not limited to, papers, correspondence, memoranda, notes, interoffice communications, charts, proposals, lists, notebooks, circulars, brochures, catalogues, advertisements, plans, handbooks, manuals, letters, minutes, resolutions, statements, contracts, agreements, summaries, messages, diaries, address books, rolodexes, calendars, personal planners, telephone logs, telephone records, books of account, bills, checks and check stubs, receipts, invoices, vouchers, orders, printouts, e-mails, maps, charts, diagrams, blue prints, sketches, models, prototypes, electronically stored information, CD-ROMs, disks or diskettes, audio or video tape, palm pilot, blackberry, or other PDA data, and/or any other such documents or form of written, printed or electronically stored information, data or words.  "Document" also includes any preliminary notes and drafts, and all originals, copies, and any copy that contains any notation or other addition to or modification of the original.  Without limitation of the term "control" as used above, a document is deemed to be in your control if you have the right to secure the document or a copy thereof from another person, of public or private entity which has actual possession thereof.  If a document was, but is no longer in your possession or subject to your control, state what disposition was made of it, by whom and the date or dates, or approximate date or dates, on which such disposition was made, and why.

I.      "Person" means any natural individual in any capacity whatsoever or any entity or organization, including divisions, departments, or other units therein, and shall include, but not be limited to, a public or private corporation, partnership, joint venture, voluntary unincorporated association, organization, proprietorship, trust, state, government agency, commission, bureau, or department.

J.      1.      The term "identify" with respect to a natural person means to:

        (a)      state his or her name; and

        (b)      state his or her current or last known residence, address and telephone number.

    2.      The term "identify" with respect to a document or report means to state its:

        (a)      date;

        (b)      title or content identifier;

        (c)      author; and

        (d)      current location.

    3.      The term "identify" with respect to a communication, means to state its:

        (a)      date;

        (b)      names and titles of persons involved; and

        (c)      the content of the communication.

    4.      The term "identify" with respect to a transaction, event, incident or occurrence means to:

        (a)      state the date thereof;

        (b)      identify each person involved; and

(c)      identify the location of the transaction, event, incident or occurrence.

K.      "Reflect(s), relate(s) to, or refer(s) to" means pertains to, refers to, concerns, evidences, embodies, comprises, or has any logical or factual connection with the subject matter of the Interrogatories.

L.      "State in detail the factual basis for your contention," as used in these Interrogatories, means that you should fully and completely describe every act, event, occurrence, omission, document or communication of which you know that supports your contention, as well as identify any witnesses whose testimony you expect will support your position.

M.      "Action" means the civil litigation pending between Plaintiff Andrew Adams and Defendant Festival Fun Parks in the United States District Court for the District of Connecticut, No. 3:11- cv-00427 (JCH).

N.      "Complaint" means the document Plaintiff filed in the United States District Court for the District of Connecticut on March 18, 2011.

O.      "Health Care Provider" means any doctor or other practitioner or institution of medical science or healing art, including but not limited to, counselors, nurses, chiropractors, psychologists, psychiatrists, podiatrists, dentists, optometrists, social workers, therapists, obstetricians, and physical/occupational therapists, as well as hospitals, clinics, hospices, and other institutions providing health care.

## INTERROGATORIES

1.      Identify any person from whom you have obtained or will obtain a written or oral report, statement, memorandum, affidavit, declaration, or testimony regarding any of the allegations in your Complaint and describe the general subject matter of the report, statement, memorandum, affidavit, declaration, or testimony.

**ANSWER:**

Subject to and without waiving the Objection: one or more of the following individuals will be deposed.

1.      Justin Walters (employed by defendant): Walters will likely have discoverable information on plaintiff's employment with the defendant, his conduct directed towards the plaintiff, and the allegations set forth in plaintiff's Complaint.

2.      Bill Cook (employed by defendant): Cook will likely have discoverable information on plaintiff's employment, plaintiff's job performance and the allegations set forth in plaintiff's Complaint.

3.      Joseph Fecko (employed by defendant): Fecko will likely have discoverable information on plaintiff's employment, plaintiff's job performance, and the allegations set forth in plaintiff's Complaint.

4.      Tommy Juskevicious (employed by defendant) Juskevicious will likely have discoverable information on plaintiff's employment and the allegations set forth in plaintiff's Complaint.

5.      Wayne Olsen (employed by the defendant) Olsen will likely have discoverable information on plaintiff's employment, plaintiff's job performance, and the allegations set forth in plaintiff's Complaint.

6.      Jim Stevens (employed by defendant) Stevens will likely have discoverable information on plaintiff's employment, plaintiff's job performance, and the allegations set forth in plaintiff's Complaint.

7.      Jerry Brick (employed by the defendant) Brick will likely have discoverable information on plaintiff's employment, plaintiff's job performance, and the allegations set forth in plaintiff's Complaint.

8.      Michael Hayes (employed by defendant) Hayes will likely have discoverable information on plaintiff's employment, plaintiff's job performance, and the allegations set forth in plaintiff's Complaint.

9.      John Fitch (employed by defendant) Fitch will likely have discoverable information on plaintiff's employment, plaintiff's job performance, and the allegations set forth in plaintiff's Complaint.

10.     Richard Aylward (former employee of the defendant, current address unknown) Aylward will likely have discoverable information on plaintiff's employment, plaintiff's job performance, the allegations set forth in plaintiff's Complaint.

11.     Bryn Goldbeck (employee of the defendant) Goldbeck will likely have discoverable information on plaintiff's employment, plaintiff's job performance, the allegations set forth in plaintiff's Complaint.

12.     Holly Byrnes (former employee of defendant, current address unknown) Byrnes will likely have discoverable information on plaintiff's employment, plaintiff's job performance, the allegations set forth in plaintiff's Complaint.

13.     `Jim Lenois (former employee of defendant, current address unknown) Lenois will likely have discoverable information on plaintiff's employment, plaintiff's job performance,

the allegations set forth in plaintiff's Complaint.

14.     Rich Booch (employee of defendant) Booch will likely have discoverable information on plaintiff's employment, plaintiff's job performance, the allegations set forth in plaintiff's Complaint.

15.     Marianne Dudac (former employee of defendant, current address unknown) Dudac will likely have discoverable information on plaintiff's employment, plaintiff's job performance, the allegations set forth in plaintiff's Complaint.

16.     Cynthia K. Niedbala, M.S., Educational Diagnostician (formerly with Newington Children's Hospital, Newington, Connecticut, current address unknown) Niedbala will likely have discoverable information concerning plaintiff's mental disability.

2.     Describe in detail the amount of damages that you are claiming in this Action for Festival Fun Park's alleged violations of the Americans with Disabilities Act, the Connecticut Fair Employment Practices Act, and Title VII of the Civil Rights Act.  Include in your description the basis of each calculation of damages by item, including each and every factor used in making said calculation, and identify any documents that record or relate to your damages or that record the basis of your calculation of damages.

**ANSWER:**

1.     Back Pay: 10/31/09 through present date of December 1, 2011, at $10.66 per hour, 40 hours per week equals $46,051.20  (subject to offset from wages and income earned post termination)(further subject to any overtime worked)

2.     Front Pay: Two years - $44,345.60(subject to additional overtime pay and to any offset

from current wages and/or income)

3.      Emotional Distress - $50,000.00

4.      Consequential Damages: will be supplied

5.      Attorneys' Fees & Court Costs: will be supplied

6.      Punitive Damages: To be determined by trier of fact

        3.      Identify each and every Health Care Provider who has examined, diagnosed, and/or treated the diagnosis of your alleged "mental retardation," including, but not limited to, any Health Care Provider who made any recommendation in regards to your employment or any accommodation related thereto.  For each such Health Care Provider, state the dates you were examined, diagnosed, or received treatment, and describe the diagnosis and/or treatment.

**ANSWER:**

        Subject to and without waiving the objection, plaintiff identifies the following

1.      Newington Children's Hospital

        Clinician: Cynthia K. Niedbala, M.S. Educational Diagnostician

        Date of Testing: 1990

        The Newington Children's Hospital moved or became a part of the Connecticut

Children's Medical Center, 282 Washington Street, Hartford, Connecticut 06016 in 1996.

        4.      Identify each person not already identified whom you know or believe has any knowledge or information related to any and all facts, circumstances, or issues raised in the

Complaint, and for each such person, describe in detail the nature of his or her information or knowledge.

**ANSWER:**

See individuals identified in response to Interrogatory No. 1

5.      Identify each and every statement, whether written or oral, made at any time by Defendant, or any of its current or former agents or representatives, that you contend or believe constitutes an admission or declaration against interest on the part of Defendant or any of its current or former agents or representatives with regard to the subject matter of your Complaint.

**ANSWER:**

Subject to and without waiving the Objection, plaintiff identifies the following:

1.      Justin Walters stated: Andy get down on your knees that is the best spot for you.

2.      I went looking for my blow torch that had my name on it. When I found it the word "SUCKS" was written on it.

3.      Mario Abela, my other boss in the shop, told me that Justin Walters liked to play jokes on me.

4.      Walters, told the me that he "had" my mother last night and that she was good.

5.      Mario Abela told me to give Walters a chance and that he was not so bad.

6.      Fitch told me that I would have to deal with it (Walter's harassment) if I wanted to work in the department.

7.      Walters told me that being on my knees was my best position and that I liked being on my knees because I liked guys so much.

8.      Walters threw and smashed an apple on my truck.

Additional admissions may be discovered during the course of discovery.

6.     Identify each expert witness you have reason to believe you will engage, use, or ask to provide testimony in connection with this matter and, as to each such person, describe in detail his or her profession or occupation and the field in which he or she allegedly is an expert, the subject matter about which he or she is expected to testify, the substance of the opinion to which he or she is expected to testify, give a summary of the grounds upon which he or she bases that opinion, and identify all documents upon which he or she is expected to rely in support of his or her testimony.

**ANSWER:**

Subject to and without waiving the objection, plaintiff identifies the following:

Newington Children's Hospital – now a part of CT Children's Medical Center

Clinician: Cynthia K. Niedbala, M.S. Educational Diagnosticia

It is anticipated that Niedbala will offer testimony regarding her clinical records pertaining to the plaintiff. As for the substance of her opinions, see attached documents Plaintiff's Bates Nos. Nos. 161-171

7.     Identify each employee of Festival Fun Parks (if any) that you notified, informed, or otherwise apprised of your alleged "mental retardation," and for each such person identify the date and substance of the communication related to your "mental retardation," and whether the notification was made in writing.

**ANSWER:**

I identified in my job application with the defendant that I was a slow learner. I also informed my bosses and my general manager about my learning disability.

8.      Describe in detail your professional qualifications and experience that would qualify you to work in the paint department at Lake Compounce.

**ANSWER:**

See attached copy of my resume and May 24, 2009 memo from Jerry Brick. Plaintiff's Bates Nos. 6; 172

9.      Identify each instance of harassment you experienced while employed by Festival Fun Parks, and for each such instance identify the representative of Festival Fun Parks that allegedly harassed you, the date on which the alleged harassment occurred, the location in which the alleged harassment occurred; and describe the substance of the alleged harassment.

**ANSWER:**

Feb. 2009 and July 2009:Walters, told me that being on my knees was my best position and that I liked being on my knees because I liked guys so much.

June 2009: Walters said that he  "had" my mother last night and that she was good.

June 2, 2009: I went looking for my blow torch that had my name on it. When I found it the word "SUCKS" was written on it.

July 2009 – Walters threw nuts and bolts towards me and they landed into the parts washer and the fluid splashed onto me.

August 2009 – Walters put his palette of 2 Water Park Pumps in my work area.

September 2009 - Walters threw and smashed an apple on my truck.

October 2009 – I was working on the sky ride at the park.  Walters questioned the work that I performed on the ride.

10.     Identify each complaint you made to a representative of Festival Fun Parks of any alleged harassment, and for each such complaint identify the representative of Festival Fun Parks to whom you reported the alleged harassment, identify the date on which you reported the alleged harassment, describe the substance of the complaint, and state whether the complaint was made in writing.

**ANSWER:**

February 2009 – I verbally reported Walters "on you knees" comment to John Fitch.

June 2009 – I showed my blow torch with the word "sucks" on it to Fitch

July 2009 – I verbally reported to John Fitch and Mario that Walters was putting things in my work area

July 2009, I told Mario that I was having a problem with Walters picking on me.

August 2009 – I told Mario about Walters putting things in my work area

September 2009 – I told Fitch about Walters throwing an apple at my truck

October 2009 – I told Jerry Brick about the problems I was having at the shop and asked to work in the paint shop.

11/8/09 email – see attached plaintiff's Bates No. 20

11.     Identify each instance of discrimination you experienced while employed by Festival Fun Parks, and for each such instance identify the representative of Festival Fun Parks that allegedly discriminated against you, the date on which the alleged discrimination occurred,

the location in which the alleged discrimination occurred; and describe the substance of the alleged discrimination.

**ANSWER:**

Justin Walters called me stupid on multiple occasions.

In October 2009, Walters said that I did not know what I was doing.

In June 2009, someone wrote the word "sucks" next to my name located on my blow torch.

In September 2009, Walters threw and smashed an apple on my truck.

In February and July 2009 Walters, told me that being on my knees was my best position and that I liked being on my knees because I liked guys so much.

In June 2009 Walters, told the plaintiff that he "had" plaintiff's mother last night and that she was good.

In October 2009 I spoke to Jerry Brick, and asked if he could find a new position to work because of the problems I was having and I was told that there were no open positions in the painting department.

12.   Identify each complaint you made to a representative of Festival Fun Parks of any alleged discrimination, and for each such complaint identify the representative of Festival Fun Parks to whom you reported the alleged discrimination, identify the date on which you reported the alleged discrimination, describe the substance of the complaint, and state whether the complaint was made in writing.

**RESPONSE:**

February 2009 – I verbally reported Walters "on you knees" comment to John Fitch.

June 2009 – I showed my blow torch with the word "sucks" on it to Fitch

July 2009 – I verbally reported to John Fitch and Mario that Walters was putting things in my work area

July 2009, I told Mario that I was having a problem with Walters picking on me.

August 2009 – I told Mario about Walters putting things in my work area

September 2009 – I told Fitch about Walters throwing an apple at my truck

October 2009 – I told Jerry Brick about the problems I was having at the shop and asked to work in the paint shop.

11/8/09 email – see attached plaintiff's Bates No. 20

13.     State in detail the factual basis for your contention that "defendant treated the plaintiff adversely different from similarly situated non-male employees."

**ANSWER:**

See amended complaint as the amended complaint eliminated the allegation

14.     Identify the discriminatory employment practice(s), if any, that you opposed during your employment with Festival Fun Parks.   For each discriminatory practice that you identify as having opposed, identify the statement, writing, or other communication you made to a representative of Festival Fun Park in which you opposed the allegedly discriminatory employment practice(s), and identify the representative of Festival Fun Parks with whom you so communicated.

**ANSWER:**

February 2009 – I verbally reported Walters "on you knees" comment to John Fitch.

June 2009 – I showed my blow torch with the word "sucks" on it to Fitch

July 2009 – I verbally reported to John Fitch and Mario that Walters was putting things in my work area

July 2009, I told Mario that I was having a problem with Walters picking on me.

August 2009 – I told Mario about Walters putting things in my work area

September 2009 – I told Fitch about Walters throwing an apple at my truck

October 2009 – I told Jerry Brick about the problems I was having at the shop and asked to work in the paint shop.

11/8/09 email – see attached plaintiff's Bates No. 20

      15.      Identify any and all conduct by Festival Fun Parks that constituted discharging, expelling, or otherwise discriminating against you as a result of any opposition to a discriminatory employment practice identified above.

**ANSWER:**

      I complained to the defendant that Walters was harassing me. Defendant did not end the harassment. I asked the defendant for a job transfer. Defendant did not transfer me. Defendant terminated my employment.

      16.      Identify by case or docket number any complaint or charge you have filed, or any proceeding with which you have testified or assisted, and for each such complaint, charge or

proceeding describe in detail the subject of the complaint, charge, or proceeding, and the state the current status of the litigation, charge, or proceeding.

**ANSWER:**

Objection pending

17.     Describe in detail all your efforts to secure employment with any person between your separation from Festival Fun Parks through the present.  Your response should include an identification of any and all applications or interviews for employment and any and all attempts to establish or to buy a business operation or establish self-employment.  If an offer of employment was extended to you, please describe each offer, indicating by whom and when made and the full terms of the offer (salary, fringe benefits, bonuses, conditions of employment, etc.), whether you accepted or refused any offer of employment, and the identity of any documents which record or reflect any of the above.

**ANSWER:**

1.     M&M Market and Deli, LLC, 1277 Stafford Avenue, Bristol, CT 06010. See attached plaintiff's Bates Nos. 129-160

2.     Illusions, 1639 Wolcott Road, Wolcott, CT 06717. See attached plaintiff's Bates Nos. 18-19

3.     Andrew Adams d/b/a Gold Leaf Galleries, home address. See attached plaintiff's Bates Nos. 107-128

18.     Identify each document or other fact that you believe will support or refute any of the allegations in your Complaint to the extent such document or other fact is not otherwise identified in any other answer to these Interrogatories

**ANSWER:**

Objection pending

Date:  August 11, 2011

FISHER & PHILLIPS LLP


_____
Risa B. Boerner, Esquire
Fisher & Phillips LLP
Radnor Financial Center
201 King of Prussia Road,
Radnor, Pennsylvania  19087
(610) 230-2132
(610) 230-2151 (facsimile)
rboerner@laborlawyers.com

*Counsel for Defendant Festival Fun
Parks LLC*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 11, 2011, a copy of the foregoing First Set of Interrogatories of Defendant Festival Fun Parks Directed to Plaintiff Andrew Adams were served by first-class U.S. Mail on counsel for Plaintiff Andrew Adams, as follows:

James V. Sabatini, Esquire
Sabatini & Associates, LLC
One Market Square
Newington, Connecticut 06111

*Counsel for Plaintiff*

_____
Risa B. Boerner

# EXHIBIT 4



**NEWINGTON CHILDREN'S HOSPITAL**

EDUCATIONAL EVALUATION & CONSULTING SERVICES
(203) 667-5315

DATE: December 3, 1990
RE: Andrew Adams
Medical Record: 132576

Mr. & Mrs. Lawrence Adams
1272 Stafford Avenue
Bristol, Connecticut 06010

Dear Mr. & Mrs. Adams:

Enclosed please find Andrew's Diagnostic Perceptual/Cognitive
Assessment.  Copies of this evaluation have been sent only
to those who have been indicated on the signed release.

Should you have questions or concerns regarding specific test
results or recommendations, please contact Educational Evaluation
and Consulting Services at 667-5315 for assistance.

Sincerely,



Barbara E. Brown, M.S.
Director

Enclosure

BEB/dw

**P000161**

NEWINGTON CHILDREN'S HOSPITAL

DIAGNOSTIC PERCEPTUAL/COGNITIVE ASSESSMENT

EDUCATIONAL EVALUATION AND CONSULTING SERVICES

Andrew Adams                         Medical #: 132576
BD: 8/15/79                          Date of Testing: 10/30/79
CA: 11+3                             Referral: Parents -
Grade: 5.2 Special                     Mr. and Mrs. Lawrence Adams
Education (1990-91)                   Clinician: Cynthia K. Niedbala, M.S.
Stafford Elementary School             Educational Diagnostician
Bristol, Connecticut

Background Information and Reason for Referral

Per parental report, Andy has been involved in specialized
services, initially for speech and language needs, since
preschool.  Specific educational data regarding his performance
throughout the primary grades was not available for review prior
to this assessment.  However, per parental report, Andy has
participated within the Aim program, Stafford Elementary School,
Bristol, Connecticut, since kindergarten age.

The results of a triennial psychological review, completed within
his school system, (January, 1990), revealed substantial
deficiencies in verbal and non-verbal spheres, which resulted in
a composite score which was marginally within the Borderline
range.  Visual motor integrative skills were displayed three
years below his chronological age.  An educational assessment
(April, 1990) revealed reading, spelling and mathematics skills
to be within a second to third grade skill range.  A speech and
language assessment indicated continued deficiencies in receptive
and expressive vocabulary, while selected language processing
skills requiring categorization and determination of differences
were displayed as above average.

Andy currently continues to participate in a self-contained
special educational program, designed to meet his needs as a
student with mild Mental Retardation, and/or Borderline
abilities.  He is currently mainstreamed with fifth grade
students for art, music, physical education,  and homeroom,
following a similar program model to what was initiated in fourth
grade.

Andy was referred for this Diagnostic Perceptual/Cognitive
Assessment by his parents, Mr. and Mrs. Lawrence Adams, to
determine current processing and academic achievement levels with
recommendations for programming.

Individualized Educational Program/Transition Services

Student: _Andrew Adams_

Long Term Goal: INDEPENDENT LIVING

( ) No special skills training needed
( ) Independent (House or Apartment)    ( ) Supervised Living    ( ) Group Home    ( ) Family
( ) Other _____
Specialized skills training in:
(✓) Activities of Daily Living    (✓) Social Skills    (✓) Self-Advocacy    (✓) Financial Planning
(✓) Money Management    (✓) Legal    ( ) Other: _____

Goal Statement:

Evaluation Schedule Code:    0 – Not Addressed    1 – Partial    2 – Half    3 – Most    4 – Goal/Accomplished

Annual Statements of Needed Services: Objectives/Activities

| Objectives/Activities | Person/Program/Agency Responsible | Evaluation Procedure | Projected Date of Completion | Evaluation Schedule | | | |
|---|---|---|---|---|---|---|---|
| | | | | 1st MP | 2nd MP | 3rd MP | 4th MP |
| Andy will complete all of the needed steps to open a checking account and to maintain it on a daily basis independently. | Student/staff | Unit Tests in Banking and teacher made activities | 12/96 | 2 | | | |
| Andy will plan menu for a day, including the correct number of foods from each of the pyramid groups to make it nutritionally sound. | Student/Staff | Teacher-Made Evaluation | 8/96 | | 2 | | |

End of Year Summary:

End of Year Summary:

Justification Statement: Did the PPT conclude a need in this area? Yes _____. No _____
If no, please provide a justification statement indicating the reasons:

P000163

Long Term Goal: INDEPENDENT LIVING                    pg. ____

Evaluation Schedule Code:  0 - Not Addressed   1 - Partial   2 - Half   3 - Most   4 - Goal Accomplished

| Annual Statements of Needed Services: Objectives/Activities | Person/Program/ Agency Responsible | Evaluation Procedure | Projected Date of Completion | Evaluation Schedule 1st MP | 2nd MP | 3rd MP | 4th MP |
|---|---|---|---|---|---|---|---|
| Andy will independently sort/launder and iron as needed his laundry. | Staff | Teacher-Made Checklists and Student Self-Evaluation | 3/96 | 3 | | | |
| End of Year Summary: | | | | | | | |
| Andy will maintain acceptable personal hygiene, e.g. clean hair, hands and nails and acceptable clothing. | Staff/ student/ parents | Student Self-Evaluation | 3/96 | 2 | | | |
| End of Year Summary: | | | | | | | |
| Andy will identify the time in 1 minute intervals and will state the time in 15 minute intervals before or after that time. | Staff | Teacher-Made Evaluation and situational assessment. | 2/96 | 2 | | | |
| End of Year Summary: | | | | | | | |
| Andy will complete a unit on basic First Aid and will state/display behavior needed in an emergency situation. | Staff/ parents | Basic First Aid, scoring at least 90% on each unit test. | 1/96 | 2 | | | |
| End of Year Summary: | | | | | | | |

P000164

Long Term Goal: INDEPENDENT LIVING

pg. w3

Evaluation Schedule Code: 0 - Not Addressed  1 - Partial  2 - Half  3 - Most  4 - Goal/Accomplished

| Annual Statements of Needed Services: Objectives/Activities | Person/Program/Agency Responsible | Evaluation Procedure | Projected Date of Completion | Evaluation Schedule 1st MP / 2nd MP / 3rd MP / 4th MP |
|---|---|---|---|---|
| Andy will set an alarm clock and a clock radio, digital time and standard, to the correct time and set the alarm using the correct buttons. | Student/Staff parents | Teacher-Made Checklists | 10/96 | 1 |
| End of Year Summary: | | | | |
| Andy will state and write the sizes he needs for his personal clothing. | student/staff | Self-Evaluation | 1/96 | 2 |
| End of Year Summary: | | | | |
| Andy will complete unit on ordering from a catalog, scoring at least 98% on each unit | student/staff | Ordering form a catalog | 11/96 | 1 |
| End of Year Summary: | | | | |
| Andy will use a sales tax chart to compute tax and then add it to a price to get total. | student, staff | Teacher-Made Activities | 12/96 | 1 |
| End of Year Summary: | | | | |

Long Term Goal: INDEPENDENT LIVING

pg. when

Evaluation Schedule Code: 0 – Not Addressed    1 – Partial    2 – Half    3 – Most    4 – Goal Accomplished

| Annual Statements of Needed Services: Objectives/Activities | Person/Program/ Agency Responsible | Evaluation Procedure | Projected Date of Completion | Evaluation Schedule 1st MP | 2nd MP | 3rd MP | 4th MP |
|---|---|---|---|---|---|---|---|
| Andy will state under what conditions and the method to use a portable fire extinguisher. | staff/parents | Information Checklist and Situational Assessment | 2/96 | 1 | | | |
| End of Year Summary: | | | | | | | |
| Andy will state and demonstrate 4 methods of clearing a clogged toilet or drain. | staff/parents | Teacher-Made Checklists | 2/96 | 2 | | | |
| End of Year Summary: | | | | | | | |
| Andy will complete Everyday Living Skills, Lessons 4-10 scoring at least 90% on each unit test. | student/staff | Everyday Living Skills | 2/96 | 3 | | | |
| End of Year Summary: | | | | | | | |
| End of Year Summary: | | | | | | | |

P000166

Individualized Educational Program/Transition Services

Student: _Andy Adams_

Long Term Goal: EMPLOYMENT/POSTSECONDARY EDUCATION

( ) 4 Year College  ( ) 2 Year College  (✓) Postsecondary vocational training  ( ) Ind. Competitive Employme
(✓) 1 Time-limited assistance for Employment  ( ) Supported Employment  ( ) Apprenticeship/Training
( ) Military  ( ) Other: _____

Goal Statement: _____

Evaluation Schedule Code:  0 - Not Addressed   1 - Partial   2 - Half   3 - Most   4 - Goal/Accomplished

| Annual Statements of Needed Services: Objectives/Activities | Person/Program/ Agency Responsible | Evaluation Procedure | Projected Date of Completion | Evaluation Schedule 1st MP | 2nd MP | 3rd MP | 4th MP |
|---|---|---|---|---|---|---|---|
| Andy will work in a community job-site two days a week. | Student/job coach | Work-site and supervisor evaluations | 4/96 | 3 | | | |
| Andy will read the want ads, and evaluate the qualifications needed, and the benefits and draw backs of each opening, stating which he is qualified for and which he would like. | Student/staff | Teacher-made activities and evaluations. | 4/96 | 2 | | | |

End of Year Summary:

End of Year Summary:

P000167

## Long Term Goal: EMPLOYMENT/POSTSECONDARY EDUCATION

Evaluation Schedule Code:   0 - Not Addressed     1 - Partial     2 - Half     3 - Most     4 - Goal/Accomplished

| Annual Statements of Needed Services: Objectives/Activities | Person/Program/ Agency Responsible | Evaluation Procedure | Projected Date of Completion | Evaluation Schedule 1st MP | 2nd MP | 3rd MP | 4th MP |
|---|---|---|---|---|---|---|---|
| Andy will prepare a resume of his education and employment experiences. | student/staff | Evaluation of Resume | 4/96 | 1 | | | |
| End of Year Summary: | | | | | | | |
| When a supervisor or co-worker is speaking to him, Andy will establish eye contact with the person. | student/staff | Self evaluation | 4/96 | 2 | | | |
| End of Year Summary: | | | | | | | |
| During a performance review, Andy will describe his work in a positive manner | student/staff | self evaluation and staff evaluation | 3/96 | 1 | | | |
| End of Year Summary: | | | | | | | |
| Andy will discuss a complaint about work situation with his supervisor. | student/staff | self evaluation and staff evaluation | 4/96 | 1 | | | |
| End of Year Summary: | | | | | | | |

Long Term Goal: EMPLOYMENT/POSTSECONDARY EDUCATION

Evaluation Schedule Code:   0 - Not Addressed   1 - Partial   2 - Half   3 - Most   4 - Goal/Accomplishe[d]

| Annual Statements of Needed Services: Objectives/Activities | Person/Program/Agency Responsible | Evaluation Procedure | Projected Date of Completion | Evaluation Schedule 1st MP | 2nd MP | 3rd MP | 4th MP |
|---|---|---|---|---|---|---|---|
| Andy will identify and state the meanings for all food prep. terms in Brigance Essential Skills. | Staff | Evaluation Checklist | 12/95 | 2 | | | |
| End of Year Summary: | | | | | | | |
| Andy will identify and carry out in sequential steps for the recipe directions in Brigance Essential Skills. | Staff | Evaluation Checklist | 4/96 | 1 | | | |
| End of Year Summary: | | | | | | | |
| Andy will explore Technical School opportunities in the culinary area. | Staff/Student/parents | Evaluation by Andy of each visitation | 4/96 | 2 | | | |
| End of Year Summary: | | | | | | | |
| Andy will be referred to B.R.S. | Staff/Student/parents | Referral proc. begun | 4/96 | 4 | | | |
| End of Year Summary: | | | | | | | |

P000169

Individualized Educational Program/Transition Services

Student: _Andy Adams_

Long Term Goal: COMMUNITY PARTICIPATION

( ) No special skills training needed
( ) Specialized skills training in:

( ) Transportation        ( ) Recreation/Leisure        ( ) Consumerism
( ) Medical               ( ) Other

Goal Statement:

Evaluation Schedule Code: 0 – Not Addressed    1 – Partial    2 – Half    3 – Most    4 – Goal/Accomplished

| Annual Statements of Needed Services: Objectives | Person/Program/ Agency Responsible | Evaluation Criteria | Projected Date of Completion | Evaluation Schedule |  |  |  |
|---|---|---|---|---|---|---|---|
|  |  |  |  | 1st MP | 2nd MP | 3rd MP | 4th MP |
| Andy will plan the route and take a public bus to a local destination. | student/staff | Checklist Evaluation | 2/96 | 1 |  |  |  |
| Andy will identify local agencies that may offer support after graduation. | student/staff/ parents | Agency Response Checklist | 4/96 |  |  |  |  |

End of Year Summary:

End of Year Summary:

Justification Statement: Did the PPT conclude a need in this area?   Yes ____   No ____
If no, please provide a justification statement indicating the reasons:

P000170

Student: Andy Adams

Long Term Goal: COMMUNITY PARTICIPATION

pg. 2

Evaluation Schedule Code: 0 - Not Addressed   1 - Partial   2 - Half   3 - Most   4 - Goal/Accomplished

| Annual Statements of Needed Services: Objectives/Activities | Person/Program/Agency Responsible | Evaluation Procedure | Projected Date of Completion | Evaluation Schedule 1st MP | 2nd MP | 3rd MP | 4th MP |
|---|---|---|---|---|---|---|---|
| Andy will identify community clubs and organizations that may be of interest and will make an initial contact. | Student/Staff | Results from Telephone Poll/Contact Poll | 4/96 | 1 | | | |
| Andy will identify places in the community where he can spend leisure/recreation time, and will plan an activity that he and a friend can attend. | Student/Staff/Parents | evaluations of student/staff/parents | 2/96 | 4 | | | |
| Andy will locate name in white pages of the phone book independently. | Student/Staff | Teacher-made checklists | 1/96 | 2 | | | |
| Andy will locate a phone number in the yellow pages of a needed service. | Staff | Teacher-made checklists | 4/96 | 2 | | | |

End of Year Summary:

End of Year Summary:

End of Year Summary:

End of Year Summary:

# EXHIBIT 5

TO:  **Palace Entertainme  Corporate Headquarters**
4590 MacArthur Blvd., Suite 400
Newport Beach, CA 92660

From: Andy Adams

This is my letter to you telling you what happen to me.  I have been working at Lake Compounce since 1996 With the Kenneywood Theme Park. Back in 2007 I work in the rides Maintenance Dept.  I have learned how to do things under Mario Abela and John Fitch my two managers.  I been having problem with someone in the shop.  He always pick on me from the time I punch in the morning time and till I punch out.  I had to go to a Clinic for my neck and back pain because of all the problems I was dealing with at work.  Since I had been going to the clinic it's been helping my neck and back problem.  So I went to Jerry Brick the GM at Lake Compounce and I have said to him that I am thinking of leaving.  And he said why? And I told him that I am having some problem here at work and he told me to talk to Mario and John too.  Which I did talk to John about.  When I have ask Jerry can I go to the paint shop to work he said to me that Palace is not going to open up any new jobs. they are cutting back on things and Jerry total agreed with them to save money.  The paint shop has a lot of things to do this winter.  There is only one guy that is working in the paint shop.  I ask Jerry if I could work in the paint shop to help Jim.  Jerry call palace up on the phone and told them that I have someone leaving that is a full time team member.  I never gave my notice or put it in writing I said I was thinking of leaving because I had a hard time in the Maintenance Dept. and I ask him if I can go into the paint shop.  Jerry, Mario, and I had a meeting about this and Jerry said to me what's the plan and I said to him that I was looking but did not get the job I wanted.  So at this time I was only looking around and then jerry said well you gave your notice but I never did.  I only said I am thinking of it because he wouldn't offer me to work in the paint shop.  So then he said to me well if you can't do the job then I don't have anything here for you at this time.  So I felt I was push out the door.  Then Jerry said to me that if you have to file for unemployment I will not fight it at all. I will let you have it.  Mario was there when Jerry telling me this. This one guy name Justin Walters has always picking on me every day at work.  He always made me do all his work for him things that were his job at the park to do. Making me clean out the water park filters.  He takes credit for it all the time.  Also saying things to me like what the hell is wrong with you if I mess something up or did not know what I was doing.  Or you stupid what the heck is wrong with you. He never has anything nice to say to no one at work.  Then one day I was using my own pickup truck at work and I had it park where the shop was.  We were on our break and Justin thought it was funny to throw his apple at my truck, and the apple went all over my truck he never clean it up at all.  He started to laugh about it and I told him that you are a big ass for what you did.  But this is the kind of guy you have working for you at this park.  And that's why I was having problems with sleeping, eating, and my Nervous System.  I have told my boss about the apple thing that he did to my truck.  And I don't think anything happen with that at all.
This is my story and its truth of it all.
Thank you
Andy Adams
11/08/2009

EXHIBIT 6

# ANDY'S LOG OF THINGS THAT HAPPEN AT LAKE COMPOUNCE THEME PARK

**Feb. 2009** I and Tommy J, Justin Walters, Joe, & Kyle where at the Boulder Dash Roller
Coaster. Down by the South end of the park, Justin Walters and Tommy J came down to drop
off some Steel. Tommy J did not have his keys with him to open the gate up and told me to get
down on my knees and I will step on your back to get over the fence. That's when Justin
Walters have then said yeah Andy get down on your knees that's your best Spot for you. You
like to look up at the guys chock area all the time. At that time I gave Justin Walters a dirty look
back at him I was Very mad at him for saying that kind of thing. Tommy J told me to not take
that from him and get back at him for that. But I did not want to do any thing I went to my boss
about it. Which was John Fich and John just gave me a smile and a look and told me I told you
before I hire you that you will get pick on and harssed. And that is the nature of working in the
shop and that I did not want you to come to me every day that someone picks on you. So I feel
John did not want to do any thing about this at all. But I have told this to everyone that I work
with in the shop what Justin said to me and they did not think it was funny at all.

**June 2, 2009** I have been looking for my Blow touch Gun that I use at the park. It was on my
bench all the time when it was missing I have ask people have they seen it. And everyone has
told me NO. But when I went looking for it in the shop I have found it in this black lock box that
we keep all of our straps for picking up big things in the shop. I had my name on it so people
would know it is my. Right next to my name in big black bold letters it said the word SUCKS
right next to it. I have shown John Fich my boss this and he told me he will talk to people about
it. Which I know he did not do any thing about it.

**Also from June 2009 Till Aug 2009** Justin Walters had put this palt of 2 Water Park Pumps
right in my work area. Right close up to my tool box so I can't even open up my box at all. I
have move this once in the shop so I can work on my things. Then as soon as I come back to the
shop the pumps will be right back in my work area and right near my toll box. Joarden that
works in the shop there got the fork lift and move them pumps from my side of the work area to
his area of the shop and put them at Justin Walters area. Then me and Joarden went park into the
park to work on our rides. Then Justin Walters calls me on my 2 way radio Maint 5 to Maint 18
Andy. Joarden and I stop working so I can answer my radio. Justin Walters said over the radio
did you move my pumps in the shop. I said NO I did not someone else did put he just wanted
everone in the park to hear him talk to me over the 2 way radio. But this is the things that he
does to me there just because he NEVER like me form day one.

**July 8, 2009** I went to Mario my other boss in the shop and have told him things that I am having troblem with Justin Walters. He told me that Justin comes from Kennywood and he does not have any friends at all. He likes you a lot Andy. He just likes to play jokes on you and just try to get alog with him ok. But just try to be nice to him at work it's not like he goes home with you and you have to deal with him there. But I am sorry I said to Mario I should not have to deal with this at all. But then Mario said to me that he is trying to make friends here so just try to talk with him ok. So I was not happy with Mario and I just got up and walk out of his office and went back to work.

**September 2009** I was driving my pick up truck from the park back to the shop I have park my truck over by the ADMI bulding. I got out of my truck and walk to the back of it to grab some things out of it. When I saw Justin Walters throw his apple on the side of my truck on the right side. It hit my truck and made a bag on it and the apple mash on to my truck. Then I saw Justin Walters laugh at it and never walk over there to clean it off. I told him that you are a big ass hole for what you did. I don't know why he threw his apple at my truck when there is a big green dumpers outside the shop where he was. I have told John Finch about this and John told me he was going to talk to him about it. And tell him that is not nice of you to do at all. But I know notting got done about it at all. Because the bosses are good friends with him and they don't want to be the bad guys at all. There was even people that saw him threw the apple at my truck.

**Oct 2009** I was working on the sky ride at the park. I was working on it with a other guy at the park. I forgot to do one thing on the ride and I have call John my boss to come down to see me. Then when we came down there to see me and took care of the thing. Then the next day Justin Walters had to say things to me wow what the heck is wrong with you. Then he said to Vic the other worker you better check your ride out real good. They had Andy and this other guy working on your ride. Then Justin Walters stated to laugh about it. It made me mad that he was treaing me this way. Then after this has happen I just got tired of being treaded this way. So that's when I started to look for a new job and put in applications to find a new job. But it did not go so good. I have told Jerry that I am going to be leaving because I was having problems in the shop. But he never ask me what kind at all.

And this is how Justin Walters has been to me for the past 2 years I have work in the shop. He NEVER like me from day one. And I just don't know why I have always been nice to him and talk to him, I even got lunch for him when I went out. Even when he was short cash I put it in for me. But never got one THANK YOU from him at all.

This is my log that I have kept from the time I work in the shop. I never went by the day because it will be a 25 to 30 page log so I just kept it brief for you to have.

Andy Adams

# EXHIBIT 7

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **ANDREW ADAMS,** | : | |
| | : | |
| **Plaintiff,** | : | **Case No.:  3:11 cv 00427 (JCH)** |
| | : | |
| | : | |
| **vs.** | : | |
| | : | |
| **FESTIVAL FUN PARKS, LLC, d/b/a** | : | |
| **LAKE COMPOUNCE THEME PARK,** | : | |
| | : | |
| **Defendant.** | : | **October 6, 2011** |

**Jury Trial Demanded**

## FIRST AMENDED COMPLAINT

Plaintiff, Andrew Adams, by and through his attorneys, Sabatini and Associates, LLC, complaining of the defendant, respectfully alleges:

### PARTIES

1.  Plaintiff Andrew Adams is a Connecticut citizen residing in the City of Bristol.

2.  Defendant, Festival Fun Parks, LLC d/b/a Lake Compounce Theme Park. is a limited liability company organized and existing under the laws of the State of Delaware. Defendant's principal place of business is 4590 Macarthur Blvd., Newport Beach, California.

3.  At all times material, plaintiff is an employee within the meaning of the Americans With Disabilities Act of 1990 (ADA), Title VII and the Connecticut Fair Employment Practices Act 46a-60(a)(1) *et seq.*

4.  At all times material, defendant is an employer within the meaning of the ADA, Title VII and the Connecticut Fair Employment Practices Act 46a-60(a)(1) *et seq.*

## JURISDICTION AND VENUE

5.  The Court has jurisdiction pursuant to 28 U.S.C. §1331 and 28 U.S.C. §1343 and this action is brought pursuant to: the American With Disabilities Act of 1990, cited as 42 U.S.C. §12101 and Title VII of the Civil Rights Act of 1964 as amended by the Civil Rights Act of 1991.

6.  This Court has personal jurisdiction over the Parties and venue is proper under 28 U.S.C. §1391(b) in that a substantial part of the events or omissions giving rise to the claim occurred in the State of Connecticut.

## GENERAL ALLEGATIONS

7.  Plaintiff is suffers from mental retardation.

8.  Plaintiff is male.

9.  At all times material, Defendant employs fifteen (15) or more individuals.

10.  In May 2008, defendant hired the plaintiff as a full time employee with the job title of Maintenance Helper.

11.  Plaintiff worked at defendant's Lake Compounce Theme Park located in Bristol, Connecticut.

12.  Plaintiff was subjected to sexual harassment by his co-employees including Justin Walters.

13.  Defendant, by and through its employees, called the plaintiff stupid.

14.  Defendant, by and through its employees, told the plaintiff that he did not know what he was doing.

15.  Defendant, by and through its employees, wrote the word "sucks" next to plaintiff's name located on plaintiff's blow torch.

16. Defendant, by and through its employees, threw and smashed an apple on plaintiff's truck.

17. Defendant, by and through its employee, Walters, told the plaintiff that being on his knees was his best position and that he liked being on his knees because he liked guys so much.

18. Walters would repeatedly make the above-referenced comment when plaintiff was required to get on his knees to perform his job duties.

19. Defendant, by and through its employees Walters, told the plaintiff that he "had" plaintiff's mother last night and that she was good.

20. Plaintiff complained to his immediate supervisor, John Fitch, about the harassment.

21. Fitch told the plaintiff that he would have to deal with it if he wanted to work in the department.

22. Fitch failed to end the harassment.

23. Upon information and belief, Fitch failed to make any effort to end the harassment.

24. Plaintiff spoke to Fitch's supervisor, Mario Abela about the harassment by Walters and was told to give Walters a chance and that he was not so bad.

25. Plaintiff spoke to defendant's general manager, Jerry Brick, and asked if he could find a new position to work because of the problems he was having.

26. Plaintiff asked if he could work in the painting department.

27. Defendant told the plaintiff that there were no open positions in the painting department.

28.  On October 31, 2009, defendant terminated plaintiff's employment.

29.  At all times material, defendant was aware of plaintiff's mental disability.

30.  Defendant sexually harassed the plaintiff and harassed the plaintiff on the basis of his disability.

31.  At all times material, plaintiff's disability does not prevent him from performing the essential functions of his job with or without a reasonable accommodation.

32.  Any excuse to be given by the defendant regarding plaintiff's termination would be a pretext for the termination.

33.  Plaintiff filed charges on the following date: February 22, 2010 with the Equal Employment Opportunity Commission (EEOC).

34.  Plaintiff's receipt of the right to sue letter is pending.

35.  Plaintiff filed charges on the following date: February 22, 2010, with the Commission on Human Rights and Opportunities (CHRO).

36.  Plaintiff received a release of jurisdiction (copy attached as Exhibit 1) on the following date: December 29, 2010.

### FIRST COUNT
**(Disability Discrimination In Violation Of The ADA)**

1.  Plaintiff repeats the allegations in paragraphs 1 through 41 above as if fully incorporated herein.

37.  Defendant's actions violate the Americans With Disabilities Act of 1990 as amended, which prohibits discrimination on the basis of disability.

38.  Defendant, by and through its agents and/or employees, violated the Americans With Disabilities Act, in one or more of the following ways:

(a)    In that defendant interfered with plaintiff's privilege of employment on the basis of plaintiff's disability;

(b)    In that defendant discriminated against the plaintiff in such a way that it adversely affected his status as an employee including termination;

(c)    In that defendant terminated plaintiff's employment; and

(d)    In that defendant treated the plaintiff adversely different from similarly situated non-disabled employees;

39.  As a direct and proximate result of defendant's unequal treatment and discrimination, plaintiff has been deprived of his employment and equal employment opportunities because of her disability.

40.  As a further direct and proximate result of defendant's discrimination of the plaintiff, plaintiff has been deprived of income, wages, and benefits.

41.  As a further result of defendant's termination and discrimination of the plaintiff, plaintiff has suffered severe humiliation, embarrassment, emotional distress, and harm to professional reputation.

42.  Plaintiff has suffered and will continue to suffer injuries and losses as a result of defendant's wrongful and discriminatory acts.

43.  Defendant's conduct towards the plaintiff was arbitrary and discriminatory all in violation of the ADA.  The defendant exhibited ill will, malice, improper motive and indifference to the plaintiff's civil rights by terminating his employment on the basis of his disability.

## SECOND COUNT
### (Disability Discrimination in Violation of C.G.S. §46a-60(a)(1))

1. Plaintiff repeats the allegations in paragraphs 1 through 43 above as if fully incorporated herein.

44. Defendant, by and through its agents, servants, and/or employees, violated the Connecticut Fair Employment Practices Act C.G.S. §46a-60a *et seq.* in one or more of the following ways.

      a.      In that defendant interfered with plaintiff's privilege of employment on the basis of plaintiff's disability;

      b.      In that defendant limited and classified the plaintiff by his disability in such a way that deprived him of opportunities and recognition given to other similarly situated coworkers;

      c.      In that defendant discriminated against the plaintiff in such a way that adversely affected his status as an employee;

      d.      In that defendant treated the plaintiff adversely different from similarly situated non-disabled employees;

      e.      In that defendant terminated plaintiff's employment on account of his disability; and

      f.      In that defendant intentionally discriminated against the plaintiff;

45. As a direct and proximate result of defendant's unequal treatment and discrimination, plaintiff has been deprived of his employment and equal employment opportunities because of his disability.

46. As a further direct and proximate result of defendant's discrimination of the plaintiff, plaintiff has been deprived of income, wages, and benefits.

47.  As a further result of defendant's termination and discrimination of the plaintiff, plaintiff has suffered severe humiliation, embarrassment, emotional distress, and harm to professional reputation.

48.  Plaintiff has suffered and will continue to suffer injuries and losses as a result of defendant's wrongful and discriminatory acts.

49.  Defendant's conduct towards the plaintiff was arbitrary and discriminatory all in violation of the C.G.S. Section 46a-60(a)(1).  The defendant exhibited ill will, malice, improper motive and indifference to the plaintiff's civil rights by terminating him employment on the basis of his disability.

### THIRD COUNT
### (Gender Discrimination in Violation of C.G.S. §46a-60(a)(1))

1.  Plaintiff repeats the foregoing allegations as if the same were repeated herein.

50.  Defendant's actions violated Connecticut Fair Employment Practices Act, C.G.S. §46a-60(a)(1) as amended, which prohibit discrimination on the basis of gender in one or more of the following ways:

(a)     In that defendant terminated plaintiff's employment because of his gender;

(b)     In that defendant interfered with plaintiff's privilege of employment on the basis of plaintiff's gender;

(c)     In that defendant limited and classified the plaintiff by his gender in such a way that deprived herein of opportunities and recognition given to other similarly situated coworkers;

(d)     In that defendant discriminated against the plaintiff in such a way that adversely affected his status as an employee;

(e)     In that defendant treated the plaintiff adversely different from similarly situated non-male employees; and

(f)     In that defendant discriminated against the plaintiff because the plaintiff did not act more masculine thus did not fit a stereotype of his gender.

51. As a direct and proximate result of defendant's discrimination and wrongful termination, plaintiff has been deprived of his employment and equal employment opportunities because of his gender.

52. As a further direct and proximate result of defendant's discrimination of the plaintiff, plaintiff has been deprived of income, wages and benefits.

53. As a further result of defendant's termination and discrimination of the plaintiff, plaintiff has suffered severe humiliation, embarrassment and emotional distress.

54. Plaintiff has suffered and will continue to suffer injuries as a result of defendant's wrongful and discriminatory acts.

55. Defendant's termination and unequal treatment of the plaintiff was arbitrary, unreasonably discriminatory and retaliatory all in violation of Connecticut's Fair Employment Practices Act. The defendant exhibited ill will, malice, improper motive, and indifference to the plaintiff's civil rights by terminating him on the basis of his gender.

### FOURTH COUNT
**(Gender Discrimination in Violation of Title VII)**

1. Plaintiff repeats the foregoing allegations as if the same were repeated herein.

56. Defendant's actions violated Title VII of the Civil Rights Act of 1964 as amended by the Civil Rights Act of 1991 in one or more of the following ways.

(a)     In that defendant terminated plaintiff's employment because of his gender;

(b)    In that defendant interfered with plaintiff's privilege of employment on the basis of plaintiff's gender;

(c)    In that defendant limited and classified the plaintiff by his gender in such a way that deprived herein of opportunities and recognition given to other similarly situated coworkers;

(d)    In that defendant discriminated against the plaintiff in such a way that adversely affected his status as an employee;

(e)    In that defendant treated the plaintiff adversely different from similarly situated non-male employees; and

(f)    In that defendant discriminated against the plaintiff because the plaintiff did not act more masculine thus did not fit a stereotype of his gender.

57.  As a direct and proximate result of defendant's discrimination and wrongful termination, plaintiff has been deprived of his employment and equal employment opportunities because of his gender.

58.  As a further direct and proximate result of defendant's discrimination of the plaintiff, plaintiff has been deprived of income, wages and benefits.

59.  As a further result of defendant's termination and discrimination of the plaintiff, plaintiff has suffered severe humiliation, embarrassment and emotional distress.

60.  Plaintiff has suffered and will continue to suffer injuries as a result of defendant's wrongful and discriminatory acts.

61.  Defendant's termination and unequal treatment of the plaintiff was arbitrary, and unreasonably discriminatory all in violation of Title VII. The defendant exhibited ill will, malice, improper motive, and indifference to the plaintiff's civil rights by

terminating him on the basis of his gender.

## FIFTH COUNT
### (Hostile Work Environment Sexual Harassment In Violation of Title VII)

1.  Plaintiff repeats the foregoing allegations as if the same were repeated herein.

62.  Plaintiff was repeatedly subjected to sexual harassment by his co-worker. The harassment was repetitious and continuous.

63.  The harassment was unwelcome.

64.  The harassment was based upon his gender and was sexual in nature.

65.  Plaintiff subjectively, reasonably and objectively perceived his work environment to be hostile.

66.  Defendant knew or should have known that the plaintiff was being sexually harassed and unreasonably failed to stop the sexual harassment.

67.  As a direct and proximate result of the hostile work environment sexual harassment, plaintiff suffered damages.

## SIXTH COUNT
### (Hostile Work Environment Sexual Harassment In Violation of C.G.S. §46a-60(a)(1)))

1.  Plaintiff repeats the foregoing allegations as if the same were repeated herein.

68.  Plaintiff was repeatedly subjected to sexual harassment by his co-worker. The harassment was repetitious and continuous.

69.  The harassment was unwelcome.

70.  The harassment was based upon his gender and was sexual in nature.

71.  Plaintiff subjectively, reasonably and objectively perceived his work environment to be hostile.

72.  Defendant knew or should have known that the plaintiff was being sexually

harassed and unreasonably failed to stop the sexual harassment.

73.  As a direct and proximate result of the hostile work environment sexual harassment, plaintiff suffered damages.

## SEVENTH COUNT
**(Retaliation In Violation of Connecticut Fair Employment Practices Act C.G.S. §46a-60(a)(4))**

1.  Plaintiff repeats and re-alleges the allegations set forth above as though fully set forth herein.

74.  Defendant, by and through its agents, servants, and/or employees, violated the Connecticut Fair Employment Practices Act C.G.S. §46a-609(a)(4) *et seq.* in one or more of the following ways.

a.       In that defendant retaliated against the plaintiff in response to his complaint that he was being sexually harassed;

b.       In that defendant retaliated against the plaintiff for his protesting of discriminatory conduct and treatment directed towards him on the basis of his disability.

75.  As a  result of defendant's violation of Connecticut Fair Employment Practices Act C.G.S. §46a-60(a)(4), plaintiff suffered damages including: loss of employment, loss of income and wages and benefits, and harm to his professional reputation.

76.  As a further result of defendant's retaliatory termination of the plaintiff, plaintiff has suffered severe humiliation, embarrassment, and emotional distress.

77.  Plaintiff has suffered and will continue to suffer injuries as a result of defendant's wrongful and retaliatory acts.

78.  Defendant's retaliatory conducted toward the plaintiff was arbitrary,

unreasonably discriminatory and retaliatory all in violation of Connecticut Fair

Employment Practices Act C.G.S. §46a-609(a)(4) *et seq*.  The defendant exhibited ill

will, malice, improper motive, and indifference to the plaintiff's civil rights by retaliating

against him.

**EIGHTH COUNT**
**(Retaliation In Violation of Title VII)**

1.  Plaintiff repeats and re-alleges the allegations set forth above as though fully

set forth herein.

79.  Defendant, by and through its agents, servants, and/or employees, violated

Title VII of the Civil Rights Act of 1964 as amended by the Civil Rights Act of 1991. in

one or more of the following ways.

a.      In that defendant retaliated against the plaintiff in response to his

complaint that he was being sexually harassed;

b.      In that defendant retaliated against the plaintiff for his protesting of

discriminatory conduct and treatment directed towards him on the basis of his disability.

80.  As a  result of defendant's violation of Title VII, plaintiff suffered damages

including: loss of employment, loss of income and wages and benefits, and harm to his

professional reputation.

81.  As a further result of defendant's retaliatory termination of the plaintiff,

plaintiff has suffered severe humiliation, embarrassment, and emotional distress.

82.  Plaintiff has suffered and will continue to suffer injuries as a result of

defendant's wrongful and retaliatory acts.

83.  Defendant's retaliatory conducted toward the plaintiff was arbitrary,

unreasonably discriminatory and retaliatory all in violation of Title VII. The defendant

exhibited ill will, malice, improper motive, and indifference to the plaintiff's civil rights by retaliating against him.

## DEMAND FOR RELIEF

WHEREFORE, plaintiff prays for appropriate compensatory damages including: compensatory damages; damages for back pay, front pay, bonuses, personal days, lost pension benefits, emotional distress; consequential damages; punitive damages; reasonable attorneys' fees; costs; interest; job reinstatement; prejudgment interest; for an injunction requiring the removal of any and all adverse information contained in plaintiff's personnel file; for a trial by jury; and for all other just and proper relief.

DATE:    October 6, 2011

___/s/ James Sabatini_____
James V. Sabatini, Esq.
Fed. No.: CT 19899
SABATINI AND ASSOCIATES, LLC
1 Market Square
Newington, CT 06111
Tel. No.: (860) 667-0839
Fax No.: (860) 667-0867
Email: jsabatini@sabatinilaw.com

ATTORNEY FOR PLAINTIFF

## <u>ELECTRONIC CERTIFICATE OF SERVICE</u>

I hereby certify that on October 6, 2011 a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated in the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.


_____/s/ James V. Sabatini
James V. Sabatini

**EXHIBIT 1**

# STATE OF CONNECTICUT
## COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES

**Andrew Adams**
COMPLAINANT

vs.                                                    **DATE: December 29, 2010**

**Palace Entertainment d/b/a Lake Compounce Theme Park**
RESPONDENT

CHRO Case No. 1030252

## RELEASE OF JURISDICTION

Pursuant to the request for a release of jurisdiction, the Commission on Human Rights and Opportunities hereby releases its jurisdiction over the above-identified complaint in accordance with CONN. GEN. STAT. § 46a-101. The Complainant is authorized to commence a civil action in accordance with CONN. GEN. STAT. § 46a-100 against the Respondent in the Superior Court for the judicial district in which the discriminatory practice is alleged to have occurred or in which the Respondent transacts business. If this action involves a state agency or official, it may be brought in the Superior Court for the judicial district of Hartford.

**A copy of any civil action brought pursuant to this release must be served on the Commission at 25 Sigourney Street, Hartford, CT 06106 at the same time all other parties are served. THE COMMISSION MUST BE SERVED BECAUSE IT HAS A RIGHT TO INTERVENE IN ANY ACTION BASED ON A RELEASE OF JURISDICTION PURSUANT TO CONN. GEN. STAT. § 46a-103.**

In granting this release, the Commission expressly finds in accordance with CONN. GEN. STAT. §§ 46a-100 and 46a-101(b) that all conditions precedent to the issuance of the release have been met. The complaint was timely filed under CONN. GEN. STAT. § 46a-82 and the complaint has been pending for a period of not less than 210 days. The complaint is not currently scheduled for public hearing nor is there reason to believe that the complaint will be resolved within a period of 30 days from the date the Commission received the request.

The Complainant must bring an action in Superior Court within 90 days of receipt of this release and within two years of the date of filing the complaint with the Commission unless circumstances tolling the statute of limitations are present.

With the granting of this release of jurisdiction, the Commission administratively dismisses this complaint in accordance with CONN. GEN. STAT. § 46a-101(d) without cost or penalty to any party.

Very truly yours,

Robert J. Brothers, Jr.
Executive Director

cc: Complainant's counsel James V. Sabatini by e-mail to: jsabatini@sabatinilaw.com
Respondent's Attorney: Christopher H. Mills by e-mail to: cmills@laborlawyers.com

EXHIBIT 8



Not Reported in F.Supp.2d, 2002 WL 977535 (S.D.N.Y.)
**(Cite as: 2002 WL 977535 (S.D.N.Y.))**

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Sylvia PIMENTEL, Plaintiff,
v.
CITY OF NEW YORK, Defendant.

No. 00 CIV.326(SAS).
May 14, 2002.

Sylvia Pimentel, Brooklyn, for Plaintiff (Pro Se).

Donald C. Sullivan, Esq., Assistant Corporation Counsel of the City of New York, New York, for Defendant.

OPINION AND ORDER
SCHEINDLIN, D.J.

**\*1** Sylvia Pimentel has sued the City of New York ("City"), alleging that it has "discriminated against her in employment on the basis of her race, national origin, and her disability" in violation of various federal laws. *Pimentel v. City of New York, No. 00 Civ. 326, 2001 WL 1579553, at \*1 (S.D.N.Y. Dec. 11, 2001).* Pimentel also sued the City for retaliation based on its denial of her requests to be transferred from Manhattan to Brooklyn for medical reasons. On December 11, 2001, this Court granted summary judgement to the City on all of the claims except one: With respect to the retaliation claim, this Court held that Pimentel had proffered "sufficient circumstantial evidence to permit a rational factfinder to infer that defendant would have granted plaintiff a transfer had it not been for her various administrative complaints." *Id.* at \*19.

The City now moves for reconsideration of the denial of summary judgement with respect to the retaliation claim. *See* Defendant's Memorandum of Law in Support of its Motion for Summary Judgment on plaintiff's Claim of Retaliation. The City does not challenge this Court's holding that plaintiff has produced sufficient evidence to raise a material issue of fact as to whether it denied her transfer in retaliation for her complaints of discrimination. Rather, the City argues that plaintiff "did not suffer an adverse employment action when her transfer request was denied," an issue that was not previously addressed. *Id.* at 1; *see also* 12/19/01 Letter from Donald C. Sullivan, Assistant Corporation Counsel to the City of New York at 4.

For the reasons set forth below, the motion for summary judgement on Pimentel's retaliation claim is now granted.

II. LEGAL STANDARD

A motion for summary judgment may be granted only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed.R.Civ.P. 56(c).* "[G]enuineness runs to whether disputed factual issues can reasonably be resolved in favor of either party, [while] materiality runs to whether the dispute matters, *i.e.,* whether it concerns facts that can affect the outcome under the applicable substantive law. A reasonably disputed, legally essential issue is both genuine and material and must be resolved at trial." *Mitchell v. Washingtonville Cent. Sch. Dist., 190 F.3d 1, 5 (2d Cir.1999)* (quotation marks and citations omitted).

In determining whether genuine issues of material fact are in dispute, courts must resolve all ambiguities and draw all reasonable factual inferences in favor of the non-moving party. *See Nora Beverages, Inc. v. Perrier Group of Am., Inc., 164 F.3d 736, 742 (2d Cir.1998).* The moving party bears the initial burden of demonstrating an absence of genuine issues of material fact. *See Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir.1997).* If the moving party meets its initial burden, the non-moving party may not rely on conclusory allegations or speculation to create factual disputes. Instead, the non-moving party "must produce specific facts indicating that a genuine issue of fact exists. If the evidence [presented by the non-moving party] is merely colorable, or is not significantly probative, summary judgment may be granted." *Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir.1998)* (quotation marks and citations omitted) (alteration in original).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 977535 (S.D.N.Y.)
**(Cite as: 2002 WL 977535 (S.D.N.Y.))**

III. FACTS

**\*2** In 1988, Pimentel began working for the City in the Bureau of Child Welfare.[FN1] *See Pimentel, 2001 WL 1579553, at \*1.* Two years later, she became a permanent Civil Service employee holding the position of caseworker. *See id.* In January 1997, Pimentel was promoted on a probationary basis to a supervisory position in the City's Administration for Children's Services Office of Child Support Enforcement ("OCSE"). *See id.* Over the next seven months, Pimentel received numerous memoranda that criticized her performance as a supervisor and, in August 1997, she was demoted to her previous position as a caseworker. *See id.* In January 1998, Pimentel filed a charge of discrimination with the New York City Commission on Human Rights that alleged that the City demoted her because of her race and national origin. *See id.*

> FN1. Familiarity with this Court's previous decision is presumed; only those facts that relate to Pimentel's claim of retaliation are presented here.

Seven months later, in August 1998, Pimentel was diagnosed with Hepatitis C. *See id.* One week later, Pimentel requested a transfer to OCSE in Brooklyn claiming that stress caused by harassment in the Manhattan OCSE office would worsen her medical condition. *See 8/13/98 Letter from Sylvia Pimentel attached to Notice of Motion for Summary Judgment in Favor of Defendant.* A few weeks later, on September 1, 1998, Pimentel filed a charge of retaliation with the New York State Division on Human Rights in which she claimed that the City had retaliated against her by giving her poor job assignments, disciplinary memoranda, and performance evaluations for previously filing a charge of discrimination. *See Pimentel, 2001 WL 1579553, at \*1.*

On two occasions during the following year, Pimentel requested that the City transfer her out of OCSE altogether—on March 25, 1999, and September 8, 1999. *See id.* In the first request, she cited management's alleged harassment. *See 3/25/99 Letter from Sylvia Pimentel attached to Notice of Motion for Summary Judgment in Favor of Defendant* ("Def.Not.Mot."). In the second request, sent a few weeks after Pimentel began a treatment regime for Hepatitis C,[FN2] she claimed that the harassment had caused her medical condition to worsen and again

requested a transfer out of OCSE. *See 9/8/99 Letter from Sylvia Pimentel attached to Def. Not. Mot.* None of Pimentel's transfer requests were granted. *See Pimentel, 2001 WL 1579553, at \*1.* Three weeks after her last transfer request, on September 22, 1999, Pimentel filed another complaint of discrimination that alleged she was being discriminated against on the basis of her disability (Hepatitis C), race and national origin. *See id.* Among other things, Pimentel alleged that the City was wrongfully refusing to transfer her. *See id.*

> FN2. Pimentel began Rebetron injection therapy on August 13, 1999. *See 10/13/99 Letter from Dr. Jane Geders to Dr. Carmen Co attached to Notice of Motion for Summary Judgment in Favor of Defendant.*

On January 18, 2000, Pimentel filed the instant Complaint. The sole remaining issue is whether the denial of Pimentel's transfer requests constituted an adverse employment action.

IV. TRANSFERS AND DENIALS OF TRANSFER REQUESTS AS ADVERSE EMPLOYMENT ACTIONS

Title VII prohibits an employer from retaliating against an employee who has complained of discrimination. *See 42 U.S.C. § 2000e–3(a)*(1994). To make out a prima facie case of discriminatory retaliation a plaintiff must demonstrate that: (i) she engaged in an activity protected under Title VII; (ii) the employer was aware of her participation in the protected activity; (iii) the employer took an adverse employment action against the employee; and (iv) a causal connection existed between the employee's protected activity and the adverse employment action taken by the employer. *See Gordon v. New York City Bd. of Educ., 232 F.3d 111, 116 (2d Cir.2000).*

**\*3** Title VII prohibits discriminatory acts that affect the "terms and conditions" of employment. *See 42 U.S.C. § 2000e–3(a); Gregory v. Daly, 243 F.3d 687, 695 (2d Cir.2001).* Examples of adverse employment actions are "discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand." *Morris v. Lindau, 196 F.3d 102, 110 (2d Cir.1999).* The Second Circuit has also held that lesser actions may meet the adversity threshold, but it has not explicitly defined what quantum of lesser actions constitutes an adverse employment action. *Id.*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 977535 (S.D.N.Y.)
**(Cite as: 2002 WL 977535 (S.D.N.Y.))**

"Because there are no bright line rules as to which employment actions meet the threshold for 'adverse,' courts must make this determination on a case-by-case basis." *Wilburn v. Fleet Fin. Group, Inc., 170 F.Supp.2d 219, 237 (D.Conn.2001)*, (quoting *Richardson v. New York State Dep't of Corr. Serv., 180 F.3d 426, 446 (2d Cir.1999)*).

To sustain an adverse employment action, a plaintiff must "endure[ ] a 'materially adverse change' in the terms and conditions of employment." *Galabya v. New York City Bd. of Educ., 202 F.3d 636, 640 (2d Cir.2001)* (quoting *Richardson, 180 F.3d at 446).* In order for the action(s) to be " 'materially adverse', a change in working conditions must be 'more disruptive than a mere inconvenience or an alteration of job responsibilities.' " *Id.* (quoting *Crady v. Liberty Nat'l Bank and Trust Co. of Indiana, 993 F.2d 132, 136 (7th Cir.1993)*). A " 'material adverse change' is one that 'has an attendant negative result, a deprivation of a position or an opportunity." ' *Campbell v. Grayline Air Shuttle, Inc., 930 F.Supp. 794, 802 (E.D.N.Y.1996)* (citations omitted). While adverse employment actions extend beyond readily quantifiable losses, "not everything that makes an employee unhappy is an actionable adverse action." *Phillips v. Bowen, 278 F.3d 103, 117 (2d Cir.2002). See also Bennett v. Watson Wyatt & Co., 136 F.Supp.2d 236 (S.D.N.Y.2001)*.

A. When a Transfer or Denial of a Transfer Request Is an Adverse Employment Action

Denial of a transfer request may constitute an adverse employment action in certain circumstances. For example, a transfer has an adverse impact on the terms and conditions of employment if the employee: (i) has the same job responsibilities and compensation but an increase in workload and location-specific stress [FN3]; (ii) has different job responsibilities [FN4]; (iii) is no longer eligible for promotion opportunities [FN5]; or (iv) experiences a net loss in salary [FN6]. An adverse employment action may also occur when an employee is transferred "from an 'elite' division ... which provided prestige and opportunity for advancement, to a less prestigious unit with little opportunity for professional growth." *de la Cruz v. New York City Human Res. Admin. Dep't of Soc. Serv., 82 F.3d 16, 21 (2d Cir.1996)*. Finally, denial of a transfer request may constitute an adverse employment action where an employee's work environment prior to the request is objectively unfavorable.[FN7]

FN3. *See Patrolmen's Benevolent Ass'n of the City of New York, Inc. v. City of New York, 74 F.Supp.2d 321, 335–36 (S.D.N.Y.1999)* (holding that involuntary transfer of police officers was an adverse employment action because of reduced status and an increased workload and stress).

FN4. *See Richardson, 180 F.3d at 444* ("There was sufficient evidence to conclude that the transfer and reassignment—which involved different job responsibilities and a move to a position involving contact with a prisoner population—constituted an adverse employment action.").

FN5. *See Stembridge v. City of New York, 88 F.Supp.2d 276, 283 (S.D.N.Y.2000)* (finding that transfer of employee together with ineligibility for promotion opportunities pending resolution of dispute with supervisor was an adverse employment action).

FN6. *See Bampoe v. Coach Stores, Inc., 93 F.Supp.2d 360, 373 (S.D.N.Y.2000)*.

FN7. *See Mecklenberg v. New York City Off–Track Betting, 42 F.Supp.2d 359, 378 (S.D.N.Y.1999)* (holding that denial of a request to transfer, from a department where working conditions were objectively unfavorable due to the measurable shortage in staff, to a department where conditions were more favorable constituted an adverse employment action).

B. When a Transfer or Denial of a Transfer Request Is Not an Adverse Employment Action

**\*4** A "pure lateral transfer, that is, a transfer that does not involve a demotion in form or substance, cannot rise to the level of a materially adverse employment action." *Adeniji v. Admin. for Children Serv., NYC, 43 F.Supp.2d 407, 426 (S.D.N.Y.1999)* (internal citations omitted). "[T]he mere fact that an employee has been transferred or that his job responsibilities have changed is not in itself sufficient to show an adverse change in working conditions." *Cooper v. New York State Dep't of Human Rights, 986 F.Supp. 825, 828 (S.D.N.Y.1997)*. Thus, denial

Not Reported in F.Supp.2d, 2002 WL 977535 (S.D.N.Y.)
**(Cite as: 2002 WL 977535 (S.D.N.Y.))**

of a request to transfer to an office of the same agency or department in a location more convenient to the employee's home, where there will no significant change in duties or opportunities for advancement, does not constitute an adverse employment action.[FN8]

> FN8. *See Nonnenmann v. City of New York,* 174 F.Supp.2d 121, 133 (S.D.N.Y.2001) (holding that denial of officer's request to transfer to a more convenient precinct was not an adverse employment action because the transfer would not have involved a material change in working conditions and because Nonnenmann did not allege that the salaries, benefits and opportunities for advancement in the two locations were different); *see also Duncan v. Shalala,* No. 97 CV 3607, 2000 WL 1772655, at *4 (E.D.N.Y. Nov. 29, 2000) (holding that denial of a transfer request so that an employee could live near his wife was not an adverse employment action).

An "adverse employment action affects the terms, privileges, duration, or conditions of the plaintiff's employment" and, for that reason, "subjective feelings ... are not enough to transform the denial [of a transfer request] into an adverse employment action within the meaning of Title VII." *Bunis v. Runyon,* No. 94 Civ.2063, 1997 WL 639241, at *3 (S.D.N.Y. Oct. 16, 1997). If an employee "earns the same salary, has the same benefits, works the same hours ... and has the same opportunities for promotion" following a transfer then there is no adverse employment action, even if the employee is "extremely unhappy about it." *Garber v. New York City Police Dept.,* No. 95 Civ. 2516, 1997 WL 525396, at *4 (S.D.N.Y. Aug. 22, 1997) (holding that "purely subjective feelings about a transfer which, by objective standards, did not negatively alter the terms and conditions of his employment in any respect" have no bearing on whether an adverse employment action occurred).[FN9] Interference with "sleeping, therapy, eating and medication schedules are purely subjective matters that Title VII does not address." *Armfield v. Jacobson,* No. 95–CV–4820, 1998 WL 427560, at *6 (E.D.N.Y. Jan. 21, 1998).

> FN9. *See also Morris,* 196 F.3d at 113 ("Morris does not allege that the transfer

here involved any change in job description, days and hours, duties, benefits, or opportunity for promotion. It follows that the transfer was not an adverse employment action.").

Denial of "requested transfers [that] did not involve an upgrade in position or increase in wages" is not an adverse employment action. *Gonzalez v. FedEx Co.,* No. 95 Civ. 3529, 1998 WL 289722, at *4 n. 7 (S.D.N.Y. June 3, 1998). In such a case, an employee is not seeking a better position or enhanced conditions and is not harmed by denial of a transfer request.

## V. PIMENTEL'S CLAIMS

A. Denial of Pimentel's Request for a Lateral Transfer Was Not an Adverse Employment Action

On August 13, 1998, Pimentel made her first request for a transfer—a pure lateral transfer to the OCSE office in Brooklyn. The denial of this request fails to constitute an adverse employment action for four reasons. *First,* there would have been no discernible difference in job responsibilities. She would have served the public in Brooklyn—the same public—just as she did in the Manhattan office. There is no objective evidence that the workload and associated levels of stress were different. *See supra* Parts IV.A. and B. [FN10] *Second,* where there is no loss of salary, benefits, seniority, tenure or promotion opportunities, there is no adverse employment action. In this case, Pimentel does present any evidence, or even claim, that the requested transfer would have improved the terms and conditions of her employment. *See supra* Parts IV.A. and B.[FN11] *Third,* a transfer, or denial of a transfer, to a more or less convenient location does not, by itself, constitute an adverse employment action.[FN12] *See supra* Part IV.B. [FN13] *Fourth,* Pimentel's claim that she would have been happier or more at ease in the Brooklyn office of the OCSE cannot elevate the denial of her request to an adverse employment action because it is based only on her subjective feelings. *See supra* Part IV.B.[FN14]

> FN10. *See also Richardson,* 180 F.3d at 446; *Patrolmen's Benevolent Ass'n,* 74 F.Supp.2d at 335–36; *Adeniji,* 43 F.Supp.2d at 426; *Cooper,* 986 F.Supp. at 828.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 977535 (S.D.N.Y.)
**(Cite as: 2002 WL 977535 (S.D.N.Y.))**

FN11. *See also Galabya,* 202 F.3d at 641; *de la Cruz,* 83 F.3d at 21; *Bampoe,* 93 F.Supp.2d at 373; *Stembridge,* 88 F.Supp.2d at 283.

FN12. Pimentel had not yet started medical treatment when she requested a transfer to the Brooklyn office. Denial of this request therefore had no impact on her ability to seek ongoing medical treatment.

FN13. *See also Nonnenmann,* 174 F.Supp.2d at 133; *Duncan,* 2000 WL 1772655, at *4.

FN14. *See also Morris,* 196 F.3d at 113; *Armfield,* 1998 WL 427560, at *6; *Bunis,* 1997 WL 639241, at *3; *Garber,* 1997 WL 525396, at *4.

B. Denial of Pimentel's Request for a Transfer Out of OCSE Was Not an Adverse Employment Action

**\*5** Pimentel's second and third request, if granted, would not have constituted a pure lateral transfer because she asked to be transferred out of OCSE altogether. Nonetheless, her claim of an adverse employment action based on the denials of these transfers fails for two reasons.

*First,* while Pimentel claims that the Manhattan office of OCSE is a particularly stressful place for her, she has not offered any evidence that conditions in this office are *objectively* worse than conditions at other City agencies where employees interact with the public on a regular basis. *See supra* Part IV.A .[FN15] *Second,* when Pimentel requested a transfer out of OCSE, she did not request assignment to any particular agency. As a result, there is no way to evaluate whether the denials involved "an upgrade in position or increase in wages." Accordingly, I cannot conclude that plaintiff suffered an adverse employment action. *See supra* Part IV.B.[FN16]

FN15. *See also Mecklenberg,* 42 F.Supp.2d at 378.

FN16. *See also Gonzalez,* 1998 WL 289722, at *4 n. 7.

VI. CONCLUSION

Because Pimentel has failed to establish that denial of her transfer requests constituted an adverse employment action, the defendant's motion for summary judgment is granted. The Clerk of the Court is directed to close this case.

SO ORDERED:

S.D.N.Y.,2002.
Pimentel v. City of New York
Not Reported in F.Supp.2d, 2002 WL 977535 (S.D.N.Y.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in A.2d, 2007 WL 2570413 (Conn.Super.), 44 Conn. L. Rptr. 62
**(Cite as: 2007 WL 2570413 (Conn.Super.))**

C

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Superior Court of Connecticut,
Judicial District of Ansonia-Milford.
Michael DZUBATY
v.
MILFORD BOARD OF EDUCATION.

No. CV065000824S.
Aug. 20, 2007.

John R. Williams, New Haven, for Michael Dzubaty.

Halloran & Sage, Westport, CT, for Milford Board of
Education.

RICHARD A. ROBINSON, J.
*Facts*
**\*1** The plaintiff brings this action pursuant to the
provisions of the Connecticut Fair Employment Prac-
tices Act, Conn. Gen Stat. §§ 46a-60, et seq. (herein-
after CFEPA).

He alleges in his complaint that he was em-
ployed as a school teacher by the defendant Milford
Board of Education from 1999 until his termination
from employment in June 2004.

He alleges that in 2003 he was diagnosed with
severe hypertension. He further alleges that his
hypertension is so severe that it substantially affects
his major life activities, including living and breath-
ing.

The plaintiff alleges that he notified the defen-
dant of his condition after he was diagnosed.

Before he gave notice of his condition to the de-
fendant, the plaintiff had received satisfactory or bet-
ter employment performance ratings.

After the defendant learned of the plaintiff's con-
dition the defendant became highly critical of the

plaintiff's job performance and began a pattern of bad
evaluations for the purpose of terminating the plain-
tiff's employment.

In June 2004 the defendant gave the plaintiff a
"nonrenewal hearing" and subsequently terminated
the plaintiff's employment.

The defendant's stated reason for terminating the
plaintiff was inadequate job performance. The plain-
tiff alleges that the stated reason is false and was de-
signed to cover up the fact that the defendant did not
want the plaintiff on its payroll because it might incur
substantial medical expenses and may need to give
the plaintiff a medical leave of absence.

The plaintiff alleges that he was able to perform
the essential functions of his job either with or with-
out a reasonable accommodation.

The plaintiff alleges that the defendant has dis-
criminated again him because of his disability in vio-
lation of § 46a-60(a)(1) C.G.S.

On March 23, 2007 the defendant filed a motion
for summary judgment. The defendant argues that the
plaintiff's condition does not constitute a recognized
disability under the Connecticut Employment Prac-
tice Act. The defendant further argues that the "un-
disputed facts demonstrate that the plaintiff was ter-
minated because of performance deficits and not be-
cause of his physical condition."

*Standards*
Before addressing the merits of the defendant's
motion, a brief review of the standards for the grant-
ing of a motion for summary judgment is warranted:
"Summary judgment shall be rendered forthwith if
the pleadings, affidavits and any other proof submit-
ted show that there is no genuine issue as to any ma-
terial fact and that the moving party is entitled to
judgment as a matter of law. In deciding a motion for
summary judgment, the trial court must view the evi-
dence in the light most favorable to the nonmoving
party." (Internal quotation marks omitted.) *Orkney v.
Hanover Ins. Co.,* 248 Conn. 195, 201, 727 A.2d 700
(1999).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2007 WL 2570413 (Conn.Super.), 44 Conn. L. Rptr. 62
**(Cite as: 2007 WL 2570413 (Conn.Super.))**

Section 17-45 of the Connecticut Practice Book concerns the proceedings for motions for summary judgment. It provides that: "A motion for summary judgment shall be supported by such documents as may be appropriate, including but not limited to affidavits, certified transcripts of testimony under oath, disclosures, written admissions and the like. The motion shall be placed on the short calendar to be held not less than fifteen days following the filing of the motion and the supporting materials, unless the judicial authority otherwise directs. The adverse party [prior to the day the case is set down for short calendar] shall at least five days before the date the motion is to be considered on the short calendar file opposing affidavits and other available documentary evidence. Affidavits, and other documentary proof not already a part of the file, shall be filed and served as are pleadings."

**\*2** "[T]he party opposing a motion for summary judgment] must provide an evidentiary foundation to demonstrate the existence of a genuine issue of material fact ..." (Citations omitted.) *Appleton v. Board of Education*, 254 Conn. 205, 209, 757 A.2d 1059 (2000). It "must be demonstrated by counter-affidavits and concrete evidence." (Citations omitted.) *Pion v. Southern New England Telephone*, 44 Conn.App. 657, 663, 691 A.2d 1107 (1997). "A material fact ... [is] a fact which will make a difference in the result of the case." (Citations omitted.) *H.O.R.S.E. of Connecticut, Inc. v. Washington*, 258 Conn. 553, 560, 783 A.2d 993 (2001). "In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party." (Citations omitted.) *Barry v. Quality Steel Products, Inc.*, 263 Conn. 424, 450, 820 A.2d 258 (2003). "The test is whether a party would be entitled to a directed verdict on the same facts." (Citations omitted; Internal quotation marks omitted.) *Cummings & Lockwood v. Gray*, 26 Conn.App. 293, 296-97, 600 A.2d 1040 (1991). "In ruling on a motion for summary judgment, the court's function is not to decide issues of material fact, but rather to determine whether any such issues exist." (Citations omitted.) *Nolan v. Borkowski*, 206 Conn. 495, 500, 538 A.2d 1031 (1988). A conclusory assertion [in an affidavit] does not constitute evidence sufficient to establish the existence of a disputed material fact for purposes of summary judgment. See *Hoskins v. Titan Value Equities Group, Inc.*, 252 Conn. 789, 793-94,

749 A.2d 1144 (2000).

*Discussion*

Section 46a-60 of the Connecticut General Statutes concerns discriminatory employment practices. This statute provides in pertinent part that: "(a) It shall be a discriminatory practice in violation of this section: (1) For an employer, by the employer or the employer's agent, except in the case of a bona fide occupational qualification or need, to refuse to hire or employ or to bar or to discharge from employment any individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment because of the individual's race, color, religious creed, age, sex, marital status, national origin, ancestry, present or past history of mental disability, mental retardation, learning disability or *physical disability,* including, but not limited to blindness." (Emphasis added.)

*The Plaintiff's Physical Condition Does Not Constitute a Recognized Disability Under CFEPA*

The defendant argues that it is entitled to summary judgment because the plaintiff is not "disabled" as that term is defined in CFEPA.

To establish a prima facie case of discrimination, a plaintiff must show (1) that he is an individual who has a disability within the meaning of the law, (2) that a covered employee had notice of the disability, (3) that with reasonable accommodation, he could perform the essential functions of the position in question, and (4) the employer refused to make such accommodations. *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208 (2d Cir.2001).

**\*3** Once the plaintiff has met his/her burden of proof of establishing a prima facie case, Connecticut courts employ the burden shifting framework of *McDonnell Douglass Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); see *Levy*, 936 Conn. at 103-04. To establish a prima facie case, the plaintiff must prove that: (1) he is in a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) that the adverse action occurred under circumstances giving rise to an inference of discrimination. *Board of Education of City of Norwalk v. Comm'n on Human Rights and Opportunities*, 266 Conn. 492, 509, 832 A.2d 660 (2003). If a plaintiff meets this initial burden of establishing a prima facie case of discrimina-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2007 WL 2570413 (Conn.Super.), 44 Conn. L. Rptr. 62
**(Cite as: 2007 WL 2570413 (Conn.Super.))**

tion, the defendant must then offer a legitimate reason for its decision, and if it does so, the burden shifts back to plaintiff who must demonstrate pretext. See *Ford v. Blue Cross & Blue Shield of Connecticut, Inc.,* 216 Conn. 40, 53, 578 A.2d 1054 (1990); see also *Ann Howard's Apricots Restaurant, Inc. v. Comm'n on Human Rights & Opportunities,* 237 Conn. 209, 224, 676 A.2d 844 (1996).

The defendant argues that the plaintiff stated at his deposition of December 1, 2006 that his high blood pressure is controlled when he takes his medication. It appears to this court that the defendant is urging this court to use what appears to be an ADA analysis to determine that the plaintiff does not have a disability. It essentially asserts that this Court must consider the effect of high blood pressure medications prescribed to the plaintiff. See *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 119 S.Ct. 2139, 144 L.Ed.2d 450 (mitigating or corrective measures must be taken into account in judging whether an individual suffers a disability); *Murphy v. United Parcel Serv., Inc.,* 527 U.S. 516, 119 S.Ct. 2133, 144 L.Ed.2d 484 (1999) (a truck driver with high blood pressure did not suffer a "disability" under the ADA where the medication for the condition allowed him to perform major life activities without substantial limitation).

The Americans with Disabilities Action ("ADA") and CFEPA define "disability" differently. The ADA's definition is more restrictive than CFEPA's. The United States District Court has held that "the disability discrimination provisions of CFEPA do not mirror the federal ADA." *Hill v. Pfizer, Inc.,* 266 F.Sup.2d 352, 364 (D.Conn.2003). Specifically, the court stated that "[t]o be disabled under Connecticut law is different than being disabled under the ADA." (Internal quotation marks omitted.) *Id.* "Physically disabled is defined under the CFEPA ... as any individual who has any chronic physical handicap, infirmity or impairment, whether congenital or resulting from bodily injury, organic processes or changes or from illness, including, but not limited to, epilepsy, deafness or hearing impairment or reliance on a wheelchair or other remedial appliance or device." (Citation omitted; internal quotation marks omitted.) *Id.*

"The Second Circuit has held that the ADA has an additional requirement that is absent from the

CFEPA definition. *Beason v. United Technologies Corp.,* 337 F.3d 271, 275 (2d Cir.2003). 'The CFEPA defines the term [p]hysically disabled as refer[ring] to any individual who has any chronic physical handicap, infirmity, or impairment ... The ADA also prohibits disability-based discrimination and similarly defines disability as a physical or mental impairment. But, significantly, it adds a requirement that the impairment substantially limit[s] one or more of the major life activities of [the] individual,' (Citation omitted; internal quotation marks omitted.) *Id.,* at 277. 'Absent similar language in the CFEPA, [the Second Circuit] believe[s] the Connecticut Supreme Court would decline to find the CFEPA possesses the same restrictive threshold.' *Id.* Furthermore, '[g]iven that the definition of disability used by the ADA essentially predates the definition of physical disability promulgated by the Connecticut General Assembly, had it wished to do so, could have adopted the ADA definition. The fact that the General Assembly chose not to adopt that language readily supports an inference that the Connecticut legislature appreciated the scope of the ADA definition and intended the CFEPA definition to be different.' " *Curry v. Goodman,* Judicial District of Hartford, at Hartford, D.N. CV 02-0817767S (Nov. 18, 2004, Stengel, J.)

**\*4** The court notes that although the plaintiff did state that his blood pressure is largely controlled by medication, he also stated that his blood pressure becomes uncontrolled when he gets very upset. He also stated that there were some incidents while working for the defendant that his blood pressure became uncontrolled.[FN1]

> [FN1]. See defendant's Exhibit A in support of the motion for summary judgment at page 256.

Even if this court were to accept the defendant's argument and apply the American Disability Act's standards to determine whether or not the defendant is disabled under CFEPA, there are genuine issues of fact as to whether the plaintiff's blood pressure was sufficiently under control to a point where it cannot be considered a disability.

The defendant argues in the alternative that "[t]o the extent the plaintiff may argue that the existence of a recognized disability is established by the five episodes in which his hypertension caused him

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2007 WL 2570413 (Conn.Super.), 44 Conn. L. Rptr. 62
**(Cite as: 2007 WL 2570413 (Conn.Super.))**

to leave work and be hospitalized; he would then not be a 'qualified individual with a disability' under the ADA and CFEPA because his hypertension rendered him completely unable to work and thus unable to perform the essential takes of the job." [FN2] However, there are genuine issues of material fact in existence as to whether the plaintiff's high blood pressure rendered him "completely unable to work."

> FN2. See defendant's memorandum in support of the motion for summary judgment at page 17.

*The Defendant was Terminated Because of Performance Deficits and not Because of His Physical Condition*

The main issue before this court concerns the intent of the defendant employer in terminating the plaintiff's employment. It is well settled law that "[s]ummary judgment is inappropriate where the inferences that the parties seek to have drawn deal with questions of motive, intent and subjective feelings and reactions." *Tryon v. North Branford,* 58 Conn.App. 702, 707, 755 A.2d 317 (2000). "A question of intent raises an issue of material fact, which cannot be decided on a motion for summary judgment." *Picataggio v. Romeo,* 36 Conn.App. 791, 794, 654 A.2d 382 (1995). "[E]ven with respect to questions of motive, intent and good faith [however], the party opposing summary judgment must present a factual predicate for [her] argument in order to raise a genuine issue of material fact." *Wadia Enterprises, Inc. v. Hirschfeld,* 224 Conn. 240, 250, 618 A.2d 506 (1992). Upon completing its review of the Exhibits filed in support of the objection to the motion of summary judgment this court finds that the plaintiff has met his burden of proof to show that there are genuine issues of material fact in existence as to the motive of the defendant in terminating the employment of the plaintiff.

*Conclusion*

For all of the foregoing reasons, the defendant's motion for summary judgment is denied.

Conn.Super.,2007.
Dzubaty v. Milford Bd. of Educ.
Not Reported in A.2d, 2007 WL 2570413 (Conn.Super.), 44 Conn. L. Rptr. 62

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.