**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| ANDREW ADAMS, | : | CIVIL ACTION NO. |
| Plaintiff, | : | 3:11-cv-427 (JCH) |
| | : | |
| v. | : | |
| | : | |
| FESTIVAL FUN PARKS, LLC, d/b/a/ | : | MARCH 12, 2013 |
| LAKE COMPOUNCE THEME PARK, | : | |
| Defendant. | : | |

**RULING RE: MOTION FOR SUMMARY JUDGMENT (Doc. No. 30)**

I.   **INTRODUCTION**

Plaintiff Andrew Adams ("Adams") commenced this action against defendant Festival Fun Parks, LLC, d/b/a Lake Compounce Theme Park ("Festival Fun Parks"), his former employer.  The Complaint alleges eight counts.  Counts 1 and 2 claim that Festival Fun Parks discriminated against Adams on the basis of his disability in violation of the Americans With Disabilities Act, 42 U.S.C. § 12101, et seq. (the "ADA")  and the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. § 46a–60(a), et seq. (the "CFEPA").  Counts 3 and 4 claim that Festival Fun Parks discriminated against Adams on the basis of his gender in violation of the ADA and Title VII of the Civil Rights Act of 1964, as amended ("Title VII").  Counts 5 and 6 claim that Adams was subjected to sexual harassment and a hostile work environment in violation of Title VII and the CFEPA.  Finally, Counts 7 and 8 claim that Festival Fun Parks retaliated against Adams in response to his complaints of harassment and discrimination in violation of the CFEPA and Title VII.  Festival Fun Parks has filed a Motion for Summary Judgment (Doc. No. 30) on all counts.

## II.     STATEMENT OF FACTS

Festival Fun Parks owns and operates Lake Compounce, a theme park located in Bristol, Connecticut.  Def.'s Local Rule 56(a)1 Statement ¶ 1.  Each summer from 1997 through 2007, with the exception of part of the summer of 2003, Adams worked at Lake Compounce as a seasonal employee of Festival Fun Parks.  Id. ¶¶ 5, 7.  As a seasonal employee, he held various positions at Lake Compounce, including ride operator, ride trainer, assistant ride supervisor, assistant ride coach, and housekeeping supervisor.  Id. ¶¶ 6, 10.  Sometime in 2008, Adams was hired as a full-time employee at Lake Compounce.  He worked there as a Mechanical Helper until his employment ended in October 2009.  Id. ¶¶ 12–13.

Adams alleges that he was subjected to sexual harassment and gender and disability discrimination while he was a full-time employee of Festival Fun Parks.  Pl.'s Local Rule 56(a)(2) Statement ¶ 8.  Adams alleges that he suffers from a "slight mental retardation," which causes him to be a slow learner and have difficulty remembering things.  Id. ¶¶ 1–2.  Adams claims that he kept a log of incidents of workplace harassment that occurred between February 2009 and October 2009.  This log identifies approximately six such incidents, most of which identify a co-worker, Justin Walters ("Walters"), as the source of the harassment.  Id. ¶¶ 10–15 & Ex. 6 ("Adams Log").  Adams alleges that he told John Fitch ("Fitch") and Mario Abela ("Abela"), two of his supervisors, as well as Mike Hayes, who worked in HR, about his being harassed, but that they failed to do anything about the situation.  Id. ¶¶ 10, 12, 14, 16.

Adams further alleges that in September 2009, he asked Jerry Brick ("Brick"), the general manager, if he could be transferred to the paint shop.  Id. ¶ 17.  According to

Adams, Brick told Adams he could not transfer him because he lacked painting experience.  Brick later told him that there were no open positions in the paint shop.  Id. ¶¶ 18–19.  In October 2009, Adams resigned.[1]  L.R. 56(a)(1) ¶ 13.

## III.   STANDARD OF REVIEW

A motion for summary judgment "may properly be granted . . . only where there is no genuine issue of material fact to be tried, and the facts as to which there is no such issue warrant judgment for the moving party as a matter of law."  In re Dana Corp., 574 F.3d 129, 151 (2d Cir. 2009).  Thus, the role of a district court in considering such a motion "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists."  Id.  In making this determination, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought.  See Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 274 (2d Cir. 2009).

"[T]he moving party bears the burden of showing that he or she is entitled to summary judgment."  United Transp. Union v. Nat'l R.R. Passenger Corp., 588 F.3d 805, 809 (2d Cir. 2009).  Once the moving party has satisfied that burden, in order to defeat the motion, "the party opposing summary judgment . . . must set forth 'specific facts' demonstrating that there is 'a genuine issue for trial.'"  Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009) (quoting Fed. R. Civ. P. 56(e)).  "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor."  Beyer v. Cnty. of Nassau, 524

---

[1] Adams testified that he resigned from Festival Fun Parks.  Deposition Transcript of Andrew Adams, Jan. 20, 2012, Ex. 2 to Def.'s Mot. Summ. J. (Doc. No. 30-2) ("Adams Tr.") at 90:2–5, 92:4–15.  However, Adams also claims that he was constructively terminated.  See L.R. 56(a)(2) ¶¶ 21–24.  Adams' claim of constructive discharge is addressed, infra, at Part IV.B.2.i.

F.3d 160, 163 (2d Cir. 2008) (quoting <u>Guilbert v. Gardner</u>, 480 F.3d 140, 145 (2d Cir. 2007)); <u>see also</u> <u>Havey v. Homebound Mortg., Inc.</u>, 547 F.3d 158, 163 (2d Cir. 2008) (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 252 (1986)) (stating that a non-moving party must point to more than a mere "scintilla" of evidence in order to defeat a motion for summary judgment).

## IV.   DISCUSSION

Festival Fun Parks argues that it is entitled to summary judgment regarding all of Adams' claims because Adams has failed to establish a <u>prima</u> <u>facie</u> case of disability discrimination, sexual harassment, gender discrimination, or retaliation; or alternatively, because Adams cannot show that Festival Fun Parks' constructive discharge, or failure to transfer him to another shop, was pretextual or done with discriminatory intent.

### A. <u>Disability Discrimination Claims</u>

Counts 1 and 2 claim that Festival Fun Parks discriminated against Adams on the basis of his disability in violation of the ADA and the CFEPA.

#### 1.   Americans With Disabilities Act

The ADA provides that, "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  "Claims alleging disability discrimination in violation of the ADA are subject to the burden-shifting analysis originally established by the Supreme Court in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)."  <u>McBride v. BIC Consumer Products Mfg. Co., Inc.,</u> 583 F.3d 92, 96 (2d Cir. 2009).  Under such

analysis, the "plaintiff must establish a prima facie case [of discrimination]; the employer must offer through the introduction of admissible evidence a legitimate non-discriminatory reason for the discharge; and the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext." Sista v. CDC Ixix N.A., Inc., 445 F.3d 161, 169 (2d Cir. 2006) (citing Heyman v. Queens Vill. Comm. for Mental Health for Jamaica Cmty. Adolescent Program, 198 F.3d 68, 72 (2d Cir.1999)).

Festival Fun Parks argues that Adams has failed to establish a prima facie case of disability discrimination.  To establish such a case, Adams must show four elements: "(1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability." Giordano v. City of New York, 274 F.3d 740, 747 (2d Cir. 2001).  Festival Fun Parks contests only the second and fourth elements.

i.      Whether Adams was disabled within the meaning of the ADA.  Adams may show that he is disabled in one of three ways:  (1) he suffers a physical or mental impairment that "substantially limits" one or more of his "major life activities"; (2) he shows a record of such impairment; or (3) he is "regarded" as having such an impairment.[2] See 42 U.S.C. § 12102.

Adams claims that he suffers from mental retardation.  See Compl. (Doc. No. 1) ¶ 7.  He testified in his deposition that he is a "slow learner" and has to "constantly go at a slower pace" to pick things up.  Deposition Transcript of Andrew Adams, Jan. 20,

---

[2] Adams does not appear to allege that he has a record of a disability.  See generally Am. Compl. (Doc. No. 16).

2012, Ex. 2 to Def.'s Mot. Summ. J. (Doc. No. 30-2) ("Adams Tr.") at 105:12–14.[3]  He

also testified that he was diagnosed as having "slight mental retardation," although he

does not have any medical records of this diagnosis.  Id. at 112:2–13.  He also testified

that, when he was in fifth grade, he was assessed to be at a "third, fourth grade level of

reading."  Id. at 112:17–113:25.  As a basis for this testimony, Adams relies on an

unsworn summary of a diagnostic assessment conducted by Dr. Cynthis K. Niedbala in

January 1990.  This summary states that, at the time, Adams participated in a program

"designed to meet his needs as a student with mild Mental Retardation, and/or

Borderline abilities."  Ex. 4 to Pl.'s Obj. to Def.'s Mot. Summ. J. ("Niedbala Summary"),

at Bates No. P000162.

        The parties disagree as to whether the court may consider the Niedbala

Summary.  Generally, unsworn summary reports are inadmissible as hearsay and may

not be considered on summary judgment.  See, e.g., Fall v. New York State United

Teachers, 289 Fed. Appx. 419, 421 n.3 (2d Cir. 2008) (finding that unsworn audiologist

reports "constitute inadmissible hearsay"); Weltz v. City of New York, No. 99 Civ. 3932,

2004 WL 1907309, *5 (S.D.N.Y. Aug. 25, 2004) (finding that unsworn doctor's letters

were inadmissible as hearsay and could not properly be considered at summary

judgment).  However, Adams argues that the Niedbala Summary is admissible because

Festival Fun Parks waived any objections to its admissibility when it submitted the

document as an exhibit to its Local Rule 56(a)(1) Statement and "relied upon" the

document in its Motion for Summary Judgment.  Pl.'s Opp. Def.'s Mot. Summ. J. ("Pl.'s

Opp.") at 15 (citing Capobianco v. City of New York, 422 F.3d 47, 55 (2d Cir. 2005)).

---

[3] Exhibit 2 contains only excerpts of Adams' deposition.  Other portions of the same deposition transcript are excerpted in Adams' papers.  See  Pl.'s Opp., Ex. 2 (Doc. No. 36-4).  This court will not differentiate between the two excerpts, but will cite to "Adams Tr." whenever it cites to either exhibit.

The Capobianco case is inapposite.  There, the Second Circuit held that the district court improperly decided sua sponte to exclude, at summary judgment, two unsworn letters written by the plaintiff's doctor.  First, the Capobianco court noted that the defendants submitted both letters as exhibits to their Rule 56.1 Statement and then "cited . . . and relied on them in seeking summary judgment," and that "[n]either side objected to the admissibility of the reports."  Capobianco, 422 F.3d at 55.  Here, although Festival Fun Parks attached the Niedbala Summary to its Rule 56.1(a) Statement, see Ex. D-9 to Adams Tr., it did so to note that Adams produced the document in discovery, "[i]n support of his claim that he is disabled," and that Adams did not produce the actual assessment referenced in the Niedbala Summary.  L.R. 56(a)(1) ¶ 24.  Then, in its Motion for Summary Judgment, Festival Fun Parks argued that the summary was inadmissible hearsay.  Def.'s Mem. Mot. Summ. J. (Doc. No. 30-1) at 10– 11.  Accordingly, Festival Fun Parks attached the Niedbala Summary to its Local Rule 56(a)(1) Statement to argue why it should not be relied upon, and then, unlike in Capobianco, explicitly argued that the document was inadmissible.  Compare Capobianco, 422 F.3d at 55 (noting that "[n]either side objected to the admissibility of the reports"), with Def.'s Mem. Mot. Summ. J. at 10–11 (referencing Niedbala Summary, and arguing that it is hearsay that "cannot be considered for purposes of summary judgment").

Second, the Capobianco court held that the district court's sua sponte decision to exclude the unsworn letters prejudiced the plaintiff, because he "reasonably believed that he could rely" on documents initially submitted by and relied on by the defendants.  Again, because Festival Fun Parks did not rely on the Niedbala Summary, and in fact

argued against its inadmissibility, there is no similar concern here of detrimental reliance by Adams.  Further, on the same date it filed its Motion for Summary Judgment, Festival Fun Parks filed a Motion to Preclude the Testimony of Dr. Cynthia K. Niedbala, the purported author of the report underlying the Niedbala Summary.  See Doc. No. 29 (filed on March 15, 2012, the same date as the Motion for Summary Judgment).  In papers supporting that motion, Festival Fun Parks argued, among other things, that the assessment report was inadmissible because it was unsigned, and "a review of the report suggests that it was not even prepared by Dr. Niedbala."  Doc. No. 29-1, at 5.  This court subsequently granted Festival Fun Park's Motion to Preclude, noting that Adams had failed to object.  See Doc. No. 39 (granting Doc. No. 29 "absent objection").

Finally, in Capobianco, the court noted that excluding the reports prejudiced the plaintiff because, had he known they would be excluded, he could have "obtained an affidavit easily" from someone who had "already been designated as an expert" and whose "expert report had previously been produced."  Capobianco, 422 F.3d at 55.  Here, Adams is not similarly prejudiced, particularly considering that Festival Fun Parks made a Motion to Preclude Niedbala's testimony.  Given all of the above, the court will not consider the Niedbala Summary on summary judgment.

Absent consideration of the summary, the remainder of Adams' evidence consists of his own testimony.  However, such self-serving testimony, without more, is insufficient to create a material issue of fact as to whether Adams is disabled within the meaning of the ADA.  See, e.g., Buotote v. Ill. Tool Works, Inc., 815 F. Supp. 2d 549, 558 (D. Conn. 2011) (granting summary judgment on plaintiff's disability claim under the ADA where he "provide[d] no evidence of his disability beyond his own testimony and a

disability rating"); Baerga v. Hosp. For Special Surgery, No. 97 Civ. 0230, 2003 WL 22251294, at *6 (S.D.N.Y. Sept. 30, 2003) ("Courts in the Second Circuit have consistently held that when a plaintiff fails to offer any medical evidence substantiating the specific limitations to which he claims he is subject due to his condition, he cannot established that he is disabled within the meaning of the ADA." (citations and internal quotation marks omitted)).

Moreover, even if this court were to credit Adams' testimony that he is a "slow learner" and must go at a "slower pace," such statements would not be sufficient to establish a prima facie case as to his being disabled under the ADA, because they constitute conclusory statements that do not show that Adams is substantially limited in his ability to perform a class or broad range of jobs.  See Littleton v. Wal-Mart Stores, Inc., 231 Fed. Appx. 874, 877 (11th Cir. 2007) ("The term substantially limits means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes . . . .  The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." (quotation marks and citations omitted)).  Adams has not testified, or come forward with other evidence, that he is substantially limited in his ability to perform a wide variety of tasks or jobs. Thus, there is no material issue of fact as to whether he is disabled within the meaning of the ADA.

ii.     Whether Adams was regarded as disabled within the meaning of the ADA.

Adams can also show that he is "disabled" under the meaning of the ADA by showing that Festival Fun Parks "regarded" him as suffering a mental impairment that

substantially limits one or more of his major life activities.[4]  See 42 U.S.C. § 12102.  To

succeed on the "regarded as" prong under the ADA, Adams cannot merely show that

Festival Fun Parks regarded him as "somehow disabled"; he must show that Festival

Fun Parks regarded him as disabled within the meaning of the ADA, i.e., as "having an

impairment that substantially limits a major life activity."  Capobianco, 422 F.3d at 57

(internal quotation marks and citations omitted); Piascyk v. City of New Haven, 64 F.

Supp. 2d 19, 32 (D. Conn. 1999) (noting that an employer's mere awareness that an

employee is impaired is insufficient to meet the "regarded as" standard, as the

employee "must show that defendants perceived his impairment as substantially limiting

the exercise of a major life activity" (internal quotation marks and citations omitted)).

        Adams has not provided evidence from which a reasonable jury could find that

Festival Fun Parks regarded him as disabled within the meaning of the ADA.  Adams

did testify that he told his supervisors that he had taken special education classes and

that he had a "hard time with remembering a lot of things."  Adams Tr. at 21:23–25.

However, even viewing this evidence in a light most favorable to Adams, it does not

show that his supervisors' awareness of his comments resulted in their perceiving him

as being disabled, much less substantially limited in his exercise of a major life activity.

Adams did not show them any medical reports assessing him as mentally disabled, and

there is no evidence that his soon-to-be supervisors responded to Adams' comments in

a way that evinced that they perceived him to be disabled.  In fact, after this

---

        [4] As a preliminary matter, Festival Fun Parks argues that Adams failed to plead that he was
regarded as disabled, and thus is precluded from relying on the "regarded as" prong to show he is
disabled.  Def.'s Mem. Mot. Summ. J. at 11.  Because Adams has not presented evidence creating a
material factual dispute as to whether Festival Fun Parks regarded him as being disabled, this court does
not need to reach that issue.

conversation occurred, Festival Fun Parks hired him as a full-time employee, and nothing in the record shows any reservations or restrictions related to this decision.

Nor does the evidence reasonably support a finding that anyone else at Festival Fun Parks was aware of Adams' alleged mental disability.  Adams argues that his testimony that his co-workers would "call him stupid," and ask him what was wrong with him, evince a belief that he was "impaired and not smart enough to do the job."  Pl.'s Opp. at 16.  However, a reasonable jury could not find that calling someone "stupid," without anything more, was evidence that the speaker perceived that person to be mentally impaired so as to substantially limit that person's exercise of a major life activity.  Moreover, there is no evidence in the record that Adams told his co-workers that he suffered from a mental disability, or that they somehow knew this fact.

Because the record does not create a material factual dispute as to whether Adams was disabled under the ADA, this court does not need to determine whether Adams was terminated because of his alleged disability.  Adams has failed to establish a prima facie case of disability discrimination under the ADA, and the court grants summary judgment as to Count 1.[5]

2.  Connecticut Fair Employment Practices Act

Discrimination claims brought under the CFEPA are construed similarly to claims brought under the ADA.  See Worster v. Carlson Wagon Lit Travel, Inc., 353 F. Supp. 2d 257, 267 (D. Conn. 2005) ("Connecticut courts review[ ] federal precedent concerning employment discrimination for guidance in enforcing the CFEPA.").  Indeed,

---

[5] Even assuming arguendo that Adams were disabled under the meaning of the ADA, summary judgment would still be appropriate, because Adams failed to show that he suffered an adverse employment action because of his alleged disability.  See infra, Part IV.C.2 (ruling that Adams failed to prove adverse employment action regarding gender discrimination claim).

"Connecticut courts generally analyze ADA and CFEPA claims under the same standard."  Buck v. AT&T Servs., Inc., No. 08 Civ. 1619, 2010 WL 2640045, *1 n.1 (D. Conn. June 28, 2010).  Notably, the definition of "disability" is broader under the CFEPA than it is under the ADA, as the CFEPA does not require that a disability "substantially limit a major life activity."  Buotote, 815 F. Supp. 2d at 556.  However, "[a]lthough the CFEPA applies more broadly than the ADA, the evidentiary standards for the two statutes are the same, and they are therefore often examined in conjunction.  Thus, although the CFEPA has no 'substantial limitation' requirement, the need for corroborating evidence of disability under the ADA is also required under the CFEPA." Id. at 557 n.10 (internal citations omitted).

This court has determined that Adams presented insufficient evidence to corroborate his claims that he was mentally disabled.  See supra, Part IV.A.1.i; see also Buotote, 815 F. Supp. 2d at 558 (granting summary judgment on CFEPA claim where plaintiff's evidence consisted only of "his own testimony and a disability rating that lacks context or other helpful guidance").  Accordingly, this court also grants summary judgment as to Adams' claim of disability discrimination under the CFEPA.

B.  Sexual Harassment/Hostile Work Environment Claims

In Counts 5 and 6, Adams brings hostile work environment sexual harassment claims in violation of Title VII and the CFEPA.  "Title VII prohibits discrimination against any individual with respect to his or her compensation, terms, conditions, or privileges of employment, because of, inter alia, such individual's sex."  Kaytor v. Electric Boat Corp., 609 F.3d 537, 546 (2d Cir. 2010) (internal quotation marks and alterations omitted) (quoting 42 U.S.C. § 2000-2(a)(1)).  Additionally, under the CFEPA, an employer may

12

not "discriminate against [any] individual in compensation or in terms, conditions or privileges of employment because of the individual's . . . sex . . . ."  Conn. Gen. Stat. § 46a-60(a)(1).  As with Adams' disability discrimination claims, these claims are both analyzed under the burden-shifting analysis found in McDonnell Douglas.  See Jamilik v. Yale Univ., 362 Fed. Appx. 148, 150, 151 n.3 (2d Cir. 2009) (applying McDonnell Douglas analysis to Title VII sex discrimination claim, and noting that "CFEPA claims are governed by the same standards applicable to Title VII claims"); Hall v. Family Care Home Visiting Nurse and Home Care Agency, LLC, 696 F. Supp. 2d 190, 198 (D. Conn. 2010) (analyzing Title VII and CFEPA sex discrimination claims under McDonnell Douglas analysis).

    1.  Sufficiently Severe Discrimination

To establish a prima facie hostile work environment claim under Title VII and CFEPA, Adams must show the following:  "(1) that the workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of [Adams'] work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to [Festival Fun Parks]." Carter v. New Venture Gear, Inc., 310 Fed. Appx. 454, 457–58 (2d Cir. 2009) (quoting Mack v. Otis Elevator Co., 326 F.3d 116, 122 (2d Cir. 2003)); Lamphear v. Potter, No. 09-1640, 2012 WL 3043108, *7 (D. Conn. July 25, 2012) (citing Carter).  When determining whether an employer's conduct was "sufficiently severe," courts must consider the "totality of the circumstances" and examine "the nature of the workplace environment as a whole," including the following factors:  the frequency and severity of the alleged discriminatory conduct; whether the conduct is physically threatening or

humiliating as opposed to a mere offensive utterance; and whether the conduct unreasonably interferes with an employee's work performance.  Kaytor v. Electric Boat Corp., 609 F.3d 537, 547 (2d Cir. 2010) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993), and Cruz v. Coach Stores, Inc., 202 F.3d 560, 567 (2d Cir. 2000)). Moreover, courts must use "both an objective and a subjective standard . . . to prove the existence of a hostile work environment violative of Title VII."  Id.

Adams must also establish that the abuse in question was based on his gender. Id. (citing Raniola v. Bratton, 243 F.3d 610, 621 (2d Cir. 2001)).  However, the court may consider "facially neutral incidents . . . so long as a reasonable fact-finder could conclude that they were, in fact, based on sex."  Alfano v. Costello, 294 F.3d 365, 378 (2d Cir. 2002)).  For example, "[c]ircumstantial evidence that facially sex-neutral incidents were part of a pattern of discrimination on the basis of gender may consist of evidence that the same individual engaged in multiple acts of harassment, some overtly sexual and some not."  Kaytor, 609 F.3d at 547–48 (quoting Alfano, 294 F.3d at 375).

The Amended Complaint alleges that Adams was "repeatedly subjected to sexual harassment by his co-worker," and that such harassment was "repetitious and continuous" and "based upon his gender and was sexual in nature."  Am. Compl. ¶¶ 62. 64, 68, 70.  Adams also claims in his Affidavit that he was subjected to constant harassment by his co-worker Justin Walters, which caused him embarrassment and nightmares.  Aff. of Andrew Adams, Ex. 2 to Opp. Mot. Summ. J. (Doc. No. 36-4) ("Adams Aff.") ¶¶ 27–28; Adams Tr. at 129:15–16 (claiming he was "picked on . . .

constantly and bullied").  Adams identifies the following specific incidents of harassment:[6]

(1) February 2009:  co-worker Walters told Adams to "get down on your knees[;] that's your best [s]pot for you."

(2) June 2, 2009:  someone wrote on Adams' lock box, next to his name, "SUCKS."

(3) June 2009 and August 2009:  Walters asked Adams, on the company's two-way radio, whether Adams had moved Walters' equipment.  Adams alleges that this statement constituted harassment because Walters "just wanted ever[y]one in the park to hear [Walters] talk to [him] over the 2 way radio."

(4) July 8, 2009:  Adams complained to Abela about Walters' behavior.  Abela told Adams that Walters just liked to play jokes on him, and that Adams should try to get along with him.[7]

(5) September 2009:  While Adams was outside his truck, Walters threw an apple on the side of Adams' truck.

(6) October 2009:  Fitch spoke to Adams about forgetting to do something while checking one of the rides.  The next day, Walters asked Adams, "[W]hat the heck is wrong with you[?]," told another worker, "[Y]ou better check your ride out real good," and laughed.

---

[6] In his log, Adams indicates that other instances of harassment occurred.  See Adams Log ("I never went by the day because it will be a 25 to 30 page log so I just kept it brief for you to have."). However, there is no indication in the record that these other incidents constituted sexual harassment. For example, Adams testified that some of these incidents involved Walters calling him names like "Stupid," Adams Tr. at 39:15–23, which no reasonable factfinder would consider to be sexual in nature.

[7] This does not appear to constitute an independent incident of alleged harassment.

<u>See</u> Adams Log.  In his deposition, Adams identified three possibly additional incidents:

(1) Walters calling him "stupid, or what the heck is the matter with you";[8] (2) "[Walters]

constantly staring me down, when I'm down on my knees working on my rides"; and (3)

"just throwing things at me."[9]  Adams Tr. at 97:2–15.[10]  Additionally, in Adams' Affidavit,

he adds that, when Walters told Adams to get down on his knees in 2009, he also said

that this was because Adams likes men.  Adams Aff. ¶ 10.[11]

Adams has failed to meet the <u>prima</u> <u>facie</u> case to establish that a hostile work

environment existed under Title VII.  First, a reasonable factfinder could not conclude

that the work environment was objectively hostile under Title VII/CFEPA.  Only two of

the specific incidents could reasonably be construed to be sexual in nature:  Walters'

February 2009 comment about Adams being "on his knees," and Adams' testimony that

---

[8] It is unclear whether this is the same incident as the October 2009 incident referenced in Adams' Log, but a reasonable juror could conclude that this was a separate incident.

[9] Despite this testimony, Adams testified elsewhere in his deposition that Walters only threw something at him once.  Adams Tr. at 40:13–15 ("Q:  So [there was] only one time that [Walters] threw something at you?  A:  Yeah.").  However, a reasonable juror could conclude that this throwing incident was a different one than the September 2009 incident referenced in Adams' Log.

[10] In his Affidavit, Adams also testifies that Walters told him that he had "had [Adams'] mother last night and that she was good."  Adams Aff. ¶ 19.  However, Adams did not mention this incident during his deposition.  Further, he testified that the incidents he did mention were the only examples of gender discrimination against him.  <u>See</u> Adams Tr. at 93:11–13 ("Q:  Is there anything, other than [Walters' comment about Adams being on his knees], that you feel is an example of you being treated differently because of your sex or gender?  A:  No."), 17–20 ("Q:  Other than the one comment about on your knees that Justin Walters made, are there any other times you felt you were being discriminated against at Lake Compounce?  A:  No, just that time when he said that to me.").  This court does not credit the portions of Adams' subsequent Affidavit that discuss additional incidents and contradict his prior sworn testimony.  <u>See</u> <u>Trans-Orient Marine Corp. v. Star Trad. & Marine, Inc.</u>, 925 F.2d 566, 572–73  (2d Cir. 1991) ("The rule is well-settled in this circuit that a party may not, in order to defeat a summary judgment motion, create a material issue of fact by submitting an affidavit disputing his own prior sworn testimony.") (citing cases).

[11] Adams also states in his Affidavit that he told Fitch about Walters' comment.  Adams Aff. ¶ 10.  However, this testimony contradicts Adams' earlier deposition testimony, where he testified that when he spoke to Fitch, he only discussed the general issue of being picked on and did not cite any specific incidents.  Adams Tr. at 62:1–11; <u>see</u> <u>supra</u>, n.10.

Walters would stare him down while he worked on his knees.[12]  Even assuming the sexual nature of those incidents, they cannot reasonably be construed to constitute circumstantial evidence that the other "facially sex-neutral incidents were a pattern of discrimination on the basis of gender."  Kaytor, 609 F.3d at 547–48 (quoting Alfano, 294 F.3d at 375); see also Petrosino v. Bell Atl., 385 F.3d 210, 223 (2d Cir. 2004) ("Simple teasing, offhand comments, or isolated incidents of offensive conduct (unless extremely serious) will not support a claim of discriminatory harassment.").  Even if Adams subjectively felt that his work environment was hostile, a reasonable person in his position would not find that these isolated incidents created a workplace "permeated" with discriminatory intimidation that was based on his gender and so "sufficiently severe or pervasive" so as to alter the conditions of his working environment.

Second, the evidence in the record does not support Adams' contention that any discrimination, even if it occurred, was based on his gender.  In other words, even if it were established that Walter mistreated Adams, it would not necessarily follow that the mistreatment was based on sex.  Adams testified that he believed that Walters discriminated against him because "I don't have a girlfriend" and "[b]ecause I don't date girls, I don't go on dates."  Adams Tr. at 93:8–10, 95:13–16.  However, Adams does not provide evidence that Walters was aware of the dating habits of Adams or their other co-workers.  Nor is there evidence that Walters knew that Adams did not have a girlfriend.  Consequently, a reasonable juror could not conclude that Walters discriminated against Adams for the reasons Adams proffers if there is no evidence that Walters was aware of those facts.

---

[12] In fact, those comments are the only ones that Adams himself identified as being based on his sex or gender.  See supra, n.10.

### 2. Imputing Conduct to Employer

Even if the incidents in the record were sufficient to create a material issue of fact as to whether a hostile work environment existed, summary judgment would still be appropriate because the evidence before the court cannot support a finding that "a specific basis exists for imputing the conduct that created the hostile work environment" to Festival Fun Parks. Murray v. N.Y. Univ. College of Dentistry, 57 F.3d 243, 249 (2d Cir. 1995) (citations omitted); Martinsky v. City of Bridgeport, 814 F. Supp. 2d 130, 151 (D. Conn. 2011) (citing Murray). Here, Walter, Adams' coworker, is the one alleged to have engaged in discrimination against Adams. However, there is no indication in the record that Walters is Adams' supervisor. Nor is there any indication that Walters wielded supervisory authority delegated to him by Festival Fun Parks. See Murray, 57 F.3d at 249. Accordingly, Walters' conduct can be imputed to Festival Fun Parks only if Festival Fun Parks "either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it." Id. (quoting Kotcher v. Rosa & Sullivan Appliance Ctr., Inc., 957 F.2d 59, 63 (2d Cir. 1992). The record does not support either conclusion.

Adams testified that, sometime in 2008, he complained once to Fitch about the fact that Walters was picking on him, and that Fitch told him that he had told him before hiring him that others would pick on him and that he did not want Adams to complain to him every day. Adams Tr. at 61:3–62:21 (describing incident, and testifying that he "didn't make any other comments [to his supervisors] in 2008, other than the one to John Fitch"). However, Adams also testified that he did not state specifically to Fitch

that he thought he was being sexually harassed.[13]  Adams Tr. at 62:7–11 (testifying that

he told Fitch he was "being picked on and bullied" by Walters, but that he never used

the words "sexual harassment" or suggested the bullying was based on gender).  In

fact, Adams testified that, when he complained to Fitch, he did not cite any specific

incidents with Walters.[14]  Id. at 62:1–3.  In Rojas v. Roman Catholic Diocese of

Rochester, 660 F.3d 98 (2d Cir. 2011), a plaintiff brought a hostile work environment

claim against the Diocese of Rochester.  The evidence the district court considered

showed that she complained to the Diocese about a pastor "making my life miserable."

Id. at 103.  In affirming the district court's finding of summary judgment for the

defendants, the Second Circuit noted that the plaintiff's complaints to her supervisor

"related to the general friction between the two [employees] and made no reference to

sexual harassment," and that there was no evidence that the Diocese "knew or should

have known about the alleged sexual harassment."  Id. at 107.  Likewise, the fact that

Adams complained generally about being "picked on" by a co-worker is not evidence

that his supervisors were aware that he was claiming that he was being discriminatorily

treated based on his sex.[15]  See Andersen v. Rochester City Sch. Dist., 481 Fed. Appx.

628, 632 (2d Cir. 2012) (finding that a vague complaint to supervisors, which did not

request employer school district to "take any responsive action," could not have "put the

---

[13] Adams also testified that he never asked Walters to stop engaging in any of the alleged discrimination.  Adams Tr. at 97:16–23.

[14] Adams originally testified that, when he complained to Fitch in 2008, he complained specifically about Walters throwing an apple at his truck.  However, when he was notified that the alleged incident with the apple did not occur until 2009, he altered his testimony and stated that he did not discuss the incident regarding the apple.  Adams Tr. at 61:15–25.

[15] Adams appears to describe a separate incident in which someone had written "sucks" on his blowtorch.  According to Adams, he showed the blowtorch to Fitch, who shook his head and walked away.  Adams Tr. at 103:24–104:18.  However, as with the 2008 incident, there is no indication that Adams identified this to Fitch as an instance of sexual harassment.  In fact, there is no indication that Adams said or did anything at all, other than to show Fitch the blowtorch.  See id.

district on reasonable notice that [the plaintiff] was complaining of sex discrimination by co-workers in violation of Title VII" and provided "no basis . . . for concluding that . . . the district intentionally created an intolerable work atmosphere").

Adams also testified that the next time he complained to a supervisor was in the summer of 2009, when he complained to Abela, the "main supervisor," about Walter picking on him.  Adams Tr. at 17:14–15.  Abela told Adams that he would talk to Walters and "tell him to knock it off."  Id. at 103:3–6.  Adams further testifies that Abela went to Walters and asked him to stop, which he did.  Id. at 103:17–20 ("Q:  He [Abela] told [Walters] to knock it off?  A:  Yes.  Q:  And did [Walters] knock it off after that?  A: Yes."), 168:4–10.  Adams  In other words, not only was there an opportunity for Adams to raise complaints with his supervisors, and not only did his supervisor responded by taking action and telling Walters to stop, but Walters did in fact stop harassing Adams after being reprimanded.  Thus, far from creating a hostile work environment, at least one of Adams' supervisors acted to prevent one.

The record does not reasonably support the conclusion that Walters' conduct should be imputed to Festival Fun Parks.  According to Adams' own testimony, he complained once in 2008, but did not identify any specific incidents or state that he was complaining about sexual harassment.  Then, after complaining about an incident in 2009, his main supervisor acted on Adams' complaint.  Based on the evidence in the record, this court grants summary judgment as to Adams' hostile work environment claims.

C.  Gender Discrimination Claims

    1.  Prima Facie Case

Counts 3 and 4 claim that Festival Fun Parks discriminated against Adams on the basis of his gender in violation of the ADA and Title VII of the Civil Rights Act of 1964, as amended ("Title VII").  As with the previous four counts, these claims are subject to the McDonnell Douglas burden-shifting analysis.  See Dawson v. Bumble & Bumble, 398 F.3d 211, 217 (2d Cir. 2005) (applying McDonnell Douglas analysis to gender stereotyping claim under Title VII).  Thus, Adams must make the prima facie case that (1) he is a member of a protected class; (2) he was competent to perform the job or performed his duties satisfactorily; (3) he suffered an adverse employment decision or action; and (4) that adverse decision or action occurred under circumstances giving rise to an inference of discrimination based on his membership in the protected class.  See id.

Adams argues that he has a claim for gender discrimination under Title VII because Festival Fun Parks discriminated against him for failing to conform to gender stereotypes.  Gender stereotyping claims are cognizable under Title VII.  See Price Waterhouse v. Hopkins, 490 U.S. 228, 251 (1989).  "Generally speaking, one can fail to conform to gender stereotypes in two ways:  (1) through behavior or (2) through appearance."  Dawson, 398 F.3d at 221.  It is clear from the record that Adams' claim is based on behavior, not appearance.

In support of his gender stereotyping claim, Adams argues that he was "not seen to be masculine enough," and references the following incidents, which have already been discussed supra:  (1) when Adams was first hired in the machine shop, Fitch told

him that he might get picked on, but that he should "be a man" and "be tough";[16] (2) co-workers' comments about his being "on his knees" and that he "sucks" constituted "comments comparing him to feminine sexual stereotypes"; and (3) Adams believed he was harassed because he was unmarried and did not have a girlfriend, and "thus was perceived as not manly enough." See Pl.'s Opp. at 28.

In Price Waterhouse, the court found that a female plaintiff had a viable gender stereotyping claim where she was denied promotion based on her perceived tendency to act in a "masculine" manner and "overcompensate[ ] for being a woman" by acting in a "macho" fashion, and where it was suggested that she "walk more femininely, talk more femininely, dress more femininely, wear make-up, have her hair styled, and wear jewelry." Price Waterhouse, 490 U.S. at 235.

This court does not decide whether the record in this case supports a similar finding. Even assuming arguendo that a reasonable juror could find that Adams was subject to gender stereotyping under Title VII, his claim would still fail. A reasonable factfinder could not conclude that Adams suffered an adverse employment action; nor could a reasonable factfinder conclude that such adverse action, if it occurred, was taken because Festival Fun Parks perceived that Adams failed to conform to gender stereotypes.

2.  Adverse Employment Action

Adams claims that Festival Fun Parks took two adverse employment actions against him: first, that Festival Fun Parks constructively discharged him by forcing him

---

[16] Adams suggests that Fitch's comment came in response to Adams' complaint about Walters harassing him, but in the portion of the deposition testimony he cites to, he testified that Fitch made the comment before Adams started working with Walters. Adams Tr. at 99:10–24 ("Q:  And this [comment] was [made] before you started working with Justin Walters?  A:  Before I even got hired to work in the shop.").

to resign based on the allegedly discriminatory conduct; and second, that Adams'
supervisor refused to transfer him to the paint shop.[17]

       i.      <u>Whether Adams was constructively discharged</u>.  Constructive discharge
occurs when "an employer, rather than directly discharging an individual, intentionally
creates an intolerable work atmosphere that forces an employee to quit voluntarily."
<u>Chertkova v. Conn. Gen. Life Ins. Co.</u>, 92 F.3d 81, 89 (2d Cir. 1996); <u>see</u> <u>Brittel v. Dep't
of Corr.</u>, 247 Conn. 148, 178 (1998) (using same definition).  "Case law generally
focuses on two parts of this standard:  the employer's intentional conduct and the
intolerable level of the work conditions."  <u>Petrosino</u>, 385 F.3d at 229.  The Second
Circuit has not determined definitively whether an employer must have acted with
<u>specific</u> intent to cause the plaintiff to resign.  <u>Id.</u> ("[T]his court has not expressly insisted
on proof of specific intent.").  However, a plaintiff must at least show that the employer's
actions were "deliberate and not merely negligent or ineffective."  <u>Id.</u> at 229–30
(quotation marks and alterations omitted) (quoting <u>Whidbee v. Garzarelli Food
Specialties, Inc.</u>, 223 F.3d 62, 74 (2d Cir. 2000)).  Regarding the second prong, the
question is whether working conditions were so intolerable that a reasonable person in
the employee's position felt compelled to resign.  <u>Id.</u> (internal citations omitted).

      Adams has failed to provide evidence sufficient to show there is a material issue
of fact as to whether was constructively discharged.  First, a reasonable juror could not
find that the working conditions at Festival Fun Parks were "so difficult or unpleasant

---

[17] Adams appears to argue, at times, that he did not resign, but was terminated.  <u>See, e.g.</u>, Pl.'s
Opp. at 8; Adams Aff. ¶¶ 21, 23 (claiming that "I did not ever give a verbal or written resignation" and "I
had never resigned").  However, these statements contradict his sworn deposition testimony.  <u>See, e.g.</u>,
Adams Tr. at 15:4–13 (testifying to written and oral resignation), 89:24–90:5 (testifying that he resigned
and that no one told him he was terminated), 91:11–92:17 (changing testimony, but reiterating that he
resigned and that no one told him he was terminated).  Thus, this court does not credit the portions of
Adams' subsequent Affidavit that contradict his prior sworn testimony.  <u>See</u> <u>Trans-Orient Marine Corp.</u>,
925 F.2d at 572–73 .

that a reasonable person in the employee's shoes would have felt compelled to resign."

Chertkova, 92 F.3d at 89.  This court has reviewed Adams' evidence of incidents of

harassment and discrimination, which consist of name-calling, instances where a co-

worker mentioned Adams being "on his knees" and stared at him, and instances where

that same co-worker threw things at Adams or at his truck.  See supra, at Part IV.B.2.

Adams' testimony, at most, supports a finding that Adams subjectively felt compelled to

resign.  But that is not enough.  See Petrosino, 385 F.3d at 230 (noting that the issue of

whether working conditions were intolerable "is assessed objectively by reference to a

reasonable person in the employee's position.").  No reasonable factfinder could

conclude that these incidents were "so difficult or unpleasant" that a reasonable person

would have felt compelled to quit.  Id.

    Second, even if the evidence were sufficient for a reasonable juror to find the

existence of an intolerable work environment, the record cannot reasonably support a

finding that Festival Fun Parks engaged in a "*deliberate* attempt to make [Adams']

working conditions intolerable."  Wilburn v. Fleet Fin. Grp., Inc., 170 F. Supp. 2d 219,

238–39 (D. Conn. 2001) (emphasis in original).  "[M]erely ineffective or even

incompetent handling of complaints does not rise to the level of deliberate action

required by Second Circuit precedent."  Id. at 238 (internal quotation marks and

alterations omitted) (quoting Whidbee, 233 F.3d at 74).  Here, Adams testified that he

told his supervisors that his co-worker was picking on him, but did not state that he

thought he was being subject to discrimination.  Adams Tr. at 62:7–11 (testifying that he

told Fitch he was "being picked on and bullied" by Walters, but that he never used the

words "sexual harassment" or suggest that it was harassment based on gender).

Moreover, as this court has already noted, after Adams complained to a supervisor about Walters, that supervisor went to Walters and asked him to stop, which he did.  Id. at 103:17–20 ("Q:  He [supervisor] told [Walters] to knock it off?  A:  Yes.  Q:  And did [Walters] knock it off after that?  A:  Yes.").  Far from attempting to create an intolerable work environment, at least one of Adams' supervisors attempted to handle Adams' complaints; and Adams concedes that this attempt was successful.  Even if those attempts were ultimately "ineffective or even incompetent," this would not be enough to show intent.  Wilburn, 170 F. Supp. 2d at 238.  Thus, a reasonable factfinder could not conclude that Festival Fun Parks acted intentionally to render Adams' working conditions intolerable.

      ii.      Whether the refusal to transfer Adams was an "adverse employment action."  Adams alleges that he requested to be transferred to the paint shop, but that Brick, the general manager, refused to transfer him.  A failure to transfer may constitute an adverse employment action if "the change in position would have resulted in a significant change in duties and could potentially lead to increased opportunities for advancement."  Belch v. Jefferson County, 108 F. Supp. 2d 143, 154 (N.D.N.Y. 2000).

      Here, the record cannot support a finding that Festival Fun Park's failure to transfer him to the paint shop constituted an adverse employment action, because the evidence does not create a material issue of fact as to whether an open position existed.  Adams did testify that an employee at the paint shop told him that the company would send people to the paint department to help with "prepping stuff," and that he believed there were open positions because "there was a lot of things that had to get done that year."  Adams Tr. at 84:15–19, 86:15–19.  However, even if this out-of-court

statement were admissible, it would serve as evidence that workers, who were presumably employed in another part of the shop, helped out at the paint shop. It would not be evidence that a full-time, or even part-time, opening existed when Adams requested a transfer. Moreover, Adams' belief is not corroborated by the evidence. Adams testified that, when he requested the transfer, he was unaware of any open positions in that department, no one had told him that any open positions existed, and he was told that no open positions existed. See Adams Tr. at 84:13–15 (testifying that he had not "seen any positions in the paint department posted anywhere"), 86:12–14 (testifying that no one told him that "there was an open position" in the paint department), 84:3–12 (testifying that Brick told him that there were no open positions in the paint department). Brick also provided an Affidavit stating that no open positions existed in the paint shop when Adams left the company and that no positions were subsequently opened or created since then. Aff. of Gerard Brick, dated March 13, 2012, Ex. 3 to Def.'s Mem. Mot. Summ. J. (Doc. No. 34–1) at ¶¶ 4–6; L.R. 56(a)1 at 17–19. Festival Fun Parks was under no obligation to create a position for Adams simply because he requested a transfer. For these reasons, a factfinder could not reasonably find that the failure to transfer him to the paint department constituted an "adverse employment action" under Title VII.

   D. Retaliation Claims

   Finally, Counts 7 and 8 claim that Festival Fun Parks retaliated against Adams in response to his complaints of harassment and discrimination, in violation of the CFEPA and Title VII. "In adjudicating retaliation claims, courts follow the familiar burden-shifting approach of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05, 93 S.Ct. 1817,

36 L.Ed.2d 668 (1973)." Kaytor, 609 F.3d at 552 (citing Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005)).

Under the CFEPA and Title VII, a plaintiff must establish a prima facie retaliation claim by showing: (1) the plaintiff was engaged in protected activity; (2) the alleged retaliator knew that the plaintiff was involved in such activity; (3) an adverse decision or action was taken against the plaintiff; and (4) a causal connection exists between the protected activity and the adverse action. See Weixel v. Board of Educ. of the City of N.Y., 287 F.3d 138, 148–49 (2d Cir. 2002) (ADA); Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002) (Title VII).

Festival Fun Parks does not contest either of the first two prongs. Indeed, a reasonable factfinder could conclude that Adams had a "good faith, reasonable belief that he was opposing an employment practice made unlawful by Title VII or the ADEA." Kessler v. Westchester County Dept. of Social Servs., 461 F.3d 199, 210 (2d Cir. 2006) (quotation marks and alterations omitted) (citing McMenemy v. City of Rochester, 241 F.3d 279, 285 (2d Cir. 2001)). However, for the reasons described supra, the record cannot reasonably support a conclusion that any adverse employment action was taken against Adams. See supra, at Part IV.C.2.i (Adams testified that he did not tell his supervisors that he was subjected to sexual harassment), IV.A.1.ii (evidence does not support a finding that Festival Fun Parks regarded Adams as disabled).

Even if Adams were able to show that Festival Fun Parks took an adverse employment action against him, he "has not proved that defendant's conduct with respect to such alleged adverse action was pretextual for retaliation." Mirabillo v. Regional Sch. Dist. 16, No. 10-cv-1117, 2012 WL 4754689, *5 (D. Conn. Oct. 4, 2012).

27

Adams claims in his Affidavit that Brick lied about the lack of open positions in the paint shop.  Adams Aff. ¶ 20 (stating that "the paint shop had a lot of work to be done," that people would sometimes "go over to the paint shop to help out," and that he believes that after his termination, "some people" from the main shop worked in the paint shop).  However, these assertions are belied by Adams' prior deposition testimony, in which he testified that he was unaware of any openings in the paint shop and that no one told him that any such openings existed.  See Adams Tr. at 84:13–15 (testifying that he had not "seen any positions in the paint department posted anywhere"), 86:12–14 (testifying that no one told him that "there was an open position" in the paint department), 84:3–12 (testifying that Brick told him that there were no open positions in the paint department).  Thus, no material issue of fact has been created concerning Brick's reason for not transferring Adams to the paint department—that no such open positions existed at the time of the request.  Nor is there any evidence in the record "that discrimination was the real reason" for the failure to transfer him.  St. Mary's Honor Ctr. V. Hicks, 509 U.S. 502, 533 (1993).  The court concludes that Adams has failed to show a material issue of fact concerning Adams' retaliation claims.

**V.      CONCLUSION**

For the foregoing reasons, Festival Fun Parks' Motion for Summary Judgment

(Doc. No. 30) is **GRANTED**.  Summary judgment is entered in favor of Festival Fun

Parks on all Counts.

**SO ORDERED.**

Dated at New Haven, Connecticut this 12th day of March, 2013.

/s/ Janet C. Hall
Janet C. Hall
United States District Judge